## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

DAVID FRANKLIN COTNEY    )
                    )
      Defendant/Movant,    )
                    )
   v.                 )   **CASE NO. 3:07-CV-0046-WHA-CSC**
                    )   **(Cr. No. 3:03-CR-0078-WHA)**
UNITED STATES OF AMERICA, )
                    )
      Respondent.      )

### UNITED STATES' RESPONSE TO § 2255 MOTION

COMES NOW the United States of America, by and through its attorney, Leura G. Canary, United States Attorney, and, in compliance with this Court's order, responds to Defendant/Movant David Franklin Cotney's ("Cotney's") Motion Under § 2255 to Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody, as follows:

### I.  PROCEDURAL HISTORY AND RELEVANT FACTS

1.  On April 2, 2003, a federal grand jury indicted Cotney for conspiring to manufacture 50 grams or more of methamphetamine and for using a firearm in furtherance of that conspiracy, all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 924(c)(1).  Exh. 1 (attached, indictment).  On May 28, 2003, Cotney pled guilty to both counts of the indictment,

pursuant to a plea agreement reached in this case. Exh. 2, 3 (attached, plea agreement, transcript of change of plea hearing). On October 15, 2003, this Court sentenced Cotney to a term of imprisonment of 342 months, which took into account a 3-level downward departure, filed for by the United States, in recognition of Cotney's substantial assistance to the United States. Exh. 4, 5 (attached, judgment, transcript of sentencing hearing).

2.     Cotney appealed the sentence imposed in his case, which the Court of Appeals for the Eleventh Circuit affirmed. United States v. Cotney, 120 Fed. Appx. 785 (Table) (11th Cir. 2004) (Exh. 6, attached). On remand from the United States Supreme Court, in light of United States v. Booker, 543 U.S. 220 (2005), the Eleventh Circuit reaffirmed Cotney's sentence because he failed to assert error based on Apprendi v. New Jersey, 530 U.S. 466 (2000), or its progeny, in his initial brief on appeal. United States v. Cotney, 143 Fed. Appx. 290 (11th Cir. 2005) (Exh. 7, attached). The Eleventh Circuit issued its mandate in this case on October 11, 2005. Exh. 8 (attached, judgment). On January 9, 2006, the United States Supreme Court denied Cotney's petition for a writ of certiorari. Cotney v. United States, __ U.S. __, 126 S.Ct. 1119 (2006).

3.  On January 9, 2007,[1] Cotney timely[2] filed this Motion to Vacate, Set Aside or Correct Sentence.  On January 17, 2007, this Court entered an order directing the United States to respond within thirty days.

## II.  CLAIMS RAISED IN THE § 2255 MOTION

4.  In his § 2255 motion, Cotney appears to claim the following:

a.  that he was denied the effective assistance of counsel because this Court awarded him a 3-level downward departure for substantial assistance to the Government, although, he claims, a downward departure of 25-50 percent is customary;

b.  that his rights to due process and effective assistance of counsel were violated when he was convicted and sentenced for "conspiracy 'to manufacture 50 grams or more of methamphetamine,' when he was, in fact, guilty only of a lesser included offense under 21 U.S.C. § 841(b)(1)(B);"

c.  that his "rights to due process and proof beyond a reasonable doubt with

---

[1] In its order requiring a Government response to Cotney's motion, this Court determined the correct filing date to be January 9, 2007.  (Doc. # 2).

[2] Cotney had one year from the denial of his petition for a writ of certiorari to file the instant motion.  28 U.S.C. § 2255, ¶ 6, <u>Barnes v. United States</u>, 437 F.3d 1074, 1077 (11th Cir. 2006), <u>quoting</u> <u>Jones v. United States</u>, 304 F.3d 1035, 1037 (11th Cir. 2002).  Cotney appears to have complied with this deadline.

3

respect to the quantity of methamphetamine for which he was sentenced were violated when the sentencing judge, utiliz[ed]...U.S.S.G. § 2D1.11 rather than U.S.S.G. § 2D1.1;"

d.  that he was deprived of due process and effective assistance of counsel when this Court included an enhancement for obstruction of justice in the sentence it imposed on Cotney;

e.  that he was deprived of due process and effective assistance of counsel when this Court included an enhancement for an aggravating role in the offense in the sentence it imposed on Cotney; and,

f.  that the Government breached the plea agreement in Cotney's case when the court sentenced him to ten years imprisonment on Count 2 (firearms charge), and his trial counsel was ineffective for not objecting to that sentence.

### III.  RESPONSE TO CLAIMS FOR RELIEF

5.  <u>Ineffective Assistance of Counsel</u>.  Each of Cotney's claims challenges his counsels' effectiveness in some form or fashion.  To succeed on a claim of ineffective assistance of counsel, Cotney must prove both that his counsels' performance was deficient and that the deficient performance prejudiced his case.  <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984); <u>see</u> <u>also</u>, <u>Bell v. Cone</u>, 535 U.S. 685, 697-98

(2002) (reaffirming the <u>Strickland</u> standard for reviewing ineffective assistance of counsel claims); <u>Caderno v. United States</u>, 256 F.3d 1213, 1217 (11th Cir. 2001) (applying two-part <u>Strickland</u> test). More specifically, Cotney must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that his counsels' alleged errors or omissions resulted in prejudice to him to such an extent that, without counsels' alleged errors or omissions, there is a reasonable probability that the outcome of the proceeding would have been different. <u>Yordan v. Dugger</u>, 909 F.2d 474, 477 (11th Cir. 1990).

6. In analyzing counsels' performance under the performance prong of <u>Strickland</u>, conduct of counsel must be presumed to be reasonable. <u>Yordan</u>, 909 F.2d at 477. A "[d]efendant must prove deficient performance by a preponderance of competent evidence, and the standard is 'reasonableness under prevailing professional norms.'" <u>Gallo-Chamorro v. United States</u>, 233 F.3d 1298, 1303-04 (11th Cir. 2000) (footnotes omitted). The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
> The test has nothing to do with what the best lawyers would have done.

> Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.
>
> . . . Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take....

Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted).

7.    A defendant's burden in demonstrating that his counsel's deficient performance prejudiced his case is "high;" it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. Robinson v. Moore, 300 F.3d 1320, 1343-44 (11th Cir. 2002). To succeed on the ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.

8.    "It is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." Bottoson v. Moore, 234 F.3d 526, 532 (11th Cir. 2000); accord, Robinson, 300 F.3d at 1343. In raising ineffective assistance of counsel, Cotney has failed to plead facts sufficient to demonstrate that he was prejudiced by any of counsels' actions. For that reason,

his § 2255 motion should be summarily dismissed.  The United States responds to Cotney's ineffective assistance of counsel claims as follows:

a. <u>Claim 1</u>.  Cotney makes the bald assertion, without supporting facts, that it is customary for a defendant to receive a 25-50 percent reduction in his sentence when a motion for a downward departure for substantial assistance is granted.  Cotney has presented no evidence that this Court was required to reduce his sentence by 25 to 50 percent.  In fact, this Court has complete discretion to determine the amount any sentence should be reduced when the Government moves for a downward departure based on a defendant's substantial assistance.  18 U.S.C. § 3553(e), U.S.S.G. § 5K1.1(a).  Cotney has not shown that had his counsel argued that a 25-50 percent reduction was customary, then this Court would have been bound to reduce his sentence by that amount.  Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced him.

b. <u>Claim 2</u>.  Cotney's claim regarding drug quantity is without merit.  First, Cotney himself admitted that it was his intent to produce the threshold statutory quantity of 50 grams of methamphetamine.  Exh. 3, at 11:1-9.  The statutory sentencing range that corresponds to a minimum quantity of 50 grams is from 10 years to life imprisonment.  21 U.S.C. § 841(b)(1)(A).  Cotney contends he should be

sentenced in accordance with 21 U.S.C. § 841(b)(1)(B), which corresponds to methamphetamine quantities between 5 and 50 grams; that sentencing range would be not less than 5 years, and not more than 40 years (or 480 months) imprisonment. Cotney's sentence in this matter was 324 months, which is within the range in which Cotney contends he was entitled to be sentenced.  Further, contrary to Cotney's contention, this Court did not apply the guidelines sentence which corresponds to actual drug amounts (2D1.1) but instead used the guidelines section which corresponds to precursor chemicals that Cotney actually possessed (2D1.11).  Exh. 5, at 173:10-174:7.  The resulting sentencing guidelines level (32) was lower than the Government's requested guidelines level (34).  Id. at 174:5-7.  And, it is clear that this Court considered the issue that Cotney now claims his lawyers failed to raise.  Id. 172:1-174:7.  Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced him.

c.  Claim 3.  The United States adopts the same argument as it made in response to Claim 2, paragraph 8(b), *supra*.  In addition, this Court employed the approved method that most "simply and directly [calculates] the base offense level" for drug offenses.  United States v. Blaylock, 275 F.3d 1030, 1031, cert. denied, 535 U.S. 1043 (2002).  Additionally, the United States reiterates that Cotney benefitted from this Court's calculation using § 2D1.11 (level 32) rather than using § 2D1.1

(level 34). <u>Id</u>, at 174:5-7. Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced him.

d. <u>Claim 4</u>. The Eleventh Circuit has previously ruled on this issue, finding that the facts in Cotney's case supported an enhancement for obstruction of justice. Exh. 6, at 4-5. Cotney's lawyers not only raised this issue on appeal, but they thoroughly cross-examined the witnesses who testified at the sentencing hearing about this issue. Exh. 5, at 73:3-82:1. Furthermore, Cotney himself was examined on the issue at length at the sentencing hearing, and his counsel argued the point at the conclusion of that hearing. <u>Id</u>., at 117:1-125:23, 147:4-13. Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced him.

e. <u>Claim 5</u>. The gist of Cotney's claim with regard to an aggravating role enhancement is that his lawyers failed to object to testimony on this point at the sentencing hearing on the grounds that such testimony violated the Confrontation Clause. <u>See</u> <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). Cotney's reliance on <u>Crawford</u> is misplaced. The Confrontation Clause affords a criminal defendant a ***trial*** right. <u>United States v. Cantellano</u>, 430 F.3d 1142, 1146 (11th Cir. 2005), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 126 S.Ct. 1604 (2006), quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39,

52 (1987). It "is not a sentencing right." Id. Thus, Crawford does not apply to non-capital sentencing hearings. Id. Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced him.

   f. Claim 6. Finally, Cotney's claim that the Government breached the plea agreement is without merit. Cotney claims, without any support, that the Government agreed not to argue that Cotney's discharge of the firearm that he possessed in this case warranted a 10 year sentence pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). The plea agreement reached in this case includes no such agreement. Exh. 2. The agreement was read to Cotney by his lawyers, and Cotney signed it. Exh. 2, Exh. 9, at 4 (attached, affidavit of Brenton Lawrence Dean, Esq.), Exh. 10, at 4 (attached, affidavit of Will O. Walton, III). Whether Cotney discharged the firearm is a sentencing factor, not requiring proof at trial or that it be set forth in the indictment. Harris v. United States, 536 U.S. 545, 556 (2002). Based on the discharge issue being a sentencing factor, contrary to Cotney's assertion, his lawyers reserved the right to argue this issue at sentencing. Exh. 9, at 4, Exh. 10, at 4. Finally, Cotney, himself, testified that he shot the shotgun he possessed in this case. Exh. 5, at 120:1-12, 123:4-125:22. Accordingly, Cotney has failed to meet his burden of establishing his counsel was deficient, or that any perceived deficiency prejudiced

him.

## IV.  A HEARING IS NOT NECESSARY IN THIS MATTER

Cotney has not pleaded facts or presented sufficient evidence or argument which, if true, show that he is entitled to an evidentiary hearing, and his claims for relief should be denied without an evidentiary hearing.  See Blacklidge v. Allison, 431 U.S. 63, 73-74 (1977); Tejada v. Dugger, 941 U.S. 1551, 1559 (11th Cir. 1991); United States v. Laetividal-Gonzalez, 939 F. 2d 1455, 1465 (11th Cir. 1991). Sufficient evidence, in the form of the attached Government exhibits, including affidavits from both of Cotney's lawyers, exists to rule upon the claims made by Cotney.  Should this Court determine that Cotney addressed in this response, the United States requests the opportunity to further respond to those arguments.

## V.  CONCLUSION

For the above reasons, Cotney has failed to demonstrate that he is entitled to any relief from this Court, thus, the United States respectfully requests his § 2255 motion be denied without an evidentiary hearing.

11

Respectfully submitted this 15th day of February, 2007.

> /s/ Todd A. Brown
> TODD A. BROWN
> Assistant United States Attorney
> Post Office Box 197
> Montgomery, Alabama 36101-0197
> (334) 223-7280
> (334) 223-7135 fax
> todd.brown@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **DAVID FRANKLIN COTNEY** | ) |
| | ) |
| **Defendant/Movant,** | ) |
| | ) |
| **v.** | ) **CASE NO. 3:07-CV-0046-WHA-CSC** |
| | ) **(Cr. No. 3:03-CR-0078-WHA)** |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2007, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system;  the undersigned placed a copy

of the Government's response in the United States mail, addressed as follows:

David Franklin Cotney, Jr.
11196-002
U.S. Penitentiary-Big Sandy
P.O. Box 2068
Inez, KY 41224.

Respectfully submitted,

/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
todd.brown@usdoj.gov

FILED

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

APR - 2 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO._____03-78-E_ |
| | ) | [21 USC 846, |
| DAVID FRANKLIN COTNEY, JR., | ) | 18 USC 924(c)(1)] |
| ALLEN LEE NELSON, | ) | |
| JONATHAN BOYD WELDON, and | ) | |
| JOHN GREGORY BONNER | ) | **INDICTMENT** |

The Grand Jury charges:

### COUNT 1

That from during the month of March, 2003, the exact dates being unknown to the

Grand Jury, in Chambers County, in the Middle District of Alabama, and elsewhere, the

defendants,

**DAVID FRANKLIN COTNEY, JR.,**
**ALLEN LEE NELSON,**
**JONATHAN BOYD WELDON, and**
**JOHN GREGORY BONNER**

did knowingly and intentionally combine, conspire, confederate, and agree together and

with persons both known and unknown to the Grand Jury to manufacture 50 grams or

more of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21,

United States Code, Section 841(a)(1), all in violation of Title 21, United States Code,

Section 846.

### COUNT 2

On or about the 24th day of March, 2003, in Chambers County, within the Middle

District of Alabama, the defendant,

**DAVID FRANKLIN COTNEY, JR.,**

1

GOVERNMENT
EXHIBIT
1

did unlawfully and knowingly use, carry, and possess a firearm, that is a Mossberg Model 500A 12-gauge pump shotgun Serial No. J743914, pistol grip, overall length 26 inches, sawed off barrel, loaded with #4 buckshot, a better description of which is unknown to the Grand Jury, during, in relation to, and in furtherance of the commission of the offense of conspiracy to manufacture methamphetamine, a Schedule II Controlled Substance, a drug trafficking crime prosecutable in a court of the United States, in violation of Title 18, United States Code, Section 924(c)(1).

<u>FORFEITURE ALLEGATION - WEAPON</u>

A.    Count 2 of this indictment is hereby repeated and incorporated herein by reference.

B.    Upon conviction for the violation of Title 18, United States Code, Section 924(c)(1), as alleged in Count 2 of this indictment, the defendant,

DAVID FRANKLIN COTNEY, JR.,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in the commission of this offense including but not limited to the following: a Mossberg Model 500A 12-gauge pump shotgun Serial No. J743914, pistol grip, overall length 26 inches, sawed off barrel, loaded with #4 buckshot.

C.    If the any of the property described in this forfeiture allegation, as a result of any act or omission of the defendants:

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred and sold to, and deposited with a third person;

2

(3)    has been placed beyond the jurisdiction of the court;

(4)    has been substantially diminished in value; or

(5)    has been commingled with other property which cannot be divided without difficulty; the court shall pursuant to Title 21, United States Code, Section 853 as incorporated by Title 28, United States Code, Section 2461(c), order the forfeiture of any other property of the defendant(s) up to the value of any property described in paragraph B above. All in violation of Title 18, United States Code, Section 924.

## Forfeiture Allegation – Property Used to Commit or Facilitate Commission of Drug Trafficking Offense

A.    Count 1 of this indictment is hereby repeated and incorporated herein by reference.

B.    Upon Conviction for violation of Title 21, United Stated Code, Section 841(a)(1) as alleged in Count 1 of this indictment, the defendant shall forfeit to the United States, pursuant to Title 21 United States Code, Section 853, any and all property constituting or derived from any proceeds the said defendants,

**DAVID FRANKLIN COTNEY, JR.,
ALLEN LEE NELSON,
JONATHAN BOYD WELDON, and
JOHN GREGORY BONNER,**

obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count 1 of this Indictment.

C.    Substitute Assets

If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

3

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 21, United States Code, Sections 841 and 853.

A TRUE BILL:

_____

Foreperson

_____

**LEURA GARRETT CANARY**
United States Attorney

_____

**JOHN T. HARMON**
Assistant United States Attorney

_____

**TODD A. BROWN**
Assistant United States Attorney

4

**FILED**

MAY 28 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　CR. NO. 03-0078-E
　　　　　　　　　　　　　　　　　)
DAVID FRANKLIN COTNEY, JR.　　)

## PLEA AGREEMENT

**DEFENSE COUNSEL:**　　　　　　**BRENT L. DEAN**

**ASSISTANT U.S. ATTORNEY:**　　**TODD A. BROWN**

### COUNT AND STATUTES CHARGED:

**Count 1**　　**21 U.S.C. § 846**
　　　　　　　**Conspiracy to Manufacture Methamphetamine (50 g or more)**

**Count 2**　　**18 U.S.C. § 924(c)**
　　　　　　　**Use, Carry, Possess Firearm in Furtherance of Drug Trafficking Crime**

### COUNTS PLEADING PURSUANT TO PLEA AGREEMENT:

**Count 1**　　**21 U.S.C. § 846**
　　　　　　　**Conspiracy to Manufacture Methamphetamine (50 g or more)**

**Count 2**　　**18 U.S.C. § 924(c)**
　　　　　　　**Use, Carry, Possess Firearm in Furtherance of Drug Trafficking Crime**

### PENALTIES BY COUNT - MAXIMUM PENALTY:

**Count 1**　　**21 U.S.C. § 846 (assuming no prior felony drug convictions)**

　　　　　　　**A term of imprisonment which may not be less than 10 years and no more than life, a fine not to exceed $4,000,000 or twice the gross loss to the victim or twice the gross gain to the defendant, whichever is greatest, or both fine and imprisonment; a term of supervised release of no less than 5 years; and an assessment fee of $100.00.**

1

GOVERNMENT
EXHIBIT
2

**Count 2**     **18 U.S.C. 924(c)**

> A term of imprisonment which may not be less than 5 years, consecutive to drug crime, a fine not to exceed $250,000 or twice the gross loss to the victim or twice the gross gain to the defendant, whichever is greatest, or both fine and imprisonment; a term of supervised release of no more than 3 years; and an assessment fee of $100.00.

## ELEMENTS OF THE OFFENSE(S):

**Count 1**

>    **First:**     That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment, to wit:  to manufacture 50 grams or more of methamphetamine; and

>    **Second:**     That the defendant, knowing the unlawful purpose of the plan, willfully joined in it.

**Count 2**

>    **First:**     That the defendant committed the drug trafficking offense of conspiracy to manufacture methamphetamine, as charged in the indictment;

>    **Second:**     That during and in relation to the commission of that offense the defendant used, carried, or possessed a firearm, as charged;

>    **Third:**     That the defendant used, carried, or possessed the firearm knowingly.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Todd A. Brown, Assistant United States Attorney, and Brent L. Dean, Esq., attorney for the defendant, pursuant to Rule 11(c)(1)(B), Federal Rules of Criminal Procedure, as Amended, have, with the authorization of the undersigned defendant, heretofore entered into discussions with a view towards reaching a pretrial conclusion of the charges pending in the Indictment herein and a Plea Agreement has been reached by said parties.

## GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the offense charged in Counts 1 and 2 of the Indictment, the attorney for the Government will do the following:

a. The Government will agree that a 3-level reduction in the applicable offense level pursuant to U.S.S.G. § 3E1.1 for the defendant's acceptance of responsibility is appropriate, so long as the defendant does not obstruct justice or otherwise fails to accept responsibility for the offense conduct.

b. If the defendant agrees to cooperate pursuant to the Cooperation Agreement contained in this Plea Agreement, the Government will debrief Defendant regarding information he may possess regarding federal and state criminal offenses. Should Defendant provide substantial assistance, the Government will evaluate the worth of the assistance and may recommend a downward departure pursuant to U.S.S.G. § 5K1.1. Evaluation of the defendant's assistance, and the filing of any reduction, is at the total discretion of the Government. If the defendant's cooperation is not completed before the time of sentencing, the Government would proceed with any further reduction pursuant to Rule 35, Fed. R. Crim. P.

2. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

3. The defendant agrees to the following:

a. To plead guilty to Counts 1 and 2 of the Indictment.

3

## FACTUAL BASIS

b. The defendant admits the allegations charged in Count 1 and understands that the nature of the charge to which the plea is offered involves proof as to Count 1, that during the month of March, 2003, in Chambers County, in the Middle District of Alabama, and elsewhere, the defendant and one or more of his codefendants did knowingly and intentionally combine, conspire, confederate, and agree together to manufacture 50 grams or more of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

The defendant further admits the allegations charged in Count 2 and understands that the nature of the charge to which the plea is offered involves proof as to Count 2, that on or about the 24th day of March 2003, in Chambers County, in the Middle District of Alabama, the defendant did knowingly and unlawfully use, carry, or possess a firearm, that is, a Mossberg Model 500A, 12-gauge pump shotgun, Serial No. J743914, pistol grip, overall length 26 inches, sawed off barrel, during and in relation to, and in furtherance of the commission of the offense of conspiracy to manufacture methamphetamine, a Schedule II controlled substance, a drug trafficking crime prosecutable in a court of the United States, in violation of Title 18, United States Code, Section 924(c).

## COOPERATION AGREEMENT

c. The defendant agrees to cooperate fully and testify truthfully against any and all persons as to whom the defendant may have knowledge at the grand jury, trial, or whenever called upon to do so, including individuals against which Defendant may have already provided grand jury testimony. The defendant understands that this agreement

4

does not require the defendant to implicate any other particular individual or individuals or to "make a case," rather it requires the defendant to be truthful and to testify truthfully whenever called upon. The defendant agrees to be available for the review of documents and other materials and for interviews by law enforcement officers and attorneys for the Government upon reasonable request and to fully and truthfully respond to all questions asked of the defendant by law enforcement officers and attorneys for the Government. The defendant agrees to fully and truthfully disclose to the Government everything the defendant knows about any and all documents and materials in the defendant's possession that relate to the violations charged in this Indictment and any other criminal violations in the Middle District of Alabama and elsewhere. The defendant agrees, if desired by the Government, to travel with agents outside the Middle District of Alabama to identify others involved in Defendant's narcotics organization, locations and/or residences of others involved, or any other information related to others involved in this narcotics trafficking activity. The defendant agrees to submit to a polygraph examination conducted by the Government if requested to do so.

Provided that the defendant satisfies the terms of this Plea Agreement, any information that the defendant truthfully discloses to the Government during the course of the defendant's cooperation, concerning related offenses, will not be used against the defendant, directly or indirectly. The defendant understands that this agreement does not bar the defendant's prosecution for capital felonies, perjury, false statements, and/or obstruction of justice.

If the defendant has failed or should fail in any way to fulfill completely the defendant's obligations under this agreement, then the Government will be released from its commitment to honor all of its obligations to the defendant, without the defendant being

5

allowed to withdraw the guilty plea. Thus, if at any time the defendant should knowingly and willfully withhold evidence from, or is found to have provided false information to, the Government investigators or attorneys prior to or during the defendant's testimony before grand juries or in trials, or fails to return to the Middle District of Alabama for any scheduled court appearance or any scheduled meeting with law enforcement agents in the Middle District of Alabama, then the Government will be free: (1) to prosecute the defendant for perjury, false declaration, false statement, and/or obstruction of justice (18 U.S.C. §§ 1621, 1623, 1001, 1503); (2) to prosecute the defendant for all violations of federal criminal law which the defendant has committed; (3) to use against the defendant in all of those prosecutions and sentencings the information and documents that the defendant has disclosed or furnished to the Government during the course of the defendant's cooperation; (4) to recommend a maximum sentence; and, (5) to seek forfeiture of any and all forfeitable properties of the defendant. The parties agree to submit to the court, to be decided by a preponderance of the evidence standard, the question of whether defendant has breached this agreement.

### DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

4. The defendant, before entering a plea of guilty to Counts 1 and 2, as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall meet with a

member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense. The defendant will make an honest, good faith effort to pay said fine as directed by the Financial Litigation Section of the United States Attorney's Office. The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

c. The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

e. The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

f. The Defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

g. The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

j. The defendant understands that there is no possibility of a sentence of probation.

k. The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

8

5. The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11(c)(1)(B), Federal Rules of Criminal Procedure, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

6. The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The offense level or criminal history category, as calculated by the Probation Officer and determined by the court, may differ from that projected by defendant's counsel or the U.S. Attorney.

This is 23rd day of May, 2003.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Todd A. Brown
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101
(334)223-7280

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.


David Franklin Cotney, Jr.
**Defendant**

5-28-03
**Date**


Brent L. Dean
**Attorney for the Defendant**

May 28, 2003
**Date**

11

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      EASTERN DIVISION
 4
 5    UNITED STATES OF AMERICA
 6         vs.                    CR. NO. 03-78-E
 7    DAVID FRANKLIN COTNEY,
 8             Defendant.
 9
10
11
                      * * * * * * * * * * * *
12
                     CHANGE OF PLEA HEARING
13
                      * * * * * * * * * * * *
14
              BEFORE THE HONORABLE CHARLES S. COODY, UNITED STATES
15
       MAGISTRATE JUDGE, at Montgomery, Alabama, on Wednesday, May 28,
16
       2003, commencing at 10:00 a.m.
17
       APPEARANCES:
18
       FOR THE GOVERNMENT:      Ms. Tommie Brown Hardwick
19                              Assistant United States Attorney
                                OFFICE OF THE UNITED STATES ATTORNEY
20                              One Court Square, Suite 201
                                Montgomery, Alabama   36104
21
       FOR THE DEFENDANT:       Mr. William O. Walton, III
22                              Attorney at Law
                                WALTON LAW FIRM
23                              2515 East Glenn Avenue, Suite 304
                                Auburn, Alabama   36830-6453
24
                   Proceedings reported stenographically;
25                   transcript produced by computer.
```

GOVERNMENT
EXHIBIT
3

2

1    (The following proceedings were heard before the Honorable
2    Charles S. Coody, United States Magistrate Judge, at
3    Montgomery, Alabama, on Wednesday, May 28, 2003, commencing
4    at 10:00 a.m.:)
5        THE COURT: Good morning. We are here this morning for
6    the purpose of several change of pleas in 2003-78-E.
7        First, Mr. Cotney, come forward, please.
8        THE COURT: Good morning, Mr. Dean.
9        MR. WALTON: Judge, I'm filling in for Mr. Dean.
10   Mr. Walton.
11       THE COURT: Oh. Good morning, Mr. Walton.
12       MR. WALTON: Mr. Dean is in trial.
13       THE COURT: Mr. Cotney, previously you have entered a
14   plea of not guilty to the charge against you. I understand you
15   now desire to change your plea; is that correct?
16       THE DEFENDANT: Yes, sir.
17       THE COURT: For that purpose, you must be placed under
18   oath. Please raise your right hand and be sworn.
19   (The defendant is sworn)
20       THE COURT: Mr. Cotney, what is your full name?
21       THE DEFENDANT: David Franklin Cotney, Jr.
22       THE COURT: And how old are you?
23       THE DEFENDANT: 30.
24       THE COURT: How far have you gone in school?
25       THE DEFENDANT: Eleventh grade.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

4

1    need to sign that form which you have before you consenting to
2    my taking your plea.
3        (Brief pause)
4        THE COURT: Mr. Cotney, have you received a copy of the
5    indictment returned against you in this case?
6        THE DEFENDANT: Yes.
7        THE COURT: And have you had time to discuss the
8    charges against you with your lawyers?
9        THE DEFENDANT: Yes, sir.
10       THE COURT: Do you understand those charges?
11       THE DEFENDANT: Yes, sir.
12       THE COURT: Are you fully satisfied with your lawyers'
13   representation of you in this case?
14       THE DEFENDANT: Yes, sir.
15       THE COURT: Now, there is a plea agreement in this
16   case. I have reviewed a copy of that plea agreement. Who has
17   the original?
18       All right. Mr. Cotney, I now have the plea agreement;
19   and I am turning to page 11, which is the last page of that plea
20   agreement. I am showing it to you. Mr. Cotney, look up here.
21   Is that your signature on the plea agreement?
22       THE DEFENDANT: Yes, sir.
23       THE COURT: All right. Mr. Cotney, before you signed
24   this plea agreement, did you have an opportunity to read it and
25   to discuss it with your lawyers?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

3

1        THE COURT: Mr. Cotney, have you recently been treated
2    for any mental illness or addiction to narcotic drugs of any
3    kind?
4        THE DEFENDANT: No, sir.
5        THE COURT: Are you currently under the influence of
6    any drugs, medicine, pills, or alcoholic beverage?
7        THE DEFENDANT: No, sir.
8        THE COURT: Mr. Cotney, you are now under oath. You
9    should understand that during this proceeding you will be asked
10   questions first by the Court and by your lawyer and by the
11   United States attorney. If you give false answers to any of
12   those questions, those answers may later be used against you in
13   a prosecution for perjury or for giving false answers. Do you
14   understand that?
15       THE DEFENDANT: Yes, sir.
16       THE COURT: Mr. Cotney, you have the right to have your
17   guilty plea heard, taken, and considered by the next higher
18   ranking judge. That's a United States district judge. However,
19   you may consent to my taking your plea this morning. Have you
20   talked about that with Mr. Walton?
21       THE DEFENDANT: Yes, sir.
22       THE COURT: All right. Do you want me to take your
23   plea?
24       THE DEFENDANT: Yes, sir.
25       THE COURT: All right. For that purpose, then, you

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

5

1        THE DEFENDANT: Yes, sir.
2        THE COURT: And do you understand the terms of the plea
3    agreement?
4        THE DEFENDANT: Yes, sir.
5        THE COURT: Is this the only agreement which you have
6    with the United States?
7        THE DEFENDANT: Yes, sir.
8        THE COURT: Other than this plea agreement, has anyone
9    made any promise to you to get you to plead guilty in this case?
10       THE DEFENDANT: No, sir.
11       THE COURT: Mr. Cotney, if the Court chooses to not
12   follow the terms of the plea agreement -- because the Court is
13   not bound by anything in the plea agreement -- you will not have
14   the right to withdraw your plea of guilty. Do you understand
15   that?
16       THE DEFENDANT: Yes, sir.
17       THE COURT: Mr. Cotney, has anyone attempted in any way
18   to force you to plead guilty in this case?
19       THE DEFENDANT: No, sir.
20       THE COURT: All right. Mr. Cotney, you are entering a
21   plea of guilty to count one, which is a count charging you with
22   conspiracy to manufacture methamphetamine, and count two, which
23   is a charge that you used, carried, or possessed a firearm in
24   furtherance of a drug trafficking crime. Those offenses are
25   felony offenses. If your plea is accepted, you will be

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

6

1  adjudicated guilty of those offenses; and that adjudication may
2  deprive you of valuable civil rights, such as the right to vote,
3  the right to hold public office, the right to serve on a jury,
4  and the right to possess any kind of firearm. Do you understand
5  that?
6       THE DEFENDANT: Yes, sir.
7       THE COURT: Mr. Cotney, with respect to the charge of
8  conspiracy to manufacture methamphetamine, the maximum
9  punishment for that crime is a term of imprisonment of not less
10  than ten years nor more than life, a fine of not more than $4
11  million, or both the fine and the term of imprisonment. Upon
12  release from any imprisonment, you will be subject to a period
13  of supervised release of not less than five years, and you would
14  be required to pay to the Court an assessment fee of $500. Do
15  you understand the maximum punishment for conspiracy?
16       THE DEFENDANT: Yes, sir.
17       THE COURT: With respect to the maximum punishment for
18  using, carrying, or possessing a firearm in furtherance of a
19  drug trafficking offense, the maximum term of imprisonment is a
20  term of imprisonment of not less than five years, which is to
21  run consecutive to any other term of imprisonment imposed on
22  you, a fine of not more than $250,000, or both the fine and the
23  imprisonment. After release from any imprisonment, you will be
24  subject to a period of supervised release of not less -- or not
25  more than three years, and you would be required to pay to the

Risa L. Entrekin, RDR, CRR U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

7

1  Court an assessment fee in the amount of $100. Do you
2  understand that?
3       THE DEFENDANT: Yes, sir.
4       THE COURT: Mr. Cotney, once placed on supervised
5  release, if you violate the terms of supervised release, you can
6  be given additional time in prison. Do you understand that?
7       THE DEFENDANT: Yes, sir.
8       THE COURT: Now, Mr. Cotney, have you and Mr. Walton or
9  your other lawyer talked about how the sentencing guidelines may
10  apply in your case?
11       THE DEFENDANT: Yes, sir.
12       THE COURT: All right. Mr. Cotney, the Court will not
13  be able to determine the guideline sentence for your case until
14  after a presentence report has been prepared and after you and
15  the government both have an opportunity to review that report
16  and to challenge any facts or the application of those facts to
17  the guidelines. Do you understand that?
18       THE DEFENDANT: Yes.
19       THE COURT: Mr. Cotney, any sentence which is imposed
20  on you may be different from any estimate that your lawyers have
21  given you. Do you understand that?
22       THE DEFENDANT: Yes, sir.
23       THE COURT: Mr. Cotney, even after your guideline range
24  has been determined, the Court has the authority in some
25  circumstances to impose on you a sentence which is either more

Risa L. Entrekin, RDR, CRR U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

8

1  or less severe than called for by the guidelines. Do you
2  understand that?
3       THE DEFENDANT: Yes.
4       THE COURT: Mr. Cotney, parole has been abolished. And
5  if you are sentenced to a term of imprisonment, you will be not
6  be released on parole. Do you understand that?
7       THE DEFENDANT: Yes, sir.
8       THE COURT: Now, I have read the plea agreement.
9  Correct me if I am wrong, but there appears to be no waiver of
10  any right to appeal the sentence imposed in this case.
11       MS. HARDWICK: That's correct, Your Honor.
12       THE COURT: Mr. Cotney, you have the right to appeal
13  any sentence that is imposed on you; but also, under some
14  circumstances, the government can appeal a sentence imposed on
15  you. Do you understand that?
16       THE DEFENDANT: Yes, sir.
17       THE COURT: All right. Mr. Cotney, with respect to
18  these charges, you have the right to plead not guilty and to
19  persist in that plea. You would then have the right to a trial
20  by jury at which you would be presumed innocent and the
21  government would be required to prove your guilt beyond a
22  reasonable doubt. At that trial, you would have the right to
23  the assistance of counsel for your defense, the right to see and
24  hear all witnesses and have them cross-examined in your
25  defense. You would have the right on your own part to decline

Risa L. Entrekin, RDR, CRR U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

9

1  to testify unless you voluntarily elected to do so in your
2  defense, and you would have the right to the issuance of
3  subpoenas or compulsory process to compel the attendance of
4  witnesses to testify in your defense. Do you understand your
5  right to a trial and the other rights that I have mentioned to
6  you?
7       THE DEFENDANT: Yes.
8       THE COURT: At that trial, Mr. Cotney, if you decided
9  to not testify or not put on any evidence, those facts could not
10  be used against you. Do you understand that?
11       THE DEFENDANT: Yes, sir.
12       THE COURT: Mr. Cotney, by entering a plea of guilty,
13  if the Court accepts that plea, there will be no trial of any
14  kind. You give up your right to a trial and the other rights
15  that I have mentioned to you. Do you understand that?
16       THE DEFENDANT: Yes, sir.
17       THE COURT: Mr. Cotney, with respect to the conspiracy
18  charge, at that trial the government would be required to prove
19  beyond a reasonable doubt that you and at least one other person
20  in some way or manner came to a mutual understanding to try to
21  accomplish a common and unlawful plan as charged in the
22  indictment, which specifies the manufacture of 50 grams or more
23  of methamphetamine, and second, that you, knowing the unlawful
24  purpose of the plan, willfully joined in it.
25       With respect to the second count to which you are

Risa L. Entrekin, RDR, CRR U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

10

1  entering a plea of guilty, the government would be required to
2  prove beyond a reasonable doubt that you committed a drug
3  trafficking offense or conspiracy -- that's the first count --
4  to manufacture methamphetamine and that during and in relation
5  to the commission of that offense you used, carried, or
6  possessed a firearm and that you did so knowingly.
7          Do you understand what the government would be required
8  to prove at trial?
9          THE DEFENDANT: Yes, sir.
10         THE COURT: Before I can accept your plea, there must
11 be a factual basis for my doing so. Who wishes to assist the
12 Court with that?
13         MS. HARDWICK: Your Honor, the government can assist
14 the Court with that.
15         THE COURT: All right. Ms. Hardwick?
16         DAVID FRANKLIN COTNEY, JR., the defendant, having been
17 duly sworn, testified, as follows:
18                   EXAMINATION
19 BY MS. HARDWICK:
20 Q. Mr. Cotney, on March the 24th of 2003, were you on the
21 property of Mr. Larry Bonner, which is located at 1191 Chambers
22 County Road 274 in Chambers County?
23 A. Yes, ma'am.
24 Q. Were you there with other persons?
25 A. Yes, ma'am.

12

1  at that time?
2  A. Yes, ma'am.
3          MS. HARDWICK: Your Honor, we believe that those facts
4  are sufficient to sustain a conviction in this case.
5          THE COURT: Mr. Walton, would you agree?
6          MR. WALTON: I do.
7          THE COURT: Mr. Cotney, I have told you the rights
8  which you have and the rights which you give up by entering a
9  plea of guilty to the charges against you contained in count one
10 and count two of the indictment. Is it still your desire to
11 enter a guilty plea to those charges?
12         THE DEFENDANT: Yes.
13         THE COURT: Mr. Cotney, to count one, conspiracy to
14 manufacture 50 grams or more of methamphetamine, how do you
15 plead?
16         THE DEFENDANT: Guilty.
17         THE COURT: Mr. Cotney, with respect to count two, that
18 during that offense, that you used, possessed, or carried a
19 firearm in furtherance of the drug trafficking crime, how do you
20 plead?
21         THE DEFENDANT: Guilty.
22         THE COURT: Mr. Cotney, the Court finds that you are
23 fully competent and capable of entering an informed plea, that
24 you are aware of the nature of the charges against you and the
25 consequences of your plea, and that your plea of guilty is a

11

1  Q. Were you there for the purpose of manufacturing together
2  methamphetamine?
3  A. Yes, ma'am.
4  Q. And were you in fact manufacturing methamphetamine on
5  Mr. Bonner's property?
6  A. Yes, ma'am.
7  Q. And was that manufacture 50 grams or more of
8  methamphetamine?
9  A. Yes, ma'am.
10         MS. HARDWICK: Your Honor, in reference to that, the
11 government --
12 Q. Was that in the Middle District of Alabama?
13 A. Yes, ma'am.
14         MS. HARDWICK: In reference to that count, having
15 admitted those facts, the government would proceed to count two.
16         THE COURT: All right.
17 Q. Mr. Cotney, when law enforcement came onto the property in
18 Chambers County and began to apprehend, were you in the
19 possession of a 12-gauge pump shotgun?
20 A. Yes, ma'am.
21 Q. And the overall length of that shotgun was approximately 26
22 inches with a sawed-off barrel?
23 A. Yes, ma'am.
24 Q. And were you in the possession of that in furtherance of the
25 commission of the offense of manufacturing the methamphetamine

13

1  knowing and voluntary plea supported by an independent basis in
2  fact containing each of the essential elements of the offenses.
3  I will therefore recommend that your plea of guilty to count one
4  and count two of the indictment be accepted. You will be
5  continued in the same custody previously imposed on you.
6          Thank you, Mr. Walton.
7          MR. WALTON: Your Honor, may I be excused?
8          THE COURT: You may.
9          MS. HARDWICK: Your Honor, in reference, there is a
10 forfeiture allegation that is not part of the plea agreement,
11 and there is not a specific property listed. It lists a
12 substitute property. But we would ask whether or not the
13 defendant would consent to the forfeiture of any property that
14 the government finds was related at sentencing.
15         THE COURT: All right. Mr. Cotney, do you understand
16 that question?
17         MS. HARDWICK: If the government finds that there is
18 any property related to the manufacturing of the
19 methamphetamine, would you consent to the forfeiture of that --
20         THE COURT: And when you say any property, you mean any
21 property in which he has possessory interest?
22         MS. HARDWICK: That he has ownership and possessory
23 interest.
24         MR. WALTON: To the extent we'd like to question it if
25 we think it's questionable, certainly.

14

```
1        MS. HARDWICK:  Certainly.
2        MR. WALTON:  I don't know if that was the question --
3   answer you're looking for.  I don't think there is any other
4   than the shotgun.  We would give the shotgun and anything that
5   goes with the shotgun.  That's a given.  I don't think there is
6   any other property.  They weren't near his house or around his
7   house at that time.
8        MS. HARDWICK:  No, they were not.
9        THE COURT:  Well, this matter of property can be taken
10  up at sentencing.
11       MS. HARDWICK:  At sentencing.
12       THE COURT:  Thank you, Mr. Walton.
13       Thank you, Mr. Cotney.
14  (Proceedings concluded at 10:14 a.m.)
15              * * * * * * * * * * *
16              COURT REPORTER'S CERTIFICATE
17       I certify that the foregoing is a correct transcript
18  from the record of proceedings in the above-entitled matter.
19       This 6th day of February, 2004.
20
21
                RISA L. ENTREKIN, RDR, CRR
22              Official Court Reporter
23
24
25
```

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

AO 245B  (Rev. 3/01) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| MIDDLE | District of | ALABAMA |
|---|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**V.**<br><br>**DAVID FRANKLIN COTNEY, JR.** | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br><br>Case Number:  3:03CR00078-001<br><br>Brenton L. Dean and William O. Walton<br>Defendant's Attorney |

**THE DEFENDANT:**

**FILED**

X   pleaded guilty to count(s)   1 and 2 of the Indictment on May 28, 2003

☐   pleaded nolo contendere to count(s) _____
     which was accepted by the court.

**OCT 2 2 2003**

☐   was found guilty on count(s) _____
     after a plea of not guilty.

**CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.**

**ACCORDINGLY**, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 USC 846 | Conspiracy to Manufacture 50 grams or more of Methamphetamine | 03-24-2003 | 1 |
| 18 USC 924(c)(1) | Using a Firearm in Connection with a Drug Trafficking Offense | 03-24-2003 | 2 |

The defendant is sentenced as provided in pages 2 through _____6_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant has been found not guilty on count(s) _____

☐   Count(s) _____  ☐ is  ☐ are  dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 03-03-1973

Defendant's USM No.:   11196-002

Defendant's Residence Address:

4109 18th Avenue

Valley, Alabama 36854

Defendant's Mailing Address:

4109 18th Avenue

Valley, Alabama 36854

October 15, 2003
Date of Imposition of Judgment

Signature of Judicial Officer

W. HAROLD ALBRITTON, CHIEF U. S. DISTRICT JUDGE
Name and Title of Judicial Officer

10/22/03
Date

**EOD** 10-22-03

**GOVERNMENT
EXHIBIT
4**

AO 245B    (Rev. 3/01) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __6__

DEFENDANT:        DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:      3:03CR00078-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total total term of **342 months** .

This term consists of 222 months on Count 1 and 120 months on Count 2 to be served consecutively to the term on Count 1. The sentence is imposed at 342 months because of the defendant's serious conduct and criminal history.

**X**    The court makes the following recommendations to the Bureau of Prisons:
The court recommends that the defendant be designated to a facility where Intensive Residential Substance Abuse Treatment is available.

The court further recommends that the defendant be placed in an institution separate from the co-defendants in this case.

**X**    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

☐    at _____ ☐ a.m.  ☐ p.m.  on _____ .

☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐    before 2 p.m. on _____ .

☐    as notified by the United States Marshal.

☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B     (Rev. 3/01) Judgment in a Criminal Case
              Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:        DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:      3:03CR00078-002

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term    **5 years**                                            .
This term consists of 5years on each of Counts 1 and 2, all such terms to run concurrently.

    The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994*:

    The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of
    future substance abuse.

X   The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

    If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

    The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 3/01) Judgment in a Criminal Case.
           Sheet 3C — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:       DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:     3:03CR00078-001

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in drug testing and/or treatment if directed by the probation officer, and shall contribute to the cost of any treatment based on ability to pay and availability of third party payments.

2. The defendant shall provide the probation officer any requested financial information.

3. The defendant shall not obtain new credit without approval of the probation officer unless in compliance with the payment schedule.

4. The defendant shall submit to a search of his person, residence, office or vehicle pursuant to the search policy of this court.

AO 245B    (Rev. 3/01) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___5___ of ___6___

DEFENDANT:    DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:  3:03CR00078-001

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 0 | $ 3,054.00 |

                                            total          10-22-03
X   The determination of restitution is deferred until    /    . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered
    after such determination.

☐   The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| **Name of Payee** | ***Total Amount of Loss** | **Amount of Restitution Ordered** | **Priority Order or Percentage of Payment** |
|---|---|---|---|
| The Drug Enforcement Administration 2350 Fairlane Drive,Suite 200 Montgomery, AL 36116 |  | $ 3,054.00 |  |

| **TOTALS** | $ _____ | $ ___3,054.00___ | |

☐   If applicable, restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

X   The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    X   the interest requirement is waived for the    ☐ fine and/or    X   restitution.

    ☐   the interest requirement for the    ☐   fine and/or    ☐   restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B ' (Rev. 3/01) Judgment in a Criminal Case
Sheet 6 — Criminal Monetary Penalties

DEFENDANT:          DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:    3:03CR00078-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A    X   Lump sum payment of $ ___3,254.00___ due immediately, balance due

      ☐ not later than _____ , or
      X in accordance with  ☐ C,  ☐ D, or  X  E below; or

B    ☐   Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ E below); or

C    ☐   Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐   Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E    X   Special instructions regarding the payment of criminal monetary penalties:

    Payment shall be made to the Clerk, U.S. District Court, P.O. Box 711, Montgomery, AL 36101. Any balance remaining at the start of supervision shall be paid at the rate of not less than $350.00 per month.

    The restitution shall be paid by all co-defendants who are held accountable for restitution, jointly and severally until paid in full.

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

X   Joint and Several

    Defendant Name, Case Number, and Joint and Several Amount:

    Allen Lee Nelson       Case No. 3:03CR00078-002   $3,054.00
    Jonathan Boyd Weldon  Case No. 3:03CR00078-003   3,054.00

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

ᵃ  (Rev. 3/05) Judgment in a Criminal Case
Attachment — Statement of Reasons

Judgment — Page ___1___ of ___3___

DEFENDANT:        DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:      3:03CR00078-001

## STATEMENT OF REASONS
### (Not for Public Disclosure)

☐  The court adopts the factual findings and guideline application in the presentence report.

## OR

X  The court adopts the factual findings and guideline application in the presentence report, except (see attachment, if necessary):

SEE ATTACHMENT B

**Guideline Range Determined by the Court:**

Total Offense Level:        _____39_____

Criminal History Category:    _____II_____

Imprisonment Range:    _____292_____  to  _____365_____  months. Count 2 provides a sentence of not less than

                         10 yrs. consecutive to Ct. 1.
Supervised Release Range:    _____5_____  to  _____5_____  years for Count 1; 3 to 3 yrs., Ct. 2.

Fine Range:  $ __25,000__  to  $ __4,000,000__

X  Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution:    $  __to be determined__

☐  Discretionary restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(a)(B)(ii) (or in offenses committed before April 23, 1996, pursuant to 18 U.S.C. § 3663(d)).

☐  Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because the number of identifiable victims is so large as to make restitution impracticable, pursuant to 18 U.S.C. § 3663A(c)(3)(A).

☐  Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because determining complex issues of fact and related to the cause of amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process, pursuant to 18 U.S.C. § 3663A(c)(3)(B).

☐  For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐  Partial restitution is ordered, pursuant to 18 U.S.C. § 3553(c),  for the following reason(s):

AO 245B  (Rev. 3/01) Judgment in a Criminal Case  Attachment A — Statement of Reasons
Case 3:03-cr-00078-WHA-CSC     Document 6-5     Filed 02/15/2007     Page 8 of 9

Judgment — Page ___2___ of ___3___

DEFENDANT:     DAVID FRANKLIN COTNEY
CASE          3:03CR00078-001

## STATEMENT OF REASONS
### (Not for Public Disclosure)

☐  The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

### OR

☐  The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons:

### OR

X  The sentence departs from the guideline range:

    X  upon motion of the government, as a result of a defendant's substantial assistance, or

    ☐  for the following specific reason(s):

    The sentence imposed is within the range of offense level 36, criminal history category II, and is the result of a 3 level departure from the offense level determined by the court. This creates a new guideline range of 210 months to 262 months for Count 1 and a fine range from $20,000 to $4,000,000.

    Count 2 is a 10 year consecutive sentence to Count 1.

DEFENDANT:        DAVID FRANKLIN COTNEY, JR.
CASE NUMBER:      3:03CR00078-001

## ADDITIONAL FINDINGS AND GUIDELINES APPLICATIONS EXCEPTIONS

At the time of sentencing, the court made the following findings reflecting changes in the Presentence Report:

Paragraph 26 - Pursuant to 2D1.11, the base offense level is determined on the amount of pseudoephedrine. In this case, three containers were found containing 115.07 grams, 52.62 grams, and 62.01 grams, totaling 229.70 grams of pseudoephedrine. Pursuant to 2D1.11(d)(4), at least 100 grams but less than 300 grams of pseudoephedrine establish a base offense level of 32.

Paragraph 27 - 2D1.1(b)(5)(B) should not be applied because this manufacture of methamphetamine did not constitute a substantial risk of harm to a human life or the environment. Therefore, this enhancement of 3 points should not be applied.

The above findings result in the following changes:

Base offense level  - 32
Total offense level - 39

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                                October 15, 2003

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      EASTERN DIVISION
 4
 5   UNITED STATES OF AMERICA
 6        vs.                     CR. NO. 03-78-E
 7   DAVID FRANKLIN COTNEY,
     ALLEN LEE NELSON, and
 8   JONATHAN BOYD WELDON,
 9            Defendants.
10                  * * * * * * * * * * * *
11                    SENTENCING HEARING
12                  * * * * * * * * * * * *
13          BEFORE THE HONORABLE W. HAROLD ALBRITTON, UNITED
14   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday,
15   October 15, 2003, commencing at 10:07 a.m.
16   APPEARANCES:
17   FOR THE GOVERNMENT:      Mr. Todd A. Brown
                              Assistant United States Attorney
18                            OFFICE OF THE UNITED STATES ATTORNEY
                              One Court Square, Suite 201
19                            Montgomery, Alabama   36104
20   FOR THE DEFENDANT        Mr. Brenton L. Dean
     COTNEY:                  Mr. William O. Walton, III
21                            Attorneys at Law
                              WALTON LAW FIRM
22                            2515 East Glenn Avenue, Suite 304
                              Auburn, Alabama   36830-6453
23
     FOR THE DEFENDANT        Mr. Joseph B. Lewis, Attorney at Law
24   NELSON:                  LAW OFFICE OF JAY LEWIS
                              847 South McDonough Street
25                            Montgomery, Alabama   36104
```

GOVERNMENT
EXHIBIT
5

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2003

Page 2

```
 1    APPEARANCES, Continued:
 2    FOR THE DEFENDANT          Mr. Timothy C. Halstrom
      WELDON:                    Attorney at Law
 3                               MOORE & HALSTROM
                                 4162 Carmichael Court, Suite A
 4                               Montgomery, Alabama  36106
 5            Proceedings reported stenographically;
                  transcript produced by computer.
 6
                      * * * * * * * * * * *
 7
                        EXAMINATION INDEX
 8
      RAYMOND DAVID DeJOHN
 9         DIRECT BY MR. BROWN                        8
           CROSS BY MR. DEAN                         21
10         CROSS BY MR. LEWIS                        27
           CROSS BY MR. HALSTROM                     33
11         REDIRECT BY MR. BROWN                     35
           RECROSS BY MR. DEAN                       36
12
      MELISSA MARIE KELLY
13         DIRECT BY MR. BROWN                       39
           CROSS BY MR. DEAN                         47
14         CROSS BY MR. LEWIS                        50
           CROSS BY MR. HALSTROM                     52
15         RECROSS BY MR. LEWIS                      54
16    CLAY STEWART
           DIRECT BY MR. BROWN                       57
17         CROSS BY MR. DEAN                         72
           CROSS BY MR. LEWIS                        84
18         CROSS BY MR. HALSTROM                     84
19    THOMAS LEE SIMS
           DIRECT BY MR. BROWN                       88
20         CROSS BY MR. DEAN                         94
           REDIRECT BY MR. BROWN                     98
21
      MIKE PARRISH
22         DIRECT BY MR. BROWN                       99
           CROSS BY MR. WALTON                      107
23         REDIRECT BY MR. BROWN                    115
24    DAVID FRANKLIN COTNEY, JR.
           DIRECT BY MR. DEAN                       117
25         CROSS BY MR. BROWN                       122
```

```
                                                                    Page 3
 1                    EXAMINATION INDEX, Continued
 2    JOANNE SELLERS
          DIRECT BY MR. BROWN                          130
 3        CROSS BY MR. WALTON                           134
          RECROSS BY MR. WALTON                         141
 4
                       * * * * * * * * * * *
 5
 6        (The following proceedings were heard before the Honorable
 7        W. Harold Albritton, United States District Judge, at
 8        Montgomery, Alabama, on Wednesday, October 15, 2003,
 9        commencing at 10:07 a.m.:)
10        (Call to Order of the Court)
11            THE COURT:  All right.  We have three related cases --
12    three related sentencings in one case set for this morning.  I'm
13    going to call each case first and inquire about whether the
14    objections are adequately stated in the presentence report, and
15    then we'll go from there.
16            United States of America versus David Franklin Cotney.
17    Is the government ready to proceed?
18            MR. BROWN:  The government is ready, Your Honor.  Good
19    afternoon.
20            THE COURT:  Is the defendant ready?
21            MR. DEAN:  We're ready, Your Honor.
22            THE COURT:  All right.  United States of America versus
23    Allen Lee Nelson.  Is the government ready on this one?
24            MR. BROWN:  Yes, sir.
25            THE COURT:  Is the defendant ready?
```

4

1    MR. LEWIS: Defendant is ready, Your Honor.
2         THE COURT: And United States of America versus
3    Jonathan Boyd Weldon. Is the government ready?
4         MR. BROWN: The government is ready, Your Honor.
5         THE COURT: Defendant ready?
6         MR. HALSTROM: Yes, Your Honor. We have amended our
7    objections since there was an addition of a firearms
8    enhancement. And we've got an objection to that which we are
9    making to the Court. And copies have been distributed to the
10   parties involved.
11        THE COURT: All right. Yes. I've received this this
12   morning. Now, you say you added what to this?
13        MR. HALSTROM: Your Honor, if you'll look on page --
14   the second page of that handout or that filing, number 20, the
15   probation office has inserted an enhancement of two levels for
16   firearm possession. We are objecting to that.
17        THE COURT: All right. I thought that was already in
18   there. One thing I notice in here that I did not understand was
19   originally in, and that's an objection to a point for a juvenile
20   offense in number 26.
21        MR. HALSTROM: Yes, Your Honor. That was in the
22   original objection also.
23        THE COURT: Okay.
24        MR. HALSTROM: And that's merely because it's outside
25   the five-year limitation by the guidelines.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

6

1    to be testimony offered on that, then I'll let all counsel raise
2    that objection at this time and cross-examine on that issue.
3         All right. Having said that, I'll call the case of
4    United States of America versus David Franklin Cotney. I'll ask
5    the defendant -- did you have something, Mr. Brown?
6         MR. BROWN: I was just going to call a witness.
7         THE COURT: All right. Let me finish. I'll call on
8    you in just a minute.
9         All right. I'll ask Defendant Cotney to stand.
10        (Defendant Cotney complies)
11        THE COURT: All right. Mr. Cotney, have you, and
12   Mr. Dean, have you, as defense counsel, reviewed the presentence
13   report, including any objections that may have been made after
14   the -- or rather, any revisions that may have been made after
15   the initial disclosure?
16        DEFENDANT COTNEY: Yes, sir.
17        THE COURT: And Mr. Dean, you have?
18        MR. DEAN: Yes, Your Honor.
19        THE COURT: All right. And I understand the objections
20   in this case to be as follows. Objection number one is the
21   defendant objects to the paragraph number 14 having to do with
22   the killing of the police dog on the basis that he has a legal
23   defense to that charge.
24        Objection number two is an objection to the probation
25   officer's report enhancing -- adding a two-point enhancement for

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

5

1         THE COURT: All right. I'll look at that. All right.
2    Other than that, are your objections -- well, all of your
3    objections, then, are contained in this objection that you filed
4    this morning?
5         MR. HALSTROM: Yes, Your Honor.
6         THE COURT: All right. That's as to the Defendant
7    Weldon.
8         As to the Defendant Nelson, Mr. Lewis, are all your
9    objections properly stated in the presentence report?
10        MR. LEWIS: Your Honor, they were very well stated.
11        THE COURT: Okay. And as to Defendant Cotney, are all
12   of your objections properly stated in the presentence report?
13        MR. DEAN: They are, Your Honor.
14        THE COURT: Mr. Dean? They are? All right.
15        Now, there appears to be one issue that is the same in
16   all three of these cases. And in order to not repeat things on
17   them, I'm going to suggest that if there is any testimony that
18   the government presents, evidence by the government, on this
19   issue, that I'll allow defense counsel in all three cases to
20   cross-examine on this; and we will -- and I will consider that
21   testimony in all three cases. And that is the objection to the
22   enhancement for substantial risk to human life or environment.
23   That objection is made in all three cases.
24        So I'm going to call the case against David Franklin
25   Cotney first, and we'll proceed with that. And if there's going

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

7

1    obstruction of justice based on providing materially false
2    information to the probation officer.
3         Objection number three is an objection for being given
4    three points for acceptance of responsibility in the presentence
5    report.
6         Objection number four is an objection to an enhancement
7    based on creation of a substantial risk of harm to human life or
8    the environment.
9         Objection number five is an objection to the
10   determination that the defendant was an organizer or leader and
11   being given points for that, for role as an organizer or
12   leader.
13        Objection number six is an objection to the finding in
14   the presentence report that the defendant created a substantial
15   risk of serious bodily harm while having reasonable cause to
16   believe that a person was a law enforcement officer and
17   assaulted the officer during flight.
18        And objection number seven is an objection to the
19   inclusion of uncharged criminal conduct in the presentence
20   report.
21        Is that -- are those all the objections now, Mr. Dean?
22        MR. DEAN: They are, Your Honor.
23        THE COURT: All right. You may have a seat.
24        Mr. Brown?
25        MR. BROWN: Good morning, Your Honor. The government

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

8

1    calls Task Force Agent David DeJohn to the stand.
2         RAYMOND DAVID DeJOHN, the witness, having been duly
3    sworn, testified, as follows:
4              DIRECT EXAMINATION
5    BY MR. BROWN:
6    Q. Good morning. Would you state your name, please?
7    A. Task Force Agent Raymond David DeJohn.
8    Q. And would you mind spelling your last name for the court
9    reporter?
10   A. D-E, capital J-O-H-N.
11   Q. You said you're a task force agent. Would you tell Judge
12   Albritton where you are employed?
13   A. Yes. I'm employed by the City of Prattville Police
14   Department assigned to their narcotics division. I'm also
15   cross-designated as a federal task force agent assigned to the
16   Drug Enforcement Administration here in Montgomery.
17   Q. In regards to both of those jobs, have you had any
18   particular training as it relates to methamphetamine or
19   clandestine methamphetamine labs?
20   A. Yes, I have.
21   Q. Would you briefly explain what that training is and what a
22   clandestine lab is, to begin with?
23   A. Okay. A clandestine lab is a lab that -- a makeshift lab,
24   usually in someone's home or more isolated areas, used to make
25   illegal drugs, such as methamphetamine, LSD, fentanyl, different

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

10

1    and ensuring everybody's doing something properly.
2    Q. Just generally, you're familiar with this case, the
3    sentencing we're here on today with defendants by the last names
4    of Cotney, Weldon, and Nelson; is that correct?
5    A. That's correct.
6    Q. You participated in this case in several different aspects;
7    is that right?
8    A. That is correct.
9    Q. Was one of those aspects as site safety officer at the area?
10   A. No. I was not the site safety officer at the area, but I
11   was -- I was acting in that capacity assisting other agents. We
12   were just making sure everybody was taking care of themselves
13   properly while they were working at the lab site.
14   Q. Okay. How does that come about, generally, when you're --
15   when you're contacted -- and this case happened in Chambers
16   County. You work in Montgomery and Prattville; is that right?
17   A. That's correct.
18   Q. How are you contacted when a clandestine laboratory has been
19   identified and they know that they need someone to come out
20   there?
21   A. Usually a local agency will contact the DEA. It just so
22   happens in this case, I was in the office on that particular
23   day. They explained to us the situation they had, and I was
24   acting as a responding clandestine laboratory officer, but I was
25   also responding as possible case agent.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

9

1    type of drugs.
2    Q. Okay. And you have had some type of training as it relates
3    to clandestine laboratories?
4    A. Yes, I have.
5    Q. What is that training?
6    A. I attended state and local basic clandestine laboratory
7    investigations at Quantico, Virginia, the DEA Academy. I've
8    also attended DEA site safety officers school at Quantico,
9    Virginia, for clandestine labs. Basically, it authorizes me to
10   be a site safety officer in those situations. I've also
11   attended the DEA tactical entry school for clandestine labs,
12   also at Quantico, Virginia.
13   Q. Okay. As it relates to the site safety officer issue, what
14   are your responsibilities as a site safety officer?
15   A. As a site safety officer -- on a certain assignment, I could
16   be designated as the site safety officer who is responsible for
17   the particular area, making sure that agents are properly
18   decontaminated, making sure there's a secure area around the
19   crime scene, just taking responsibility of the -- basically, the
20   decontamination of the area.
21   Q. Okay. Do you actually do the decontamination, or do you
22   coordinate that, or how does it work?
23   A. Sometimes we'll coordinate it or I'll participate in it.
24   Usually if I'm a site safety officer, I will not participate in
25   the actual collection of evidence itself. I'll be standing back

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

11

1    Q. Okay. Is that generally how -- and I'm not talking about
2    this specific case; but generally, is that -- do you have an
3    agreement with the local agencies to contact you in a case such
4    as this?
5    A. Yes.
6    Q. You also mentioned that you had some training in tactical
7    entry on clandestine laboratories. Would you explain what that
8    is, briefly?
9    A. Basically, it's a -- it's a way of entering or approaching
10   lab -- laboratory sites. Because of the dangers involved with
11   labs, they want to try to create a standard with the DEA on the
12   way entries are made to ensure the safety of the officers, also
13   in an effort to preserve the crime scene. If we go in there,
14   you know, clumsy, just running through the house or whatever, it
15   could cause an explosion, which would, you know, injure
16   officers, injure other occupants, as well as destroy a crime
17   scene.
18   Q. Okay. Let's talk about this case specifically. How were
19   you contacted about -- you indicated that you were in the office
20   and you were contacted. How did that happen?
21   A. I was in the office. And I believe it was Agent Clay
22   Stewart with the Chambers County Drug Task Force contacted our
23   office and let us know that they had discovered a lab site and
24   also a police canine had been shot.
25   Q. Okay. Did you respond by yourself or did you go with any

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

12

1 other individuals?

2 A. A couple other individuals went with me, Task Force Agent

3 Larry Hubbard as well as Task Force Agent Tony Yates. And I

4 believe Donnie Straight was there as well.

5 Q. Okay. And you called them all task force agents. Are they

6 task force officers with the Drug Enforcement Administration?

7 A. Yes, they are.

8 Q. They're like you. They're assigned to a local agency, but

9 they have been cross-designated as a federal officer?

10 A. That's correct.

11 Q. Do you recall what you did at that time?

12 A. By the time I got to Chambers County, there was already

13 numerous police officers on the scene as well as the Department

14 of Forensic Sciences, who was processing the scene, which

15 they're lab certified as well. And they were already processing

16 the scene. So basically, we stood back as observers, assisted

17 in any way we could at that point with the investigation.

18 Q. Okay. At that time, was -- had all the individuals that

19 were identified at that point, had they been taken into custody?

20 A. I believe at some point shortly after I was there, there was

21 already two in custody.

22 Q. Okay. Did you assist in trying to locate the third

23 individual?

24 A. No. We stayed at the scene. Again, Alabama Department of

25 Forensic Sciences was processing the scene. I called DEA

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

13

1 headquarters for an authorization number on the cleanup and also

2 made contact with a hazardous waste company to -- so they could

3 come for the disposal of the chemicals.

4 Q. Okay. Do you recall -- that was -- I think I should have

5 probably asked you this first. That was March 24th of this

6 year --

7 A. Yes.

8 Q. -- when you were contacted.

9 A. Yes.

10 Q. The hazardous company -- hazardous disposal company, do you

11 recall who you called?

12 A. Ferguson Harper.

13 Q. Where are they located? Do you know?

14 A. I don't know exactly where their home base is, but they have

15 various cleanup crews from -- there's one in Birmingham; there's

16 one in Jackson, Mississippi; there's one in Mobile. And they'll

17 send whichever truck is available or maybe the closest at the

18 time.

19 Q. Okay. How long does it take for that -- or how long did it

20 take in this case for that company to respond?

21 A. I don't recall the exact amount of hours. It was -- it was

22 several hours. When I contacted them, they were in Livingston.

23 I believe they were in Livingston, Alabama. So they had to come

24 across the state.

25 Q. Okay. Briefly describe what you saw at the scene as it

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

14

1 relates to the materials that were being used in the laboratory.

2 A. I immediately saw a cylinder, which was common as a common

3 cylinder for anhydrous ammonia. I was advised that there was

4 anhydrous ammonia in that cylinder. I saw a propane tank as

5 well, which is often used in clandestine labs in transferring

6 anhydrous ammonia from an authorized and approved cylinder to

7 this propane tank, which is considered very dangerous itself. I

8 saw batteries on the scene. I seen large amounts of liquid,

9 which was identified to me through forensics as being ether. I

10 could smell ether in the air as well as there was numerous jars,

11 small in size up to large, maybe gallon-size jars, maybe. There

12 was numerous other items there as well.

13 Q. Okay. You had mentioned that one of the tanks posed some

14 sort of danger. At least, the transferring of some quantity of

15 anhydrous ammonia was dangerous at some level.

16 A. Yes.

17 Q. Explain exactly how that is dangerous. What is the danger

18 in doing that?

19 A. Well, when you're -- when you're allowing ammonia to come

20 out of an authorized tank, number one, you have -- you have an

21 immediate danger to yourself as -- if you're the person doing

22 the transferring. Ammonia can cause a lot of damage to your

23 lungs. It could cause your lungs to collapse if you take in a

24 lot at one time.

25 THE COURT: Excuse me. I'm missing what you mean when

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

15

1 you say transfer. Explain that to me.

2 THE WITNESS: A lot of times they will hook a hose up

3 to the anhydrous ammonia tank and then hook another -- the other

4 end of the hose into the empty cylinder or propane tank to

5 transfer gas from this larger tank, which weighs a lot, transfer

6 it to a smaller tank, which is able to be transported around a

7 little bit easier.

8 THE COURT: But you're not saying you saw this being

9 done.

10 THE WITNESS: No, sir. No. But there's -- I believe

11 what I said earlier, there was a large propane -- or a large

12 cylinder that holds anhydrous ammonia and then the propane tank

13 there. That was there. It's common to have these things -- you

14 know, use that propane tank as a transfer.

15 Q. (Mr. Brown, continuing:) What's the mechanism between the

16 two items that allows the transfer? Is it a hose, or do you

17 hook them up directly to one another, or how do you do that?

18 A. There's crude devices. There's devices that you can get

19 from hardware stores using the exact fittings to make the

20 transfer. And if it's done in that manner, it could be a safe

21 transfer. But the fact that anhydrous ammonia is being

22 transferred into a propane tank and the nozzles on the propane

23 tank or the propane tank itself is not rated to hold back

24 anhydrous ammonia -- and a lot of times what you get is a

25 corrosion of the tank or the valves, which can cause either a

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                October 15, 2003

16

1    slow leak or a rapid leak or an explosion where the valve pops
2    off.
3    Q.  Okay.  When -- just to summarize and to put it into layman's
4    terms, if this anhydrous ammonia leaks out, that is a danger; is
5    that correct?
6    A.  Yes.  Yes.
7    Q.  But -- and I think you said because it's a danger to -- for
8    breathing it?
9    A.  It's a danger for the, you know, person who has immediate
10   contact with it.  Depending upon how much is released into the
11   air in a concentrated area, it could be a danger to people in
12   the nearby area, immediate effects, possibly even long-term
13   effects.
14   Q.  If the fitting -- this is sort of the second part of what
15   you're saying.  If the fitting is not on properly or the nozzle
16   is not on properly, you said it could cause an explosion.  Do
17   you mean like a fireball explosion, or do you mean just the tank
18   erupting or what do you --
19   A.  Tank -- most likely, the tank erupting.  The valve -- again,
20   the tank, the propane tank, and the valves on a propane tank are
21   not rated to hold the anhydrous ammonia.  Anhydrous ammonia is
22   very corrosive.  It will corrode the valves, the seals, at which
23   time -- it's going to give way at some point.  And like I said,
24   it could be either a slow leak or a rapid leak where it all --
25   the valves fail at one time.  It could fail over just time,

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                October 15, 2003

18

1    A.  Yes.
2    Q.  The batteries that you saw, were they opened or unopened?
3    A.  The batteries that I seen was still as batteries.  They
4    hadn't been tampered with.  I did not see every battery there,
5    and I don't know if Department of Forensic Sciences would have
6    anything else to say on that.
7    Q.  Okay.  You finally mentioned a quantity of liquid that
8    turned out to be ether and that you smelled ether.  Would you
9    explain how ether is used in the process and any danger that it
10   might pose?
11   A.  Ether is used in the process to produce methamphetamine.
12   It's highly explosive.  We are advised at school that one quart
13   of ether is equivalent to three sticks of dynamite.  The
14   slightest spark can set it off.  That's probably -- in this
15   particular lab and a lot of labs, the most inherent danger is
16   ether, as far as immediate effects.
17   Q.  Is there -- by you breathing it, is there some sort of
18   danger to an individual person by breathing it?
19   A.  I would imagine, long-term effects, it would cause some
20   problems to your lungs.  If you take in a lot at one time, it
21   could cause immediate problems to your lungs.
22   Q.  What type of activity would have to be in place for the
23   ether to explode or ignite?  I mean what -- what would be the
24   thing that would cause that to happen?
25   A.  It could be a spark, like I said, from a battery, from the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                October 15, 2003

17

1    sitting there; or if somebody comes up and tries to move the can
2    and it's already corroded -- the tank -- and it's already
3    corroded, it could cause a rapid release of the gas.
4    Q.  If the -- we're talking -- this is in a gas form.  If the
5    tank were to be opened up, would it convert to a liquid form?
6    A.  When it's inside the tank, it's more -- to my knowledge,
7    it's more of a liquid form.  When it hits the air, that's when
8    it becomes --
9    Q.  Gas.
10   A.  -- gas.
11   Q.  I had it reversed.
12   A.  Right.
13   Q.  You mentioned some batteries that you saw at the scene.
14   Describe what those are used for and any effect it might have
15   on -- as -- pose any kind of danger.
16   A.  The batteries itself, while they're contained as a battery,
17   is safe.  As they are -- they're opened up and lithium is
18   removed from the batteries, lithium is combustible once it hits
19   moisture.  It could start to spark or ignite whenever -- with
20   the humidity in the air.  Or if you was to put it directly into
21   water, it could ignite.
22   Q.  What are the batteries used for in a methamphetamine
23   laboratory?
24   A.  It's used in part of the process of making methamphetamine.
25   Q.  Causes a chemical reaction?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                October 15, 2003

19

1    lithium igniting.  It could be something as simple as moving
2    another metal object against a rock.  It could be from static
3    electricity in clothes.  It depends upon the concentration of
4    ether in the air.
5    Q.  How about a gunshot?
6    A.  Yes.  That could set it off.  That's one of the things they
7    teach us at tactical lab school as well, is the -- you know, to
8    understand the possibility of a gunshot going off, you could
9    have an explosion inside a lab.  And that's why they give us
10   certain items to wear when we're entering these labs.
11   Q.  You had been asked by the probation office, I believe, to
12   provide some information as it relates to the cost of cleaning
13   up that area.  Did you do that?
14   A.  Yes, I did.
15   Q.  Do you recall what the figures were?
16   A.  I don't recall the exact figures.  My recollection, it was a
17   couple thousand.  I don't -- each lab is different, so I don't
18   know what the cost of this one was exactly.
19            MR. BROWN:  Your Honor, I'm going to ask Agent DeJohn
20   some questions that relate directly to Mr. Cotney at this point
21   to avoid any kind of duplication, if that's acceptable.
22            THE COURT:  All right.  That's fine.  Go ahead.
23   Q.  Agent DeJohn, you indicated that when you arrived on the
24   scene, it was in sort of a dual capacity, one as it relates to
25   the hazardous material collection, and also as a potential case

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

20

1  agent.
2  A. That's correct.
3  Q. That's right? Did you involve yourself in the investigation
4  in this case beyond that of the laboratory cleanup?
5  A. Yes.
6  Q. During the course of that investigation, did you have the
7  opportunity to speak with an individual by the name of Nelson?
8  A. Yes.
9  Q. Allen Lee Nelson?
10  A. Yes.
11  Q. Did he provide a statement to law enforcement officers as it
12  related to the conduct there?
13  A. Yes.
14  Q. Did he -- what did he tell you about the involvement of
15  Mr. Cotney during the -- during the laboratory setup and
16  preparation?
17  A. Basically, that he was the coordinator of it, that he was
18  the one in charge of getting everything together with them. He
19  was the one, I believe, that was possibly going to be selling
20  the -- as it was indicated to me, would be selling the majority
21  of this methamphetamine that was produced. He --
22  Q. Did Mr. Nelson say what Mr. Nelson himself was going to be
23  doing?
24  A. Mr. Nelson said he was going to be the cook.
25  Q. And did Mr. Weldon indicate what he was going to be doing?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

21

1  A. Mr. Weldon was there assisting. I don't recall exactly what
2  capacity without looking at my notes. But he was there as an
3  active participant.
4       MR. BROWN: If I can have just a minute, Your Honor, to
5  make sure that I can cover everything with everyone, if I can.
6       THE COURT: All right.
7  (Brief pause)
8       MR. BROWN: I think that's all, Your Honor.
9       Thank you, Agent DeJohn. The defense attorneys may
10  have some questions for you.
11       THE COURT: All right. I'm going to consider this
12  testimony in all three cases. And I'll call on first for
13  cross-examination Mr. Dean on behalf of Mr. Cotney.
14       Mr. Dean?
15            CROSS-EXAMINATION
16  BY MR. DEAN:
17  Q. Good morning, Agent DeJohn.
18  A. Good morning.
19  Q. Let me ask you first, are you aware of the sentencing
20  guidelines or the enhancement that we're talking about right now
21  regarding substantial risk to the environment? Have you ever
22  looked at it or read it?
23  A. No, I haven't.
24  Q. I want to go over with you some of the factors that are
25  detailed in that enhancement as it applies to this specific case

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

22

1  and this specific methamphetamine lab. Can you tell me how the
2  chemicals or the liquids were stored as you saw them at the
3  scene of this lab?
4  A. With the evidence that I saw from the lab, there was
5  obviously an anhydrous ammonia tank. There was a propane tank.
6  There was either containers on scene that had been opened and
7  ether removed. There was numerous other items there. Without
8  looking at the exact list of everything there, I couldn't tell
9  you exactly what was there for sure.
10  Q. But the ammonia was in a tank. And it was sealed, to your
11  knowledge, wasn't it?
12  A. To my knowledge, it was, yes.
13  Q. Do you have any knowledge that there was anything at all in
14  the propane tank?
15  A. I have knowledge that there had been at one time. I don't
16  know if any had been retrieved from that tank on this occasion.
17  Q. You had knowledge -- you had knowledge that propane was in
18  the propane tank at one time?
19  A. No. That anhydrous ammonia had been in the tank at one
20  time.
21  Q. Do you know whether that tank was sealed, or was the valve
22  open?
23  A. I don't have knowledge whether it was sealed. But to my
24  knowledge, that is an unauthorized tank to hold anhydrous
25  ammonia.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

23

1  Q. And the batteries that you found, they had not been
2  stripped, as you would normally find them in methamphetamine
3  labs, were they?
4  A. Not that I saw.
5  Q. If a battery was still in its case and actually still in the
6  package, that doesn't cause a risk to the environment, does it?
7  A. No.
8  Q. One of the other factors in this sentencing guideline to
9  reach this enhancement that Mr. Cotney has been handed in his
10  presentence report is the manner in which these chemicals or
11  anything toxic was disposed of. And I understand in this case a
12  professional group was called in to dispose of it. Is that
13  correct?
14  A. That is correct.
15  Q. Have you -- in your professional career, have you used this
16  company before?
17  A. Yes.
18  Q. To dispose of chemicals found in a methamphetamine lab?
19  A. Yes.
20  Q. Do they do a good job?
21  A. As far as I know, yes. I mean what I see at that -- at that
22  location, I see that they're doing their job properly. When it
23  leaves our location, I can't testify that they're doing a good
24  job, because I don't know what they're doing exactly.
25  Q. But assuming they do what they're paid for and they do a

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

24

1  good job, the risk that any of these chemicals are going to be
2  released into the environment, there is no risk, because they
3  cleaned it up, correct?
4  A. Right.
5  Q. In your experience with dealing with methamphetamine labs
6  and the stages that methamphetamine is produced, you know, from
7  start -- a starting cook to a finished cook, would you say that
8  this -- in this particular case, the methamphetamine production
9  of the lab was in the initial stages?
10 A. It was -- from what I could see at that point, it was in
11 its -- probably its beginning to mid stage. You had pill
12 powder, which to me it appeared to already be broke down and
13 they were getting ready to start the process of converting the
14 ephedrine to methamphetamine.
15 Q. Do you have any idea, just based on your knowledge and
16 experience, from looking at what you saw at the lab, of how long
17 or what kind of duration or time period that the lab had been in
18 a -- you know, active or beginning to get active?
19 A. Well, it's really -- it's really hard to say how long it had
20 been active, you know, how long it took them to break down the
21 pill powder. It depends on the motivation of the cook and how
22 fast they can do it. Some can get to that step within an hour.
23 Some, it may take 12, 13, 14 hours, some longer. It depends
24 upon the experience and the motivation of the ones involved with
25 the lab itself.

26

1  A. Right. I don't know -- no one was immediately hurt. I
2  can't tell you what any long-term effects down the road from
3  being involved with the production of methamphetamine or as a
4  first responder, someone arriving to the lab, what -- what
5  long-term effects someone's going to have.
6          MR. DEAN: Your Honor, I have some photographs that I
7  would like to enter as a defendants' exhibit that make help the
8  Court visualize these type of containers and sorts of things if
9  I may be permitted to do so.
10         THE COURT: All right. Have you shown them to opposing
11 counsel? Have you shown them --
12         MR. DEAN: I've got them --
13         (Brief pause)
14         THE COURT: All right. You can have them marked here.
15         (Brief pause)
16         MR. DEAN: May I approach the witness, Your Honor?
17         THE COURT: You may.
18 Q. Agent DeJohn, I've marked as Defendants' #1 through #4 some
19 photographs that we received from -- I believe these came from
20 the Chambers County Sheriff's Department taken by Harold --
21 Howard Carlton. If you would just look at these and see if they
22 accurately depict the containers and tanks that you remember
23 seeing on the day of the arrest.
24 A. Yes. They look to be the items.
25 Q. As far as Defendants' Exhibit #1, it is a photograph of a

25

1  Q. Let me ask you a little bit about the area, the geographical
2  area where the lab was found. Are you familiar with Chambers
3  County?
4  A. Not real familiar, no.
5  Q. You're not familiar with the rural area that we call the
6  Five Points area surrounding the area of Roanoke, that type?
7  A. That -- I've heard of it; but to be honest, that was my --
8  probably my second trip to the Chambers County area, so --
9  Q. Well, when you got there, were you pretty much in the middle
10 of nowhere?
11 A. Yes.
12 Q. Was -- were there any residential houses that you noticed
13 out in the middle of this wooded area?
14 A. I believe we passed a couple on the way in, but I didn't
15 recall seeing a whole lot.
16 Q. I mean if I told you that there's probably not a residence
17 within a mile of this lab, would you have any reason to dispute
18 that?
19 A. I have no reason to dispute it. No.
20 Q. To your knowledge, as a result of any of these chemicals
21 that y'all found at the lab or, you know, the batteries or
22 anything, was anybody hurt, physically hurt, from this lab?
23 A. Not to my knowledge.
24 Q. And I'm talking about as a result of exposure to the
25 chemicals or whatever else is there.

27

1  plastic container with a top on it with what looks like a clear
2  liquid in it. Do you recall what was in there, or was that
3  where the ether was that had been --
4  A. I believe it had been relayed to me that there was ether
5  inside that container.
6  Q. Okay.
7          MR. DEAN: Your Honor, I'll ask that these be admitted
8  as Defendants' Exhibits #1 through #4.
9          THE COURT: All right. They're admitted.
10         MR. DEAN: I believe that's all the questions I have
11 for you, Agent DeJohn.
12         THE COURT: All right. Mr. Lewis on behalf of
13 Defendant Nelson, any questions?
14         MR. LEWIS: Thank you, Your Honor. May I approach the
15 deputy?
16         THE COURT: All right.
17             CROSS-EXAMINATION
18 BY MR. LEWIS:
19 Q. Officer DeJohn, before we get started, could I get a little
20 of your educational background? I'm not talking about Quantico
21 or any of the law enforcement academies, but your undergraduate
22 education.
23 A. I'm a high school graduate.
24 Q. Okay. No special training in public health issues?
25 A. No.

28

1  Q. Okay. No training in medicine.
2  A. No.
3  Q. Okay. You had indicated -- and I'm just going to pretty
4  much go down your testimony so far, trying not to duplicate
5  anything. You were not the site safety officer at that point.
6  A. No.
7  Q. At the point of the discovery of that lab.
8  A. No.
9  Q. Who was?
10 A. I don't know if Alabama Department of Forensic Sciences had
11 somebody that was acting as their site safety officer. I do
12 know they're all lab certified. But again, as we were there,
13 even though I wasn't -- someone didn't come to me and assign
14 me -- you're the lab site safety officer, I was there making
15 sure that people were doing things properly. I watched what
16 Alabama Department of Forensic Sciences was doing as they were
17 collecting evidence. And as far as their, you know, protecting
18 themselves and the hazardous conditions, I, you know, didn't see
19 anything wrong.
20 Q. Okay. And because of your training and your status at that
21 point as an on-scene officer, you wouldn't have ignored any
22 dangerous activity anyway, would you?
23 A. No.
24 Q. Okay. So whether you were the site safety officer or not,
25 you would still have exercised your skills and knowledge to

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

30

1  Q. Okay. And in fact, with the propane tank -- or with the
2  anhydrous ammonia tank already on the scene, there would have
3  been very little reason to bleed off any of the anhydrous into
4  the propane tank.
5  A. No, not if -- not if they were going to -- not if they were
6  going to cook right there, unless they wanted to move their cook
7  slightly over. I mean that tank is heavy, so to transfer it to
8  a smaller tank that could be moved just a matter of feet, for
9  lack of better words, would be beneficial for them to do that.
10 But to produce the lab, it wouldn't be beneficial.
11 Q. But you don't know that that particular conspiracy
12 necessarily involved the transfer of the anhydrous from the
13 anhydrous tank to the propane tank for that cook.
14 A. No.
15 Q. Okay. And, of course, nobody was transferring anything when
16 you got there.
17 A. No.
18 Q. And the tanks were not even hooked together.
19 A. Right.
20 Q. Okay. You've indicated that it's common to have propane
21 tanks there for transfer. And you've got a -- kind of a long
22 and storied history as a drug task force officer. How many
23 methamphetamine labs have you personally witnessed?
24 A. I would say I've responded or participated in at least ten
25 DEA investigated -- investigated labs.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

29

1  ensure the safety of the site.
2  A. Right.
3  Q. You had indicated that the propane tank was dangerous. Was
4  there any inherent danger in the anhydrous ammonia tank, which
5  you say was one that is commonly used for anhydrous ammonia?
6  A. There was no inherent dangers that I observed. If the
7  valves were proper valves that was on it, if there was no damage
8  to the tank, then there would probably not be -- no inherent
9  dangers other than it being released.
10 Q. You don't know of anything that would have caused a danger.
11 You don't know that there was a bad valve or an improper valve
12 or anything like that on the anhydrous ammonia tank.
13 A. Not to my knowledge, no.
14 Q. And you don't know that there was any anhydrous ammonia at
15 that time in the propane tank.
16 A. No, not to my knowledge. Not at the time.
17 Q. So whether or not that posed a potential risk of some sort,
18 you just don't know.
19 A. As far as the anhydrous ammonia?
20 Q. Yeah.
21 A. Not at that immediate moment, no.
22 Q. Okay. And you don't know what kind of transfer mechanism
23 was being used, if any was contemplated, for the anhydrous
24 ammonia to the propane tank, correct?
25 A. No.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

31

1  Q. How about even prior to being with DEA?
2  A. No. I had never dealt with one prior.
3  Q. Okay. So out of ten labs, at least ten labs, how many of
4  them have involved an outside haz mat cleanup team?
5  A. Say that -- can you say that again?
6  Q. Yeah. You called -- you called this company out of
7  Birmingham -- or Livingston, they happened to be in, in this
8  particular case. In how many other of those ten or more cases
9  have you called a hazardous materials disposal team?
10 A. All -- every time.
11 Q. Every time?
12 A. Yeah.
13 Q. And they've responded every time?
14 A. Yes.
15 Q. Okay. So it is common, in your experience, in any
16 methamphetamine laboratory situation to call the haz mat
17 disposal team.
18 A. Yes.
19 Q. Okay. Nothing unusual about this.
20 A. Nothing -- no. No.
21 Q. Okay. Do you know whether the valve on that propane tank
22 was corroded?
23 A. From what I could -- what I observed on the valve, the
24 outside did not appear to be corroded. I did not, you know,
25 take the valve apart or look at the inside, because obviously

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

32

1  the inside would become corroded first.
2  Q. Sure. But you don't know whether the inside was corroded.
3  You didn't take it off.
4  A. Right.
5  Q. Okay. And you'd indicated that the batteries posed no
6  particular hazard, because they hadn't been opened.
7  A. Right.
8  Q. And don't they also teach you with regard to release of
9  ether that release of ether in a confined space typically poses
10  a higher risk of explosion or harm than in an open-air area?
11  A. Yes.
12  Q. And this was not a confined space.
13  A. No.
14  Q. And your -- and because of your lack of medical training,
15  you're actually unable to offer any real evidence as to the
16  long-term health risks of breathing ether.
17  A. Right.
18  Q. Okay. And in fact, ether was commonly used for years and
19  years as a general anesthetic.
20  A. That's correct.
21  Q. So you can breathe it and survive.
22  A. Yes. But obviously, the concentrations are different --
23  Q. Yeah.
24  A. -- as prescribed by a doctor.
25  Q. But as far as you can tell, for this type of methamphetamine

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

33

1  preparation, this was a common, typical laboratory arrangement,
2  open-air laboratory arrangement?
3  A. Yes.
4       MR. LEWIS: No further questions, Your Honor.
5       THE COURT: All right. Thank you.
6       All right. Mr. Halstrom on behalf of Mr. Weldon?
7       MR. HALSTROM: Thank you, Your Honor.
8              CROSS-EXAMINATION
9  BY MR. HALSTROM:
10  Q. Is it detective or --
11  A. Task force agent.
12  Q. Task Force Agent DeJohn. Thank you. I'm Tim Halstrom. And
13  the other attorneys have well covered the areas that I would
14  ask. I've got a couple of very specific questions without a lot
15  of prop to them. Would you agree from your experience and
16  education that all meth labs pose a substantial risk to the
17  environment or to persons?
18  A. Yes.
19  Q. You testified that -- about the participation of the three
20  codefendants here, that Mr. Cotney was the organizer, that
21  Mr. Nelson was going to cook the methamphetamine, and that
22  Mr. Weldon -- well, he was there. He was assisting, I think, is
23  what you said, but you weren't sure what his role in that is.
24  Is that a correct characterization of your testimony there?
25  A. Yes. He was assisting -- through the investigation, we

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

34

1  found that he helped move some items, helped break down some
2  items. But he was basically there assisting with the production
3  of methamphetamine.
4  Q. That could have been done without his assistance by the two
5  individuals involved, could it not?
6  A. Sure.
7  Q. And based on that hiearchy that you have testified to of
8  involvement, would you agree that Mr. Weldon was a minimal
9  participant in this particular conspiracy?
10  A. Yes.
11  Q. He certainly had less involvement than any of the other two.
12  A. He was just as involved as they are. As far as the
13  individual organization, if you want to use the word
14  "organization," role --
15  Q. He was a participant in the conspiracy.
16  A. -- his role was minimal. But as far as being a participant
17  with that production of that lab, whether he's the cook or just
18  somebody who's organizing the whole thing -- if he's the one
19  popping the tops on the ether or whatever, he's, in my opinion,
20  an equal participant.
21  Q. Right. He's a coconspirator responsible for --
22  A. Right.
23  Q. -- all acts done by other conspirators in the situation.
24  But as far as his involvement, it was less as part of the
25  hierarchy of need than the other two.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

35

1  A. That's right.
2       MR. HALSTROM: No other questions.
3       THE COURT: All right. Mr. Brown, do you have any
4  redirect?
5       MR. BROWN: Just briefly, Your Honor.
6              REDIRECT EXAMINATION
7  BY MR. BROWN:
8  Q. On cross-examination, Agent DeJohn, you indicated that you
9  had also seen at the site -- I believe you also said when I was
10  asking you about some pill powder, and you described it as being
11  broken down. What do you mean by that?
12  A. It was no longer in pill form. It was in a powder form.
13  Often, you know, they break it down from the pill form, remove
14  the binder from it to extract the ephedrine from the Sudafed
15  pill in order to produce the methamphetamine. And then they'll
16  discard the binder material, which is the starch and the sugars
17  and things like that, and they'll discard it or sometimes save
18  it and set it to the side to use as a cutting agent after the
19  meth is already produced.
20  Q. All right. You were asked on redirect about -- you had
21  participated in approximately ten clandestine laboratories since
22  you've been assigned to the DEA.
23  A. Yes.
24  Q. Would you compare the size of this lab in this case as to
25  all the other labs that you have participated in? Would this be

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

36

1  large, medium, small?

2  A. It would probably be one of the larger labs that I've gone

3  to.

4  Q. And finally, you had -- you were asked about the proximity

5  of any residences or so forth to the area where the laboratory

6  was found, and you indicated that there were some on the way in,

7  but not any within, I believe, a mile radius or something.

8  A. Not that I could tell.

9  Q. There was actually a couple of buildings close by.

10  A. Yeah. There was a hunting cabin that was right there, which

11  I believe had running water. Whether they got their water from

12  a well or through county-water water line, I don't know. But

13  that's one of the inherent dangers of actual -- just lab

14  production. Often the chemicals are just discarded into the

15  earth; and obviously, it soaks down to our water table.

16        MR. BROWN: Thank you, Agent DeJohn.

17  No further questions, Your Honor.

18        THE COURT: Any recross, Mr. Dean?

19        MR. DEAN: Briefly, Your Honor.

20        THE COURT: All right.

21              RECROSS-EXAMINATION

22  BY MR. DEAN:

23  Q. Agent DeJohn, as to the pill powder you just discussed, you

24  said it was in a broken-down form?

25  A. Yes.

38

1  is done. Someone -- the landowner would have to come back in

2  and have the topsoil removed.

3  Q. What you're telling me is -- well, let me ask you this. Are

4  you aware that any of these chemicals are in the topsoil out

5  there at Five Points?

6  A. I have no idea.

7        MR. DEAN: Thank you.

8        THE COURT: Any recross, Mr. Lewis?

9        MR. LEWIS: Nothing, Your Honor.

10        THE COURT: Mr. Halstrom?

11        MR. HALSTROM: No, Your Honor.

12        THE COURT: All right. Is that all, Mr. Brown?

13        MR. BROWN: Yes, sir.

14        THE COURT: You may come down.

15        Mr. Brown, I'm going to assume that any other evidence

16  you offer after this time is offered solely in the Cotney case

17  unless you tell me otherwise.

18        MR. BROWN: Yes, sir. I understand that. I am going

19  to offer some testimony from Melissa Kelly, who is with the

20  Department of Forensic Sciences. And I'm also going to offer

21  some testimony from Detective Clay Stewart which will apply to

22  all three as well, although once we get to Mr. Stewart's

23  testimony, it is going to relate directly to different

24  objections across the board. It might affect some defendants

25  and not others.

37

1  Q. How was it stored at the scene when you got there?

2  A. I -- I don't recall exactly. I thought it was in a plastic

3  bag. I'm not 100 percent certain on that without looking back

4  over the notes. I remember seeing it briefly and was told that

5  it was -- possibly that was broken-down powder and --

6  Q. In plastic bags?

7  A. I don't recall what it was. I mean I've seen -- I've been

8  to -- you know, like I said, I've been to other labs and other

9  investigations. I can't recall exactly without looking at some

10  photos whether or not -- what container they were in.

11  Q. Do you have any knowledge whatsoever as to whether anybody

12  lived in that cabin out there on the property?

13  A. To my knowledge, it was just a hunting cabin. No one lived

14  there on a daily basis.

15  Q. Okay. And as far as any chemical getting into the

16  groundwater or well water, because y'all had some professionals

17  come out there and clean it up, that's not going to happen, is

18  it?

19  A. No. Well, they are not required to dig away the topsoil

20  during these cleanups. Their job is to take possession of the

21  chemicals, excess chemicals that the forensics doesn't use as

22  their evidence; glassware; cylinders; microwaves, if there's

23  microwaves on scene; anything used to produce meth that could be

24  contaminated. But these cleanup crews are not required by EPA

25  to remove the topsoil. So if there's damage there, the damage

39

1        THE COURT: Okay. So you're offering -- you're going

2  to call those two witnesses in all three cases?

3        MR. BROWN: Yes, Your Honor.

4        THE COURT: All right. And I'll allow defense counsel

5  to cross.

6        MR. BROWN: Yes, sir. Melissa Kelly. United States

7  calls Melissa Kelly.

8        MELISSA MARIE KELLY, the witness, having been duly

9  sworn, testified, as follows:

10              DIRECT EXAMINATION

11  BY MR. BROWN:

12  Q. Good morning.

13  A. Good morning.

14  Q. State your name, please.

15  A. Melissa Marie Kelly.

16  Q. Would you spell your last name for the court reporter?

17  A. K-E-L-L-Y.

18  Q. Ms. Kelly, how are you employed?

19  A. I work for the Alabama Department of Forensic Sciences.

20  Q. Were you employed in that capacity back on March 24th of

21  this year?

22  A. Yes, I was.

23  Q. I'm going to ask you some specifics. You were in the

24  courtroom and heard Agent DeJohn testify a moment ago; is that

25  correct?

40

1  A. That is correct.
2  Q. You heard him testify that there were some people from your
3  department that were on the scene that he described earlier.
4  A. That's correct.
5  Q. Were you one of those people?
6  A. Yes, I was.
7  Q. What was your job on the scene that day?
8  A. I was actually the person going through the evidence and
9  deciding what we were going to collect and take back to the lab.
10 Q. What criteria do you use to decide what to collect and what
11 not to collect?
12 A. Anything that could possibly be contaminated. We try to
13 take any unknown liquids back to the lab to determine what is in
14 them. We also in the process separate out acids from bases from
15 solvents for the hazardous waste crew.
16 Q. Do you -- you heard the description of the scene. And I
17 don't want to go through all of that again. I just want to ask
18 you some specific questions about certain things that Agent
19 DeJohn didn't know about.
20 A. Okay.
21 Q. The propane tank, the small propane tank that he mentioned,
22 did it in fact contain anhydrous ammonia?
23 A. It contained a small amount of anhydrous ammonia, yes.
24 Q. Would anhydrous ammonia normally come in that tank?
25 A. No, it would not.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

42

1  Q. Would you agree with that?
2  A. Yes. It is extremely flammable.
3  Q. And just to reiterate, you were there in your capacity to
4  process the chemicals and the items that were there at the
5  scene.
6  A. That's correct.
7  Q. Was some other individuals with your department also there?
8  A. Yes.
9  Q. How many? Do you recall?
10 A. There were two others.
11 Q. Okay. How long did it take to clean up and collect that
12 evidence?
13 A. Maybe three to four hours. I'm not exactly certain.
14 Q. All right. After you collected the items from there, were
15 you asked by law enforcement agents to determine a quantity of
16 methamphetamine that could be produced by the substances that
17 were there at that lab that you collected?
18 A. Yes, I was.
19 Q. Before we get into your results, if we can, let's take a
20 step back. And could you tell Judge Albritton your training and
21 education as it relates to the job you performed in this
22 capacity with the Department of Forensic Sciences?
23 A. Okay. I received a Bachelor of Science in chemistry from
24 Clemson University. I received a master's of education from
25 Boston College. I attended and graduated from the Drug

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

41

1  Q. The batteries that Agent DeJohn described had not yet been
2  opened. Were there any batteries that were on the scene that
3  had been opened?
4  A. Not that we found. No.
5  Q. And Agent DeJohn mentioned a large quantity -- large
6  quantity of ether in a container. Did you see that as well?
7  A. Yes, I did. We actually collected the ether.
8  Q. Okay. And did you smell the ether on the scene?
9  A. Yes, we did.
10 Q. Okay. You kind of reacted to that.
11 A. (Nods head)
12 Q. Was it -- explain what the reaction was.
13 A. It was a very strong odor because it was stored in a
14 Tupperware container. It was a container that it was not meant
15 to be stored in.
16 Q. Are you saying it just -- it leaks out a lot easier through
17 that type of container?
18 A. Yes, it does.
19 Q. And did you have the opportunity to determine a quantity of
20 the ether?
21 A. Yes, I did. It -- there was approximately 13.9 liters,
22 which is about 21 pounds.
23 Q. Did you hear Agent DeJohn's testimony about the volatility
24 of the ether?
25 A. Yes, I did.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

43

1  Chemistry Training Center in Jacksonville, Alabama; and then I
2  also had additional training at the Auburn laboratory from our
3  laboratory director as well as the man who is now our director.
4  Q. Okay. And your office with the Department of Forensic
5  Sciences is in Auburn; is that correct?
6  A. That is correct.
7  Q. What, if any, certification processes do you go through as
8  laboratory technician or forensic scientist on a routine basis?
9  A. Certification every year. We have to take and successfully
10 complete at least one proficiency test. And we take at least 20
11 hours of continuing education throughout the year.
12 Q. Did you use that education and experience to determine the
13 results that you came up with in this case?
14 A. Yes, I did.
15    MR. BROWN: May I approach the witness, Your Honor?
16    THE COURT: You may.
17 Q. Ms. Kelly, I'm going to show you what's been marked as
18 Government's Exhibit #1 and ask if you can identify that.
19 A. Yes, I can.
20 Q. What is it?
21 A. It is an additional report that I sent out on the
22 quantitation of the pseudoephedrine.
23 Q. From this -- from the lab in this case?
24 A. Correct.
25 Q. Does it fairly and accurately depict the results as you

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2007

44

1  remember them to be from that -- from that testing process?
2  A. Yes, it does.
3  Q. And that's actually your report; is that right?
4  A. That is correct.
5  Q. Or a copy of it?
6  A. That's a copy of it. Yes.
7        MR. BROWN: The government offers Exhibit #1, Your
8  Honor.
9        MR. HALSTROM: No objection.
10       THE COURT: Everybody has copies of that, I assume?
11       MR. LEWIS: Yes, Your Honor.
12       THE COURT: All right. It's admitted.
13  Q. You were asked to analyze more than one object; is that
14  correct?
15  A. That is correct.
16  Q. Would you explain what the objects were and what you did in
17  your analysis?
18  A. Originally, or the quantitation?
19  Q. The quantitation.
20  A. Quantitation? I was asked to quantitate three items of
21  evidence, which were both powder. The first one was some powder
22  that was wrapped in plastic. And I analyzed it the same way I
23  do a case. I performed multiple instrumental analyses on it,
24  and I weighed it. And then the same with the second two items.
25  And then I was requested later on to come back and quantitate it

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2007

46

1  pseudoephedrine.
2  Q. Okay. Did you do a calculation to determine how much
3  methamphetamine that would produce?
4  A. Yes, I did.
5  Q. What were the results of that?
6  A. That if there was 75 percent yield, the individual could
7  make 77.95 grams of methamphetamine.
8  Q. Okay. Now, you didn't calculate that at 100 percent yield?
9  A. Yes, I did.
10  Q. What was that amount?
11  A. That number was 103.93 grams.
12  Q. Why did you include 75 percent yield on your report as
13  opposed to 100 percent yield?
14  A. Because no one person can convert everything 100 percent
15  from pseudoephedrine to methamphetamine even under the most
16  ideal laboratory conditions.
17  Q. Why did you choose 75 percent?
18  A. Because that is generally the amount of methamphetamine we
19  typically will find when we have to quantitate.
20  Q. Would that be on the low end or the high end yield, in your
21  experience?
22  A. It's probably around the middle.
23  Q. Okay. Did you do the same analysis on the second item?
24  A. Yes, I did.
25  Q. What were the results of that test?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2007

45

1  as to exactly how much pseudoephedrine was present, and I did
2  this using the HPLC, which is high performance liquid
3  chromatography.
4  Q. And you did that in this case?
5  A. Correct.
6  Q. And that's reflected in your report?
7  A. Yes.
8  Q. You've identified item number one on your report. Would you
9  tell Judge Albritton what the results were of that analysis?
10  A. Item number one was pseudoephedrine hydrochloride. It was
11  approximately -- well, it was 88.12 percent pure. So there was
12  115.07 grams of pseudoephedrine in the mixture.
13       THE COURT: I don't have -- excuse me. I don't have
14  that exhibit before me.
15       MR. BROWN: May I give you a courtesy copy?
16       THE COURT: All right. Do you have another copy of
17  that available in addition to this? Do you have another copy?
18       MR. BROWN: Yes, Your Honor. I have another copy.
19  Would you --
20       THE COURT: Do you have another copy you could give me?
21       MR. BROWN: Yes, sir.
22  (Brief pause)
23  Q. You were describing item number one. And I think you had
24  said that it was -- you had given the quantity.
25  A. It was -- in the mixture, there was 115.07 grams of pure

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2007

47

1  A. That the mixture was 77.56 percent pseudoephedrine
2  hydrochloride, which came out to be 52.62 grams of
3  pseudoephedrine in the mixture. And theoretically, at a 75
4  percent yield, you can make 35.65 grams of methamphetamine.
5  Q. And the third item?
6  A. The third item was 95.35 percent pseudoephedrine
7  hydrochloride, so there was actually 62.01 grams in the
8  mixture. And at a 75 percent yield, you can make 42.01 grams of
9  methamphetamine.
10  Q. All calculated at 75 percent yield.
11  A. Yes.
12  Q. After you do your testing and your quantitative analysis on
13  these items, what do you do with the evidence that you collect?
14  A. For clan labs, we will seal it up and we will store the clan
15  labs until we are given word that we can destroy them.
16  Q. How do you go about destroying them?
17  A. We have a contract through Auburn University with a
18  hazardous waste disposal team.
19       MR. BROWN: Thank you, Ms. Kelly. I don't have any
20  further questions. Defense lawyers may.
21       THE COURT: All right. Mr. Dean on behalf of Defendant
22  Cotney?
23              CROSS-EXAMINATION
24  BY MR. DEAN:
25  Q. Ms. Kelly, can you describe -- in the tox report it refers

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

48

1  to three different items that were recovered. When you say
2  that, are you talking about three different bags of powder?
3  A. Yes. They were three separate items of powder.
4  Q. And can you tell me, as far as how the powder was
5  distributed in each bag, was there more in one, less in the
6  other, or was it three equal bags?
7  A. There was more in one bag.
8  Q. And that was the one that was, what, 115, approximately?
9  A. No. The total weight was 130 grams.
10  Q. I'll ask you this question, and you may not know it.
11  A. Okay.
12  Q. As pill powder is cooked down in a methamphetamine lab, if
13  it is all cooked at the same time in the same pot or skillet or
14  whatever and it's divided up into three different units, should
15  the quantity of pseudoephedrine be the same in each unit? Do
16  you understand what I'm saying?
17  A. No. I'm sorry. I don't.
18  Q. As opposed to three different cooks. You might get more
19  pseudoephedrine in one cook, less in another one, and then even
20  less in another one. If it's all cooked together and divided --
21  I'm just trying to figure out whether -- what the discrepancy is
22  in the amount of pseudoephedrine or the percentage of it in each
23  bag.
24  A. If you did not make sure it was uniformly mixed before you
25  separated it, that might explain inconsistencies.

50

1        MR. LEWIS: Thank you, Your Honor.
2            CROSS-EXAMINATION
3  BY MR. LEWIS:
4  Q. You had indicated that in the propane tank was a small
5  amount of anhydrous. How much?
6  A. It was enough for us to test on the scene, but not enough to
7  get a sample to take back to the lab.
8  Q. So it was residue.
9  A. Yes. Pretty much.
10  Q. Okay. So it did not indicate that on that particular
11  occasion or even by these people there had been a transfer of
12  anhydrous into that container from that larger anhydrous
13  container.
14  A. It indicated that at one point there was anhydrous ammonia
15  in there; but when it got there, I'm not sure.
16  Q. Could have been two years before.
17  A. That is correct.
18  Q. And whoever did it might not have been any one of these
19  people.
20  A. That is possible.
21  Q. So there was not a usable quantity.
22  A. No, sir.
23  Q. Okay. You had indicated that you used a -- oh, first of
24  all, let me ask you this. The powder that you tested, the three
25  little batches of powder --

49

1        MR. DEAN: I think that's all I have at this time, Your
2  Honor.
3        THE COURT: All right. Mr. Lewis?
4        MR. LEWIS: Your Honor, first I'd like to move to
5  exclude the witness on the grounds that we were not provided
6  with copies of her curriculum vitae prior to this hearing.
7        THE COURT: Mr. Brown?
8        MR. LEWIS: We were not alerted to expert testimony.
9        MR. BROWN: Your Honor, I think it was provided with
10  the curriculum vitae. I don't have -- I didn't bring the whole
11  entire discovery package with me at this time, but -- I mean you
12  could -- I would defer to defense counsel to voir dire her
13  further if she's not qualified as an expert.
14        THE COURT: Was it requested, Mr. Lewis? Did you
15  request it?
16        MR. LEWIS: We didn't make any written requests, Your
17  Honor. All we got was the tox report itself that you have in
18  front of you.
19        THE COURT: And when you got the toxicology report, you
20  didn't ask the government for a CV?
21        MR. LEWIS: No, sir. I understood that that was under
22  the standing order on discovery.
23        THE COURT: Okay. Well, I'm going to overrule the
24  objection. If you want to question the witness further about
25  her qualifications, you're free to do so.

51

1  A. Uh-huh.
2  Q. -- who collected those? Did you collect them?
3  A. Yes. I collected them.
4  Q. All three of them?
5  A. Yes, sir.
6  Q. And they -- how -- when you found them, how were they
7  packaged?
8  A. Item number one was wrapped in a piece of plastic, item
9  number two was in a Ziploc bag, and item number three was in a
10  plastic bag.
11  Q. Okay. Now, have you ever cooked methamphetamine?
12  A. Yes. We have made it in the lab.
13  Q. In the lab under controlled circumstances.
14  A. Yes, sir.
15  Q. Okay. You've never made it out in the woods.
16  A. No, sir.
17  Q. You write in your report that this would have theoretically
18  yielded 77.95, 35.65, and 42.01 grams of methamphetamine,
19  correct?
20  A. Correct.
21  Q. You did not use the phrase "actual methamphetamine."
22  A. Correct.
23  Q. Okay. Is there a difference from methamphetamine and actual
24  methamphetamine in the world of DFS?
25  A. Actual methamphetamine would be if we had a sample of

52

1  methamphetamine that we had to quantitate. Theoretically, we
2  had no methamphetamine, so we're working with the starting
3  material.
4  Q. Okay. So basically, this was potential methamphetamine.
5  A. Yes, sir.
6  Q. All right. We might call it executory methamphetamine, a
7  platonic, ideal methamphetamine. It was not actual meth.
8  A. No. It was not actual meth.
9  Q. Okay. And all you can do is use your education and training
10  to -- and the application of theories to come up with the
11  quantities that you did.
12  A. Yes, sir.
13         MR. LEWIS: No further questions, Your Honor.
14         THE COURT: All right. Mr. Halstrom?
15              CROSS-EXAMINATION
16  BY MR. HALSTROM:
17  Q. Good morning, Ms. Kelly. One question.
18  A. Okay.
19  Q. To what degree of certainty do you apply the 70 percent
20  figure to determine theoretically in this case? How certain are
21  you that theoretically it's going to amount to this much actual
22  methamphetamine?
23  A. I'm fairly certain. It's a very simple reaction. There are
24  not that many mistakes that can be made with this method that
25  was being used. However, I always calculate a hundred percent

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

54

1  we've had to do in the past on clandestinely manufactured
2  methamphetamine.
3         MR. HALSTROM: Very good. Thank you.
4         THE COURT: Mr. Brown, any redirect?
5         MR. BROWN: No redirect, Your Honor. But just so the
6  record is clear, I did have one of my earlier packages of
7  discovery. And Ms. Kelly's curriculum vitae is found at Bates
8  stamps number 80 and 81. And I can enter that into the record
9  if the Court would like.
10         MR. LEWIS: Your Honor, I stand corrected on that. If
11  he -- I didn't see it in the tox report, and I assumed that we
12  did not have it. And I apologize. I withdraw the motion.
13         THE COURT: All right. The motion is withdrawn.
14         MR. LEWIS: May I do one follow-up question, Your
15  Honor?
16         THE COURT: Sure.
17         MR. LEWIS: Or a little area.
18              RECROSS-EXAMINATION
19  BY MR. LEWIS:
20  Q. Based on what Mr. Halstrom just asked, you had indicated,
21  Ms. Kelly, that you also figure a 50 percent yield.
22  A. Yes, sir.
23  Q. All right. Now, I'm going to represent to you that all
24  these numbers we have add up to approximately 155.65 grams of
25  methamphetamine.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

53

1  yield, 75 percent yield, and 50 percent yield just -- just in
2  case.
3  Q. Is the -- I said one question. Allow me a follow-up
4  question. Is that theoretical statement, in the realm of the
5  laboratory existence, for circumstances within the laboratory
6  that you would -- you would have 75 percent reduction from the
7  raw material into the methamphetamine?
8  A. In a clan lab or in an actual lab setting?
9  Q. In the setting that you determine what the quantities
10  theoretically would be.
11  A. 75 percent is just a generally accepted number that we use
12  within our department. It is, from experiences in the past, the
13  number that we have seen that's in the middle.
14  Q. As you -- is that as you apply that to the forensics reports
15  from the material you received from clandestine labs?
16  A. I'm not sure I understand.
17  Q. Well, there are some situations where you will manufacture
18  methamphetamine in a lab circumstance, and then there are other
19  situations where you're asked to determine the quantities that
20  are available from a clandestine lab or illegal lab. And the
21  question I'm asking is whether those figures that you're using
22  come from experience in using -- from facts received from
23  clandestine laboratories, or are they figures that you're using
24  from this laboratory analysis.
25  A. They're actually figures that are based on quantitations

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

55

1  A. Okay.
2  Q. And that's methamphetamine as opposed to actual
3  methamphetamine, correct?
4  A. Correct.
5  Q. Okay. If you had figured it at a 50 percent yield, what
6  would that come out to?
7  A. Total?
8  Q. Yeah.
9  A. Approximately a little over a hundred grams.
10  Q. A little over a hundred grams. Okay. Now, why do you
11  figure the 50 percent yield?
12  A. I always do a low number, 100 percent, and then 75 percent.
13  Q. Okay. And you do the low number, the 50 percent, because
14  that's what you see sometimes, although 75 percent is what you
15  generally accept as normal, correct?
16  A. I've never seen any as low as 50 percent, but there is still
17  the possibility that in a clan lab situation, everything can go
18  completely wrong.
19  Q. Especially when you're outside in the woods.
20  A. Yes.
21  Q. Okay. But you used the 75 percent -- and I think I'm -- I
22  think I'm quoting you here -- because that's what we generally
23  find, correct?
24  A. That's the average of what we generally find, yes.
25  Q. Some are higher; some are lower.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2003

56

1    A. Yes, sir.
2    Q. So you cannot say to a scientific certainty that the yield
3    from this particular operation would have been higher than 50
4    percent.
5    A. I cannot say it would be -- it could have been in the 90
6    percentage; it could have been in the thirties.
7        MR. LEWIS: Okay. That's it. Thank you.
8        THE COURT: Mr. Brown, anything further?
9        MR. BROWN: No, Your Honor. May she be excused?
10       MR. LEWIS: No objection.
11       THE COURT: All right. You may come down.
12       All right. Mr. Brown.
13       MR. BROWN: United States calls Investigator Clay
14   Stewart. And his testimony would apply to -- at least a portion
15   of it would apply to all three defendants.
16       THE COURT: All right. And I'm accepting the testimony
17   of Ms. Kelly as applicable in all three. And I understand the
18   defendants have no objection to her being excused. Is that
19   correct, all of you?
20       MR. DEAN: That's correct, Your Honor.
21       MR. LEWIS: No objection.
22       MR. HALSTROM: No objection.
23       CLAY STEWART, the witness, having been duly sworn,
24   testified, as follows:
25

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2003

57

1                DIRECT EXAMINATION
2    BY MR. BROWN:
3    Q. Good morning. Would you state your name, please?
4    A. Clay Stewart.
5    Q. How are you employed?
6    A. Employed by the Chambers County Sheriff's Department with a
7    current assignment of the drug task force.
8    Q. What are your responsibilities with the drug task force?
9    A. To investigate drug-related crimes in Chambers County.
10   Q. Were you so employed on March 24th, on that date?
11   A. Yes, I was.
12   Q. Without rehashing testimony that's already been talked
13   about, did you -- you heard Agent DeJohn describe generally the
14   scene and Ms. Kelly generally describe the items that were found
15   at the scene as well. You were in court for that testimony,
16   right?
17   A. That's correct.
18   Q. Would you describe the -- any buildings or structures that
19   were on the scene, like right where the clandestine laboratory
20   was located?
21   A. I recall in the area of where the lab was there was a farm
22   house-type cabin. There was also a small pump house. And then
23   farther off, there was a barn-type structure, another structure
24   in the area.
25   Q. What is a pump house?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2003

58

1    A. It's what I call a well pump house where a well would be, an
2    in-ground well that would be drug or drilled.
3    Q. Do you know if the cabin had running water?
4    A. I believe it did.
5    Q. Do you know if it had a city-provided source of water?
6    A. I don't believe that there's any kind of municipal or county
7    or city-provided water in that area.
8    Q. Switch gears briefly. I'm going to show you what's been
9    marked as Government's Exhibits #6 and #7.
10       MR. BROWN: May I approach, Your Honor?
11       THE COURT: You may.
12   Q. Do you recognize those?
13   A. Yes, I do.
14   Q. What are they?
15   A. These are photographs taken of the clandestine lab on March
16   24th.
17   Q. Who took those photographs?
18   A. It would have been me.
19   Q. Do they fairly and accurately depict the scene as you
20   remember on that day?
21   A. Yes, they do.
22       MR. BROWN: Thank you. The government moves to admit
23   Exhibits #6 and #7, Your Honor.
24       THE COURT: They're admitted.
25   Q. These photographs represent --

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon                    October 15, 2003

59

1    (Brief pause)
2    Q. I'm going to identify these composite photographs. There's
3    nine photographs which are on Government's Exhibit #7. I'm
4    going to just start at the top left-hand corner and ask you to
5    identify what's in that photograph.
6    A. That's a photograph of a compressed gas cylinder that's been
7    concealed under wood and debris and old tin.
8    Q. Did you come to recognize what was located inside that
9    cylinder?
10   A. Yes, sir. It would be anhydrous ammonia.
11   Q. The top middle shows another container. What is that?
12   A. That's a photograph of a propane tank that's had an altered
13   or another valve placed on top of it.
14   Q. When you say another valve, is that the valve that generally
15   would come with that tank?
16   A. No, sir, not any I've seen. That appears to be a water-type
17   valve.
18   Q. Top right, what is that?
19   A. That's what I would call a pair of vise-grip pliers.
20   Q. Was it located in close proximity to the tanks?
21   A. Yes, sir. It would have been in the same area.
22   Q. The middle left photograph, what is that?
23   A. This photograph, in the background of the photograph, you
24   can see the container that held the ether. There's also glass
25   jars in the foreground of the photograph, and there's debris and

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

60

1   trash on the ground and a pack of coffee filters.
2   Q. What are the coffee filters? What are they there for?
3   A. The coffee filters are used in a clandestine lab to strain
4   various liquids to remove the powder or binders.
5   Q. The very middle photograph, what does that contain?
6   A. It's a photograph of a backpack that appears to have a pair
7   of blue channel-lock-type -- what I call channel-lock-type
8   pliers. It appears to be a valve or a -- behind it, it looks
9   like a water spigot valve, the top of it, with a twist on and
10  off.
11  Q. Okay. I'm going to point out an item and ask if that's the
12  item you're talking about.
13  A. Yes, sir. That's it.
14  Q. And the item there, are those the pliers that you were
15  discussing?
16  A. Yes, sir. That would be what I would call blue
17  channel-lock-type pliers, blue handled.
18  Q. Middle right, what is that item?
19  A. That appears to be a backpack with a photograph of what I
20  would call an HCL gas generator.
21  Q. Bottom left?
22  A. It is another photograph of the lab scene showing the
23  various containers, the compressed gas cylinder, a shirt, the
24  ether -- container the ether was in, and various debris around
25  the lab site.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

61

1   Q. Okay. There's a container that I'm pointing at right
2   there. It's between the tree and the shirt. Is that the
3   container that you're discussing that has either in it?
4   A. Yes. That would have been the container.
5   Q. And then the middle bottom photograph, that photograph, what
6   does it represent?
7   A. That would have been a Tupperware-type container with an
8   unknown liquid believed to be ether inside of it with aquarium
9   pump tubing on top of it.
10  Q. Government's Exhibit #7 on the top left, what is that item?
11  A. That's a photograph of the propane tank. Also in the
12  photograph is a can of what appeared to be acetone or denatured
13  alcohol. At the bottom of the photograph, there appears to be
14  some hose that has been connected to what looks like a pool
15  filter, some type of water filter, possibly an effort to make a
16  crude filter.
17  Q. Some of these items look similar to one another, so I'm just
18  going to direct you to the right-hand -- the top most on the
19  right-hand side. There seems to be some sort of container in
20  there. Do you know what that is?
21  A. No. Actually, I don't. I don't recognize what that is. It
22  appears to be possibly a propane cylinder or another type
23  cylinder. But it's a debris pile that was at the clan lab
24  site --
25  Q. Right.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

62

1   A. -- that some of the items were found around and in.
2   Q. Okay. And then the bottom right-hand side, I believe, is a
3   close-up of something that you described a moment ago.
4   A. Yes, sir. It appears to be a pair of channel-lock pliers
5   with a fitting in the mouth of them.
6   Q. Is that exactly how you found it on that day?
7   A. That's what I recall seeing. I have no knowledge if anyone
8   else had moved them. When I photographed the area, it was a
9   little time after the actual incident happened that we started
10  photographing. But that was how I observed them.
11      MR. BROWN: Your Honor, if I can have a minute just to
12  look through my list of objections to make sure I've covered the
13  ones that applied to different defendants.
14      (Brief pause)
15  Q. Now, aside from taking these photographs, Detective Stewart,
16  did you do anything else in relation to this case?
17  A. Yes, I did.
18  Q. Explain to Judge Albritton how you came to be involved in
19  this case.
20  A. We were notified by our 911 center, by our dispatch center,
21  that there was a possible clandestine methamphetamine lab in the
22  north part of our county, which was on County Road 242. A
23  gentleman had been turkey hunting and smelled a strong chemical
24  smell and had gotten word to the 911 center that there was a
25  possible meth lab. He also observed a truck at some hunting

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

63

1   property, the Bonner family hunting property. This call was
2   dispatched to Mike Parrish and Jason Fuller. It was also passed
3   on to Major Howard Carlton. Myself and Detective Tommy Sims
4   were notified by --
5       (Brief interruption)
6   A. I'm sorry. Our deputies were dispatched to it along with
7   Major Howard Carlton.
8   Q. Let's take a break right there and identify who these people
9   work for. You said Mike Parrish.
10  A. Yes, sir. Mike Parrish, Howard Carlton, and Jason Fuller
11  are all employed, like I am, with the Chambers County Sheriff's
12  Department. Tommy Sims is a detective with the Lanett Police
13  Department and at that time was currently assigned to the drug
14  task force.
15  Q. Okay. Were there any other individuals who responded to the
16  scene that day?
17  A. Investigator Shane House was also there when we arrived on
18  the County Road 242.
19  Q. What did you do once you got there?
20  A. We met with the complainant, a gentleman named Larry Bonner,
21  and he described what he had seen and smelled. We had decided
22  to -- we formulated a plan to walk into the area to see if we
23  could see anything or possibly apprehend subjects if they were
24  involved in a clan lab. Investigator Shane House was assigned
25  to watch a -- a gas line road, a logging road, just a little

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon    October 15, 2003

64

1    road that appeared to lead to the property -- the complainant
2    indicated that it was kind of a back road that led in there --
3    rough, but a back road that led to this property -- while the
4    rest of us went up to a gate and walked in to where this hunting
5    camp is.
6    Q. Describe, if you will, how you entered that property in
7    terms of the direction and how individuals that you've already
8    named were assigned to go into the property.
9    A. We walked from the gate -- instead of driving vehicles, we
10   walked in. I'm not sure the distance. It was a good distance
11   in. The complainant, Larry Bonner, accompanied us approximately
12   halfway up the road. At that point, I smelled ether, the smell
13   of ether, while we were still a good distance away.
14       I asked Larry Bonner to return back to the vehicles instead
15   of having him accompany us because I felt like there -- with a
16   strong smell of ether and I couldn't see the house, I felt there
17   was a very good chance there was going to be a clandestine meth
18   lab there.
19       We proceeded on down the road leading to the cabin or to the
20   hunting camp. When we got to the end of the road, the road
21   opened up into a field that contained the building, the hunting
22   camp itself, the pump house, and the barn. One of the first
23   things we saw was a black pickup truck backed into the edge of
24   the wood line, which is a fairly thin area of planted pines.
25   Q. Where did you go from there?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon    October 15, 2003

65

1    A. At that point, myself, Detective Tommy Sims, and Jason
2    Fuller went to the left of the property along the left-hand side
3    in a line, which is also planted pines in the area, and walked
4    around to approach the truck and the clan lab on the left-hand
5    side of the road -- of the area. Deputy or Sergeant Mike
6    Parrish, his canine Narco, and Major Howard Carlton went to the
7    right around the house and approached the vehicle and the clan
8    lab on the truck side.
9    Q. All right. You -- how were you dressed on that day?
10   A. I was wearing -- would have been wearing blue jeans and a --
11   probably some type of T-shirt. Prior to going to this area, I
12   had placed my ballistic vest on.
13   Q. How was Deputy Fuller -- how was he dressed?
14   A. He was dressed in a standard-issue Chambers County Sheriff's
15   Department uniform, brown uniform, badge, gun belt.
16   Q. And I believe you said that Tommy Sims was also in the group
17   of people that you were with.
18   A. That is correct.
19   Q. How was he dressed?
20   A. Similar to the way I am with blue jeans and a casual shirt,
21   but wearing a black ballistic vest with "police" on the front
22   and back.
23   Q. Two other individuals that you named you said went on the
24   right side of the property. One was Mike Parrish?
25   A. That's correct.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon    October 15, 2003

66

1    Q. And he's a sergeant with Chambers County?
2    A. That's correct.
3    Q. How was he dressed?
4    A. He was dressed in a -- what I would call, I guess, his K-9
5    uniform. I believe they're probably brown BDUs, a brown
6    sheriff's department shirt marked, you know, K-9, sheriff's
7    department -- I'm not sure exactly what the shirt said -- with
8    his ballistic vest under that, an under-clothing vest.
9    Q. I believe the last person is Major Carlton?
10   A. That's correct.
11   Q. How was he dressed?
12   A. I'm not sure exactly what he had on. I believe it was a red
13   Chambers County Sheriff's Department shirt, but he was also --
14   and I believe it was khakis. But he was also wearing a
15   ballistic vest, except his was gold with sheriff's lettering
16   across the front and the back.
17       MR. BROWN: May I approach the witness, Your Honor?
18       THE COURT: You may.
19   Q. Detective Stewart, I'm going to show you what's been marked
20   as Government's Exhibit #5 for identification purposes. What is
21   this?
22   A. That is my ballistic vest that I wear to keep myself from
23   gunfire and also from flash fires in a meth lab.
24   Q. Okay. Is this the vest that you wore on March 24th?
25   A. That is it.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon    October 15, 2003

67

1    Q. What does it say on the front of it?
2    A. It's police in white letters.
3    Q. And on the back?
4    A. Police.
5    Q. Let me show you what's been also marked as Government's
6    Exhibits #2, #3, and #4, and ask if you can identify those.
7    A. Yes, I can.
8    Q. What are those?
9    A. Three photographs, one depicting me wearing my ballistic
10   vest facing the front, and then two photographs of my back with
11   my ballistic vest on with the "police" in plain view on both
12   front and back.
13       MR. BROWN: Your Honor, the government moves to admit
14   Exhibits #2, #3, and #4.
15       THE COURT: They're admitted.
16   Q. And I believe you indicated that's the same vest that we
17   just looked at as Government's Exhibit #5 but did not enter into
18   evidence?
19   A. Yes. That is the same vest.
20   Q. The lettering on that vest, is it reflective in any way?
21   A. Yes. It's light reflective.
22   Q. Detective Stewart, I believe you were discussing your
23   approach to the area where the truck was and where a tree line
24   was. The three of you, Detective Sims, Deputy Fuller, and
25   yourself, were on the left side; is that right?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

68

1   A. Yes. That's correct.
2   Q. And Sergeant Parrish, his canine partner, and Major Carlton
3   were on the right side?
4   A. Yes. That's correct.
5   Q. What happened at that time?
6   A. As we were approaching the clandestine meth lab on our side,
7   I observed one subject appear to look in our direction. At that
8   point, Detective Tommy Sims ordered him to place his hands up --
9   identified himself as police, and ordered him to put his hands
10  up. Detective Sims repeated the command several times to this
11  individual. I could see two individuals in the actual lab
12  area. After Detective Sims made the verbal command several
13  times, the subjects turned and ran from the clandestine lab.
14  Q. Do you recall what he said exactly when he identified
15  himself?
16  A. The first thing he said each time was police, put your hands
17  up. I recall him saying that specifically.
18  Q. All right.
19  A. He repeated the command several times.
20  Q. Did you -- did anyone in your small group of three
21  persons -- did y'all have your weapons drawn or anything like
22  that at that point?
23  A. At the point where Detective Sims began issuing verbal
24  commands, I drew my weapon. Deputy Fuller was carrying a
25  12-gauge pump shotgun with him.

70

1   of my peripheral vision.
2       After a brief time, I got a response from Mike or heard Mike
3   and Tommy Sims in the woods. Mike was giving a description or
4   talking about someone who just shot his dog. I proceeded into
5   the woods to assist and came across our Chambers County
6   Sheriff's Department's K-9 on the ground. It appeared to be
7   shot. I continued on down to the sound where I could hear Tommy
8   Sims issuing commands for somebody to get their hand out from
9   under them, to show -- he kept -- I could hear him say, show me
10  your hands, show me your hands, as I proceeded through the
11  woods.
12  Q. Did you eventually get to that area?
13  A. As I approached that area, I came upon a 12-gauge pump
14  shotgun that was on the ground. I recovered this weapon because
15  I knew there were other people -- at least one other person in
16  the woods. I did not want to leave it in the woods. So I
17  recovered the 12-gauge shotgun and then went and essentially
18  stepped out to where Tommy Sims was with the defendant, who was
19  later identified at David Cotney, Jr.
20  Q. Was that shotgun -- was that the same shotgun that Deputy
21  Fuller had?
22  A. No, it was not. This was a different shotgun. This was a
23  sawed-off, small, Remington pump-type shotgun.
24  Q. Okay. Just one other area. As -- the shotgun that you
25  found, later on, did you ask any of the defendants about the

69

1   Q. Okay. And do you know if Detective Sims had his weapon
2   drawn at that point?
3   A. I don't recall specifically if he had it in his hand or not
4   because I was concentrating on the two people at the lab.
5   Q. After the two individuals that you saw that ran, what
6   happened after that?
7   A. As Detective Sims was issuing verbal commands, Sergeant
8   Parrish was also issuing verbal commands from the other side by
9   the truck where he and Major Carlton were. I heard Sergeant
10  Parrish identify himself several times as a deputy sheriff, that
11  he had a sheriff K-9, and he was going to release his dog. I
12  heard him issue that, to stop or he would release his sheriff
13  K-9 or canine three times, approximately three times, I believe
14  it was.
15      I couldn't see after that what happened. The subjects ran
16  off. I went in pursuit of them and stopped at the lab to secure
17  the clandestine lab.
18  Q. All right. At some point, did you meet back up with any of
19  the other officers there?
20  A. Just a short time -- I mean within seconds after getting to
21  the lab, I heard a shot and then several other shots. After I
22  heard that, I started yelling for Major Carlton, Sergeant
23  Parrish, and Detective Sims. He could see Jason. I didn't
24  realize where Major Carlton was until he answered. And he
25  turned out to be fairly close to me. I just didn't see him out

71

1   shotgun?
2   A. Later through that investigation, we did ask about the
3   shotgun.
4   Q. Who did you ask?
5   A. Both Allen Nelson and Jonathan Weldon.
6   Q. Did either of them -- and if you could identify who -- did
7   they give you any statements about the shotgun itself?
8   A. Yes. They both did.
9   Q. What did Mr. Nelson tell you about the shotgun?
10  A. That the shotgun belonged to David Cotney and he had
11  purchased it from another individual and had it with him at the
12  lab site the night prior to where we made the arrest there and
13  also at the lab site that day.
14  Q. Did he describe to you the night before at the lab site what
15  the gun had been used for?
16  A. He just said that Cotney had it with him during the prep
17  work when they were cooking down the pills. I believe that's
18  when he said it was top of the -- laying on top of the
19  refrigerator within, you know, arm's reach.
20  Q. All right. What did Mr. Weldon say as it relates to that
21  gun?
22  A. That the 12-gauge shotgun belonged to David Cotney that was
23  at the lab site.
24  Q. Did he describe anything that had happened the night before
25  as it related to the gun?

72

1  A. Weldon was not -- Weldon was not at the hunting camp the
2  night before. I believe he had been taken to visit with some --
3  his children.
4        MR. BROWN: Thanks, Detective. I don't have any
5  further questions of you at this time. The defense lawyers may
6  have some questions.
7        THE COURT: All right. We're going to break at this
8  time for lunch before we start on the cross-examination. We'll
9  start back at 1:15. We'll be in recess until 1:15.
10       (Lunch recess at 11:50 a.m. until 1:16 p.m.)
11       THE COURT: All right. Mr. Dean, cross-examine?
12       MR. BROWN: Your Honor, may I approach on an unrelated
13  matter?
14       THE COURT: All right. Does it need to be on the
15  record?
16       MR. BROWN: No, sir.
17       (Bench conference held off the record)
18       THE COURT: All right. Mr. Dean?
19              CROSS-EXAMINATION
20  BY MR. DEAN:
21  Q. Clay, I'm Brent Dean. As you know, I represent David
22  Cotney. There's several things I want to ask you about, and
23  they are of a factual nature. They're dealing with the
24  enhancements in these sentencing guidelines over the facts as my
25  client remembers them and the facts as you and the other

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

73

1  officers remember them.
2  A. All right.
3  Q. To begin with, I want to ask you about some distances as
4  best you recall from the point -- to begin with, from the point
5  you saw the truck. How far do you think you were?
6  A. A guess, from the -- where I first observed the truck, would
7  probably be -- it was a good distance, probably maybe 75, a
8  hundred yards, maybe. Maybe 125 yards. It was across the
9  opening.
10  Q. Is that as you -- and I've been out to the scene several
11  times. Is that -- as you came down the dirt road, veered left
12  where the field opened up, is that about the vicinity you first
13  saw the truck?
14  A. Yes. That would have been about the area I seen it, when it
15  opened up.
16  Q. Can you describe how the truck was parked in relation to the
17  woods?
18  A. It was parked at an angle. It wasn't backed in at a
19  90-degree angle. If you have the wood line, it was an offset
20  angle, almost -- seemed to be almost facing where the road came
21  in.
22       MR. DEAN: Your Honor, may I approach?
23       THE COURT: You may.
24       MR. DEAN: I have shown these photographs to the United
25  States attorneys. I'd like to mark this one as the next Cotney

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

74

1  exhibit.
2  Q. Clay, I'm going to try to put this on this machine. As you
3  know, in Chambers County, we have not advanced this far yet.
4  Does this photograph accurately represent about the area where
5  you first were able to see the truck as you rounded this corner
6  to the left?
7  A. I'm having a little trouble seeing the photograph. I'm
8  trying to -- if you can give me a second and let my eyes
9  adjust. I'm not sure if this is right at the opening or back a
10  little bit, but this would have been a view we would have seen
11  coming off that road where it opened up.
12  Q. And as you walked into this opening, you testified you were
13  on the left side of the house there?
14  A. I was on the left side -- on -- in this photograph you're
15  showing, we went to the left of the photograph -- of the -- of
16  the wood line.
17  Q. And Deputy Parrish and Sims would have been to the -- did
18  they go around the back of the house or just right up next to
19  the house?
20  A. It's my understanding that Major Carlton and Sergeant
21  Parrish and Narco went on the -- looking at this photograph,
22  again, to the right side of the residence or the house.
23  Q. Okay. But not all the way around coming around the back of
24  the house.
25  A. I know that all I can -- all I can say is they went to the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

75

1  right of the house. I'm not sure of their exact route around
2  the house. They came out on the other side.
3  Q. As you first saw the truck, you said that you were
4  approximately 75 to a hundred yards from the truck. By the time
5  you got to where you said you could see some individuals around
6  the lab site, approximately how many yards were you from those
7  individuals?
8  A. Less, probably, than 25 yards. Probably 30, 35 feet,
9  guessing.
10  Q. And when you first saw them, you were -- you had not entered
11  the woods, correct?
12  A. No. I had not entered the woods when I saw them.
13  Q. And they -- they were in the woods.
14  A. They were behind a -- kind of a little thin of pines, that's
15  what I -- a thin plant of pines in a row.
16       MR. DEAN: May I approach, Your Honor?
17       THE COURT: Mr. Dean, if you have any other exhibits,
18  bring them all up here and let's get them marked.
19       MR. DEAN: Okay, Your Honor.
20       (Brief pause)
21  Q. Agent Stewart, this next photograph that I've put up here
22  is -- these are the photographs taken by Howard Carlton. Can
23  you look at that and tell me if that accurately depicts where
24  the truck was parked the day y'all approached this scene?
25  A. It appears to be the same pickup truck parked -- I'm

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

76

1  assuming it hasn't been moved, because I really can't tell the
2  angle it was parked to the wood line in this photograph.
3  Q. Can you tell looking at this photograph -- if you look
4  across the hood of the truck back into the woods, it appears to
5  be -- about the only structure you can see back through the
6  woods is, from what I can gather, having been out there, that
7  old refrigerator. Was that lab site next to that old
8  refrigerator that was out there?
9  A. There was a refrigerator in the area of the lab site, in the
10  general area. I'm not sure exactly where the lab was located in
11  relation to that refrigerator. It was over a fairly large area.
12  Q. When you approached this lab site and got, you said, 25 or
13  30 yards from it, what -- tell me again what you saw there.
14  A. When we got less than 25 yards, probably 30, 35 feet from
15  it, I detected movement. I could see movement. I could also
16  see items that stood out in color. I remember blue was a color
17  that stood out. It was not something natural. And then I
18  detected movement, people moving.
19  Q. Could you tell what they were doing?
20  A. No. I could just tell they were moving around. I couldn't
21  tell what they were doing.
22  Q. Could you see their hands?
23  A. I could see the movement, but I couldn't tell if they had
24  anything in their hands or not or what they were doing. The one
25  person I did see clearer than anybody was -- ended up facing

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

78

1  Q. But none of the individuals came towards you and looked at
2  you and looked around and then took off?
3  A. One subject did that I -- I -- faced me, me and Sergeant
4  Sims and Deputy Fuller. There was one subject that looked up at
5  us at -- right before they fled.
6  Q. Do you know which one that was?
7  A. I couldn't identify him on that day. I later learned which
8  subject was standing there.
9  Q. Which one was it?
10  A. It was Jonathan Weldon.
11  Q. Can you describe to me what -- what type of visibility there
12  is between where you were standing -- where you -- I'm sure you
13  later walked around the truck somewhere.
14  A. That's correct.
15  Q. Through the woods to the lab. I can see from the photos
16  there are trees and there's bushes and things; but in your
17  opinion, what -- what type of visibility can you see through
18  there?
19  A. It would probably just vary from where you're standing.
20  It's fairly thin throughout those planted pines. They're not --
21  it's not overly grown up or wasn't at that point in time. You
22  could easily walk to the lab through the planted pines. And
23  there were, you know, trees ranging in various sizes in there.
24  I could -- you know, I could tell when I was looking that there
25  was a subject standing there. He looked at me. Later I was

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

77

1  us. And I could tell he had something in his hands.
2  Q. And tell me again who the first one was that you testified
3  that hollered police.
4  A. The first person I recall identifying themselves as police
5  was Tommy Sims.
6  Q. And Tommy was with you.
7  A. That's correct. He was right beside me.
8  Q. And Detectives Carlton and Parrish were near the truck.
9  A. Major Carlton and Sergeant Parrish were over in the area of
10  the truck.
11  Q. And how soon after Detective Sims hollered did they take
12  off?
13  A. Detective Sims identified himself as a police officer.
14  Sergeant Parrish also began to issue commands and identify
15  himself. And at that point, they took off. As the people --
16  the subject I saw -- the two subjects I saw were leaving the
17  lab, they were continuing issuing verbal commands and
18  identifying themselves.
19  Q. Was it a matter of seconds?
20  A. It was quick. It was a continuous -- Detective Sims
21  continually was identifying himself as a police officer
22  throughout the whole, you know, time span there.
23  Q. Even after they took off?
24  A. Continued to -- stop, police. He continued to identify
25  himself as a police officer.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

79

1  able to recognize him as Jonathan Weldon. And I could see items
2  at the lab site from where we were standing enough to recognize
3  it potentially being a clandestine lab.
4  Q. After you saw the individuals and you say the deputies
5  hollered police, they took off running. And I guess the next
6  chain of events you testified to were you heard a gunshot.
7  A. I went to the lab to secure the clan lab.
8  Q. Okay.
9  A. At that point, I heard a single gunshot and then several
10  more shots.
11  Q. Then you proceeded on into the woods?
12  A. I started verbally calling out for Mike Parrish and Tommy
13  Sims to make sure that neither one of those had been -- and also
14  Major Carlton. I -- and he turned out to be fairly close to
15  me. But I continued to call on these two subjects, on Sergeant
16  Sims and Sergeant Parrish, to make sure they were okay, to make
17  sure they would answer me before we proceeded into the woods.
18  Q. Were you the officer -- well, let me ask you. Who was the
19  first officer to see the dog? Was it you?
20  A. I'm not sure exactly who was first to see the dog. I saw
21  the dog, but I don't know if Sergeant Parrish had seen it or
22  Sergeant Sims had seen it, because I went by it very quickly.
23  Q. Okay. Did you see the gun where it was laying?
24  A. I saw the gun.
25  Q. How close from the dog was the gun?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

80

1  A. I'm not sure. I'm really not sure.

2  Q. Was it a -- it wasn't 20 yards from the dog, was it?

3  A. No, it wasn't 20 yards. It was fairly close.

4  Q. Several feet, would you say?

5  A. It was several feet. I'm not really sure how many.

6  Q. And how far was my client, David Cotney, in your best

7  estimate, from the dog and from the gun when you found him

8  laying down?

9  A. I didn't see your client laying down.

10  Q. Who was -- you were not the first person there to see that?

11  A. No. No, I was not.

12  Q. When did you see my client?

13  A. I saw your client after I recovered the shotgun.

14  Q. Okay.

15  A. I continued over a log. And about five feet from the log,

16  Tommy Sims had your client upright and was trying to walk him

17  out of the woods.

18  Q. And your best guess, when you saw him with Tommy Sims, how

19  far was he from where you had just seen the dog and the gun?

20  A. I'm not sure from the dog. From the gun, it was less than

21  probably -- it was approximately five feet, maybe seven feet.

22  It was fairly close.

23  Q. When you approached Detective Sims and my client, he -- had

24  he already put handcuffs on him?

25  A. Yes. He was already in handcuffs.

81

1  Q. So it was you and Detective Sims?

2  A. Sergeant Parrish was there. When I got on the scene,

3  Sergeant Parrish left, I'm assuming to go get his dog, get

4  Narco.

5  Q. There has been testimony and factual testimony about -- as

6  far as these enhancements that we're here about today, that

7  David Cotney resisted arrest. I want you to tell me, in your

8  opinion, if he resisted arrest; and if he did, how.

9  A. When I arrived to where your client was, I observed Sergeant

10  Sims trying to escort him out of the woods. Bear in mind that

11  he had gone deeper into the woods. He was trying to escort your

12  client out of the woods. It appeared to me your client

13  continued to pull his arm away from Tommy Sims' grip. He had

14  his hands handcuffed behind him, and Tommy Sims had him by the

15  arm. He continued to pull, appeared to be pulling. At that

16  point, I came down with Tommy Sims; I got on one side, he got on

17  the other, and we got out of the woods in a hurry, rapidly.

18  Q. Were you aware at that time when you noticed him pulling

19  that he had been severely bitten by the dog?

20  A. I was not aware he was injured in any way until Major

21  Carlton notified me and called the ambulance some -- however

22  minutes later.

23  Q. My client never told you that he was bitten?

24  A. No, not that I recall.

25  Q. Or having trouble walking or standing?

82

1  A. Not that I recall.

2        MR. DEAN: May I have just a moment, Your Honor?

3        THE COURT: All right.

4        (Brief pause)

5  Q. A few more questions, Clay. You heard some testimony --

6        THE COURT: Mr. Dean, please use the witness's last

7  name.

8        MR. DEAN: I apologize, Your Honor.

9  Q. Officer Stewart, you've heard some testimony today about --

10  from several people about my client's role in this conspiracy as

11  being the -- I guess -- I guess they would call him the leader

12  of it. And you and I sat down with other officers at length in

13  a proffer in this case where he -- he pretty much told y'all

14  everything he knew about what happened. I'd just like for you

15  to tell me, based on the information you learned at that time,

16  what you believe my client's role was.

17  A. I believe that your client organized the -- the cooking of

18  the methamphetamine. He was able to have people help him cook

19  or knew how to manufacture methamphetamine in a clandestine lab,

20  being Allen Nelson and Jonathan Weldon. Also, there were people

21  out there shopping specifically for your client for cooks. In

22  return, they would get either cash or drugs from your client.

23  Q. As far as this -- these three defendants here and Mr. Bonner

24  were all charged; but is there anybody else who was charged

25  either in state court or federal court as part of this ring, to

83

1  your knowledge?

2  A. I'm not sure I understand your question.

3  Q. Maybe I misunderstood your answer. You said my client had

4  people out helping him buy materials. Are you referring to

5  somebody other than the named defendants in this case?

6  A. To include the named defendants and other individuals out

7  purchasing precursor items.

8  Q. When you recovered the shotgun, did you check and see how

9  many shotgun shells were in the shotgun?

10  A. No. At that time, I did not.

11  Q. Did you at a later time?

12  A. I later turned the -- shortly thereafter, I turned the

13  shotgun over to Major Carlton for safekeeping, at which point he

14  went through the unloading procedure.

15  Q. Do you remember how many spent shotgun shells were

16  recovered?

17  A. I believe there was just one spent shotgun shell.

18  Q. Do you remember whether or not that spent shotgun shell was

19  still in the chamber when you recovered the shotgun?

20  A. The -- when I turned the shotgun over to Major Carlton, in

21  my presence, he checked the shotgun. And I believe, to the best

22  of my recollection, the spent casing, shotgun shell casing, was

23  in the chamber.

24        MR. DEAN: Okay. Thank you.

25        THE COURT: All right. Mr. Lewis?

84

1          CROSS-EXAMINATION
2    BY MR. LEWIS:
3    Q. Officer Stewart, has my client, Mr. Nelson, been cooperative
4    with you since the time of his arrest?
5    A. Yes, he has.
6    Q. And has he been cooperative with you not only about this
7    case but about other matters outside the scope of this
8    particular case?
9    A. He's been cooperative. I'm -- to be honest with you, I'm
10   having trouble remembering everything we covered. But he's been
11   cooperative throughout this -- when I've interviewed him in this
12   investigation.
13          MR. LEWIS: No further questions. Thank you.
14          THE COURT: All right. Mr. Halstrom?
15          CROSS-EXAMINATION
16   BY MR. HALSTROM:
17   Q. Mr. Stewart, were there two pair of blue channel-lock pliers
18   at the scene?
19   A. I don't recall. I don't recall if there was one pair or
20   two. The picture shows two pair, one in the backpack and then
21   the one on the thing.
22   Q. The same one wasn't moved from one place into the backpack?
23   A. Not in my presence. Not -- not to my knowledge it was
24   moved.
25   Q. And you took the pictures; is that correct?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

85

1    A. Yes. Over the course of a time span there. I took pictures
2    while coordinating other activities going on.
3    Q. You mentioned that there was some discussion between the
4    codefendants and you that indicated that there was activity the
5    night before at this same site; is that correct?
6    A. That's correct.
7    Q. But Mr. Weldon was not present at that time.
8    A. That's correct.
9    Q. And the only thing that you know that Mr. Weldon said about
10   the shotgun was that he identified it as being owned by
11   Mr. Cotney.
12   A. Yes, sir, to the best of my recollection.
13   Q. And also, Mr. Weldon has been cooperative. He offered a
14   proffer and told all that he knew about this operation and
15   whatever else he knew about in the Chambers County area; is that
16   correct?
17   A. I spoke to him at the proffer; but prior to this, I had not
18   spoken to him.
19   Q. And do you recall us discussing Mr. Weldon's involvement in
20   this particular operation as being very minimal?
21   A. I recall some of the things he was involved with in this --
22   in this particular case. I -- I don't know if you would call it
23   minimal or not. I remember what he said, you know, his
24   involvement was.
25   Q. Do you recall me in that proffer asking you -- well, I'm not

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

86

1    sure who else was there in that proffer. Do you recall?
2    A. No. Actually, I don't. It's probably in my notes, but --
3    probably Tony Yates and probably Task Force Agent DeJohn.
4    Q. I think it was Mr. Yates. -- asking whether they considered
5    Mr. Weldon's involvement in this minimal, and they answered,
6    yeah, compared to the others, it was minimal?
7    A. He was involved in it. Was he a leader or a principal, no;
8    meaning no, he was -- he took a role in it, in the manufacture
9    or the planned manufacture of methamphetamine.
10   Q. He wasn't there to cook it, and he wasn't there to gather it
11   together or organize it.
12   A. He was -- to me, he was there to help cook it. He, you
13   know, to my understanding, knows how to cook methamphetamine.
14   He was there to assist Allen Nelson and David Cotney in the
15   manufacture of it, be it washing ether or cutting open batteries
16   or whatever.
17   Q. But he wasn't there the night before. Are you aware of him
18   purchasing anything?
19   A. No, I'm not.
20   Q. Or bringing anything with him to the site?
21   A. The only thing I'm aware of him helping is move the
22   anhydrous ammonia tank from Gregory Bonner's farm to this cabin
23   up on 242, or assisting in it.
24          MR. HALSTROM: No further questions.
25          THE COURT: Any redirect?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

87

1          MR. BROWN: No, Your Honor. I don't have any further
2    questions for this witness.
3          THE COURT: All right. You may come down.
4          MR. DEAN: Your Honor, I would like to offer these
5    photographs.
6          THE COURT: All right. Those are exhibits what?
7          MR. DEAN: Defendant David Cotney's #5, #6, #7, and #8.
8          THE COURT: All right. They're admitted.
9          MR. BROWN: Your Honor, if I've written down my
10   objections down correctly, the remaining objection for Defendant
11   Weldon has something to do with calculating criminal history
12   category, his objection number six; and I believe all of
13   Mr. Nelson's objections have been addressed. So the remaining
14   witnesses, the last two witnesses, would apply only to
15   Mr. Cotney on his objection number six and some of the
16   objections that we've already covered, but I don't believe apply
17   to Defendants Weldon or Nelson at this point.
18          THE COURT: All right. The evidence offered by the
19   government, then, from this point forward would apply only to
20   the Defendant Cotney.
21          MR. BROWN: United States calls Investigator Sims,
22   Tommy Sims.
23          THOMAS LEE SIMS, the witness, having been duly sworn,
24   testified, as follows:
25

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

88

1    DIRECT EXAMINATION
2    BY MR. BROWN:
3    Q. Good afternoon. Would you state your name, please?
4    A. My name is Thomas Lee Sims.
5    Q. How are you employed, Mr. Sims?
6    A. I'm employed with the Lanett Police Department. At this
7    time, I was currently assigned to the Chambers County Drug Task
8    Force; but since, I've transferred back to patrol.
9    Q. Okay. So when you say at this time, you're talking about
10   March 24th, 2003, you worked with the drug task force, Chambers
11   County?
12   A. Yes, sir.
13   Q. No longer with them.
14   A. Correct.
15   Q. And on that -- on that day -- first of all, you've been in
16   the courtroom during the testimony so far in this sentencing
17   hearing; is that correct?
18   A. Yes, sir.
19   Q. You've heard the testimony of both Agents DeJohn and Clay
20   Stewart?
21   A. Yes, sir.
22   Q. I don't want to rehash anything that they've gone over and
23   be cumulative. You've heard Chambers County -- or Clay Stewart
24   talk about you, him, and detective -- or Sheriff Fuller, Deputy
25   Sheriff Fuller, over in one area.

90

1    A. Yes, sir.
2    Q. I'm going to show you what's been admitted as Government's
3    Exhibit #2. Is that vest similar or is your vest that you were
4    wearing that day exactly like that vest?
5    A. It's similar. It's not exact.
6    Q. Okay. How is it different?
7    A. Mine has pockets on the front, the "police" is more to the
8    left side here, and it's not quite as heavy.
9    Q. After identifying yourself, you said you saw two subjects
10   run. What did you do at that point?
11   A. I gave chase on the subject that went straight into the
12   woods.
13   Q. When you were looking at the two subjects, was it the
14   subject on the left or right?
15   A. It was the subject on the left.
16   Q. Did you know who that subject was at the time?
17   A. No, sir, I did not.
18   Q. Did you later learn who the subject was?
19   A. An idea, yes.
20   Q. Okay. While you were running after that subject, what
21   happened?
22   A. I got into the woods. We ran through the lab area. I ran
23   through the lab area and continued in the woods. I heard one
24   shot followed by numerous shots. We -- I continued on into the
25   woods, and I was keeping the subject I was chasing in sight.

89

1    A. Yes, sir.
2    Q. And that's accurate? As Investigator Stewart got -- his
3    testimony to that point, that was accurate?
4    A. Yes, sir.
5    Q. What happened -- Mr. Stewart indicated -- or Investigator
6    Stewart indicated that you at one point began identifying
7    yourself as a police officer?
8    A. Yes, sir.
9    Q. Would you take us from that point until the rest of the
10   incident of that day?
11   A. Yes, sir. When we got to that point, I observed the subject
12   either sit back -- he was -- he sat back in the chair and looked
13   over. And at that time, I began announcing police, when it
14   appeared that he looked at us. I said, police, show me your
15   hands, two to three times. At that point in time, they got up;
16   and I saw two people start running. I saw just a glimpse of one
17   and the other subject's back go into the wooded area, and I gave
18   chase.
19   Q. What were you wearing at that time when you were identifying
20   yourself as a police officer?
21   A. It was either a pair of blue or black jeans and -- I don't
22   recall the shirt, but I had a black bullet-proof vest on. It
23   has "police" across the front.
24   Q. Were you -- you were in court when a vest was described and
25   shown earlier today by Investigator Stewart?

91

1    And a subject come out from the right-hand side through some
2    small -- I call them pine saplings. And he was throwing his
3    arms. He come out running. And he looked at me and turned; and
4    when he turned, he took maybe two steps and he went over a log.
5    Q. You say he went over a log. Did he trip?
6    A. He fell over a log. Yes, sir.
7    Q. What happened then?
8    A. At that time, I began again giving verbal commands, show me
9    your hands. He had this hand outstretched (indicating).
10   Q. Now, you're showing --
11   A. I'm sorry. His left hand outstretched. His right hand was
12   under him. Clay Stewart was calling at me. I heard Deputy
13   Parrish call a description of the clothes, and I advised that I
14   had one subject on the ground down here.
15   Q. Did you know the person that you had on the ground?
16   A. I did not recognize him at that time. No, sir.
17   Q. Did you later recognize him?
18   A. After I looked at his ID and I looked at him, yes, sir, I
19   did.
20   Q. Who was it?
21   A. It was David Cotney, Jr.
22   Q. Did Mr. Cotney address you in any way?
23   A. Yes, sir, he did.
24   Q. How did he address you?
25   A. When he was laying on the ground like this, he looked back

92

1   at me and called me Tommy, called me by name.

2   Q.  After you heard the description of the clothing from

3   Sergeant Parrish and you heard Investigator Stewart, then you

4   advised them that you had Mr. Cotney in custody?

5   A.  No, sir. I said I had one subject here.

6   Q.  Okay. And what happened after that?

7   A.  Parrish began hollering, where; and I told him, down here,

8   down here. And I was yelling, show me your hands, show me your

9   hands. At that point in time when Deputy Parrish got closer, I

10  holstered my weapon. And I went down and grabbed his left hand

11  and placed it behind him. At that time, Mike began yelling at

12  me, he's got a gun, he's got a gun.

13  Q.  And Mike is Sergeant Parrish?

14  A.  Yes, sir. I'm sorry. Sergeant Parrish began yelling at me,

15  he's got a gun, he's got a gun. And at that time, I reached

16  down with both hands and grabbed his right hand that he still

17  had under him and started telling him to give me his hand.

18  Q.  Did he do that?

19  A.  No, sir. Deputy Parrish then got down over him, and he was

20  pushing on him. We were both yelling at him, give me your

21  hand. And Deputy Parrish hit him, and I got the hand out. I

22  looked up at Mike, and I said, Mike, I need your cuffs -- I'm

23  sorry -- Deputy Parrish, I said, I need your cuffs. And Deputy

24  Parrish didn't respond. And I reached up, and I took the palm

25  of my hand -- I had his hands here on the small of his back. I

93

1   reached up and I hit Mike -- I'm sorry -- Deputy Parrish in the

2   shoulder. I said, I need your cuffs. And I realized that

3   Deputy Parrish was upset. He was crying. And I asked him, I

4   said, what's wrong? Are you okay? And he stood up and handed

5   me his cuffs. And he said he -- he shot my dog. He killed

6   Narco. He killed my dog.

7   Q.  Back up just a second. You indicated that Deputy Parrish

8   got down on his knees or on the ground --

9   A.  Yes, sir.

10  Q.  -- and was there beside you. Was he --

11  A.  He -- he was facing me --

12  Q.  Okay.

13  A.  -- covering Mr. David Cotney's upper body.

14  Q.  All right. The -- his right -- Mr. Cotney's right hand was

15  the hand that you indicated, I believe, that Mr. Cotney wouldn't

16  relinquish to your control, I guess is the best way to put it.

17  A.  Correct.

18  Q.  When did he do that? I mean when did he ever let go with

19  that right hand?

20  A.  After Mike struck him.

21  Q.  Okay. Was there anything in his hand?

22  A.  No, sir, there was not.

23  Q.  After speaking with deputy -- Sergeant Parrish after he told

24  you that his dog had been shot, what happened after that?

25  A.  I cuffed David Cotney. I rolled him over onto his butt. I

94

1   searched -- actually, I rolled him onto his left side. I'm

2   sorry. I looked under him; didn't have a gun. Rolled him onto

3   his butt, helped him stand up, and we started out of the woods.

4   Q.  Was Mr. Cotney cooperative with you as you were walking

5   through the woods?

6   A.  We started walking up to the woods, and he was -- he was

7   saying something. He was mouthy. He jerked away. I asked him,

8   I said, why -- you know, what's wrong with you? At this point

9   in time, I didn't recognize him. I said, what is wrong with

10  you? I said, don't you realize you just messed your life up,

11  and started pulling him up out of the woods, because we still

12  had people in the woods we were trying to get out. And that's

13  when we ran into Investigator Stewart.

14  Q.  Did Investigator Stewart -- you heard his testimony that he

15  assisted you in taking Mr. Cotney away.

16  A.  Yes, sir.

17      MR. BROWN:  Thank you. That's all the questions I have

18  for you now. A defense lawyer may have some questions for you.

19      THE WITNESS:  Yes, sir.

20      THE COURT:  All right. Mr. Dean?

21      CROSS-EXAMINATION

22  BY MR. DEAN:

23  Q.  Detective Sims, when you first saw the individuals at the

24  lab, can you tell me how far away you were from them, your best

25  estimate?

95

1   A.  The best estimate would probably be pretty close to 35 feet.

2   Q.  35 feet or 35 yards?

3   A.  I would say feet. It was -- I don't believe it would be

4   yards.

5   Q.  How close were you to Officer Stewart as y'all were walking

6   in?

7   A.  He was -- he was beside me.

8   Q.  Right beside you?

9   A.  Yes, sir, and kind of to -- just right here (indicating).

10  Yes, sir.

11  Q.  But not -- not ten yards behind you.

12  A.  Oh, no, sir.

13  Q.  Were you on his right or left walking towards --

14  A.  I believe I would have been on his left.

15  Q.  As you were -- after you heard the gunshot, as you were

16  going further in the woods, did you personally see the dog?

17  A.  No, sir, I did not.

18  Q.  Did you personally see the gun?

19  A.  No, sir, I did not.

20  Q.  You heard Officer Stewart testify that when David Cotney

21  was -- I think he said when you were with David Cotney, he was

22  five yards from the gun and the dog? Do you remember him being

23  that close to the dog?

24  A.  No, sir. I -- first time I saw the dog, they had already

25  brought him back out of the woods. I don't know where the dog

96

1   was in relations to where I saw Mr. Cotney.
2   Q. You said you saw David Cotney fall over a log?
3   A. Yes, sir. He went over the log.
4   Q. How far were you behind him when you saw him do that?
5   A. I may have been five yards, because he come out right in
6   front of me.
7   Q. Okay. So you didn't see him and all of the sudden, he
8   appeared out of some --
9   A. Yes, sir. About like -- all of the sudden, he just
10  appeared.
11  Q. When he -- what was his position when you said he looked
12  back at you and said Tommy?
13  A. I -- can you --
14  Q. Was he -- was he on the ground --
15  A. Yes, sir.
16  Q. -- when he called your name?
17  A. Yes, sir. He was on the ground with this arm back
18  (indicating). And he looked back at me just like that over
19  his -- over his left shoulder.
20  Q. Did he say anything other than your name?
21  A. No, sir, not that I can recall.
22  Q. Were you aware at that time that he had been bitten by the
23  dog?
24  A. No, sir.
25  Q. After he was handcuffed and after you were walking him out

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

97

1   of the woods, were you aware at that point that he had been
2   bitten by the dog?
3   A. No, sir.
4   Q. You later learned that he was, correct?
5   A. Yes, sir. They -- later they told me they had an ambulance
6   on the way. Because after we turned him over to Major Carlton,
7   it was shortly thereafter I left and started riding the area
8   looking for the other subjects.
9   Q. And after you realized who it was by looking at his ID -- or
10  is what you're saying is you personally knew David Cotney?
11  A. I had spoken to him a few times. I used to go to church
12  where his uncle was pastor.
13  Q. Let me ask you one more thing that I don't think I've asked
14  anybody. What time of day was it when y'all were approaching
15  this meth lab?
16  A. Approximately?
17  Q. Approximately.
18  A. One o'clock, 1:30, something of that nature.
19  Q. P.M.
20  A. Yes, sir. Daylight.
21          MR. DEAN: That's all I have, Your Honor.
22          THE COURT: Mr. Brown, any redirect?
23'         MR. BROWN: Just briefly.
24
25

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

98

1               REDIRECT EXAMINATION
2   BY MR. BROWN:
3   Q. Investigator Sims, Mr. Dean was asking you about whether or
4   not you knew that Mr. Cotney had been bitten by a dog. Do
5   you -- do you know that he -- your response kind of indicated
6   that you'd found out that he had been bitten by a dog. Did you
7   see him being bit by a dog?
8   A. No, sir, I did not.
9   Q. Did you notice any -- was Mr. Cotney's clothes torn in any
10  way?
11  A. No, sir, not that I could see.
12  Q. Did you see any bleeding or anything when you were
13  interacting with him?
14  A. No, sir. The onlyest mark I saw was on his -- on -- up in
15  here on his face and nose. And it appeared to be mud or
16  something of that nature.
17  Q. Did you have any idea where that came from?
18  A. No, sir, I did not.
19  Q. Did you see any bleeding or anything like that?
20  A. No, sir. The -- at first I thought maybe this was blood up
21  on his nose and mouth area. But I didn't see any from -- any
22  signs of that, so I figured it was where he fell and hit his
23  face and mud.
24  Q. Okay. Did Mr. Cotney have any trouble walking when you were
25  taking him into custody?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

99

1   A. Not that I can recall. No, sir. We were in a hurry to get
2   out of there.
3          MR. BROWN: No further questions, Your Honor.
4          THE COURT: All right. Anything else, Mr. Dean?
5   You can come down.
6          THE WITNESS: Thank you, sir.
7          MR. BROWN: Your Honor, may this witness be excused?
8   He has indicated that he needs to get back to Chambers County.
9          THE COURT: Any problem? Any objection by any
10  defendant or by you, Mr. Dean?
11         MR. DEAN: No objection, Your Honor.
12         THE COURT: All right. You're excused.
13         MR. BROWN: United States calls Sergeant Mike Parrish.
14         THE COURT: I understand that this witness is being
15  offered only in the case of Mr. Cotney; is that correct?
16         MR. BROWN: Yes, sir.
17         MIKE PARRISH, the witness, having been duly sworn,
18  testified, as follows:
19              DIRECT EXAMINATION
20  BY MR. BROWN:
21  Q. Good afternoon, sir.
22  A. Good afternoon.
23  Q. Would you state your name, please?
24  A. Mike Parrish.
25  Q. How -- would you spell your last name for the court

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

100

1  reporter?
2  A.  P-A-R-R-I-S-H.
3  Q.  Thank you.  How are you employed?
4  A.  I'm a sergeant with the Chambers County Sheriff's Office.
5  Q.  Were you employed in that capacity back on March 24th of
6  this year?
7  A.  Yes, sir, I was.
8  Q.  You were present for the testimony of Investigator Stewart
9  and Sims earlier today; is that correct?
10  A.  Yes, sir.
11  Q.  Without being redundant on what they talked about,
12  Mr. Stewart, or Investigator Stewart, indicated that you and
13  Major Carlton approached what turned out to be a methamphetamine
14  lab on the right side, as opposed to Mr. Stewart, when he was on
15  the left.
16  A.  Correct.
17  Q.  He also indicated that Investigator Sims identified himself
18  by yelling out that he was a police officer and instructing one
19  individual that he didn't know at the time to raise his hands.
20  A.  That's correct.
21  Q.  Is that accurate as the way that you remember it?
22  A.  Yes, sir.
23  Q.  Okay.  Starting from that point and taking a step back, were
24  you a canine -- assigned to a canine partner at that -- on that
25  date?

102

1  A.  No, sir.
2  Q.  This five-week course, did your sheriff's department pay for
3  you to go to that course?
4  A.  Yes, sir.
5  Q.  After -- and so it had been about two years since that
6  training -- that was, this incident on March the 24th?
7  A.  Yes, sir.
8  Q.  Do you have to have periodic retraining with your dog?
9  A.  We train once a week and then recertify at least once a
10  year.
11  Q.  So your dog had been trained once and recertified twice?
12  Would that be accurate?  Or recertified once?
13  A.  Recertified once.
14  Q.  Your canine partner was with you on that day; is that right?
15  A.  Yes, sir.
16  Q.  Yourself, your canine partner, and Major Carlton were
17  standing together in a different location than the other
18  three officers.
19  A.  Yes, sir.
20  Q.  Tell us what happened at that point.
21  A.  Once Investigator Sims started yelling police, I observed
22  two subjects start running into the woods.  I gave the command
23  that I was a sheriff's K-9, stop or I would release the dog.  I
24  gave that warning two or three times.  At that time, I released
25  the dog.

101

1  A.  Yes, sir.
2  Q.  What was the canine partner's name?
3  A.  Narco.
4  Q.  Was your canine partner -- how long had he been your
5  partner?
6  A.  Almost two years.
7  Q.  Two years?
8  A.  A little shy.
9  Q.  Did you own that dog before he became your canine partner,
10  or were you issued that canine as part of your duties?
11  A.  He was paid for with donations.
12  Q.  Donations from the community?
13  A.  Yes, sir.
14  Q.  Did you actually go to training with the canine partner?
15  A.  Yes, sir.
16  Q.  Would you explain a little bit about what that entails?
17  A.  It was five weeks in Indiana at a formal school that is
18  accredited by the Indiana Law Enforcement Academy.  It's five
19  weeks, 14-, 16-hour days, of nothing but training, as far as
20  drug detection, apprehensions, building searches.  Pretty much
21  it.
22  Q.  So your dog was trained both to alert for narcotics but was
23  also trained in apprehension?
24  A.  Yes, sir.
25  Q.  Was he trained in explosives as well?

103

1  Q.  How far away from you -- were you from the individual that
2  you saw when you released your dog?
3  A.  Forty to 50 yards, probably.
4  Q.  After -- what happened after you released your dog?
5  A.  I lost sight of him for just a couple of seconds.  And just
6  as -- I was moving through some -- a thick part of the woods.
7  And as they came back into view was at the same moment that the
8  gunshot went off.  I saw K-9 Narco fall.  At that time, I
9  observed who we later identified as Mr. Cotney start turning
10  towards me with the gun.  I thought he was going to fire on me
11  at that time.  I returned fire.
12  Q.  How many times did you return fire?
13  A.  Five rounds.
14  Q.  What happened after that?  Did you go to chase after
15  Mr. Cotney?
16  A.  Well, when I fired, Mr. Cotney went down.  I thought he had
17  been hit.  I stopped firing.  He got up and took off running
18  again.  At that time, I did give chase.  I stopped when I got to
19  Narco, though, and picked him up and checked him.  And he was
20  already gone, so I went on in after Mr. Cotney.  And I had
21  already started giving out a clothing description over the radio
22  to the other officers, and I heard Investigator Sims start
23  yelling that he had him.  So I just went towards the voice.
24  Q.  Okay.  Let me take a step back.  When you released Narco,
25  did -- was he barking?  I mean was --

104

1   A. No, sir. He don't bark.
2   Q. Okay. Was he -- did he growl?
3   A. No, sir.
4   Q. Did you ever see your canine partner bite Mr. Cotney --
5   A. No, sir.
6   Q. -- or who later turned out to be Mr. Cotney?
7   A. No, sir.
8   Q. You said that you had given the clothing description, and
9   then you heard a response from Investigator Sims?
10  A. Yes, sir.
11  Q. Did you then go to where Investigator Sims was located?
12  A. Yes, sir.
13  Q. What happened then?
14  A. I saw -- Investigator Sims had one hand in his -- in his
15  hands, which looked like he was trying to get him handcuffed. I
16  started yelling to Investigator Sims that he had a gun. And I
17  noticed the other arm was still up under him. At that time, I
18  put my knee in his -- I believe his shoulder and started yelling
19  to him, show me your hands, show me your hands, show me your
20  hand. He never would. At that time, I hit him a couple times.
21  Q. Where did you hit him?
22  A. I think once in the back and once in the side of his face.
23  Q. All right. Now, he's laying on his stomach with his hand
24  underneath him; is that correct?
25  A. Yes, sir.

105

1   Q. So you hit him twice, once from behind and once as he turned
2   his head, I'm assuming?
3   A. I don't know if he was turning his head or not. It's just
4   the part that was exposed.
5   Q. Okay. After -- after you hit him, did he relinquish his
6   hand?
7   A. Yes, sir.
8   Q. Was he then cuffed?
9   A. Yes, sir.
10  Q. How did that happen? Do you recall?
11  A. I just remember holding onto the arm as Investigator Sims
12  got the handcuffs on him. Then I -- I left him there with him.
13  Q. Did you -- you left Investigator Sims there with Mr. Cotney
14  handcuffed?
15  A. Yes, sir.
16  Q. Where did you go then?
17  A. Back to Narco.
18  Q. And Narco had died by that time, or had he died by the first
19  time you had seen him?
20  A. He -- I think he probably took his last breath when I picked
21  him up the first time.
22  Q. Later that day, probably not too much after that, did
23  Investigator Stewart take your firearm from you, your service
24  firearm?
25  A. Yes, sir, he did.

106

1   Q. Why?
2   A. Standard policy. Anytime one of our weapons is fired in the
3   line of duty, it's taken and checked.
4   Q. Was it your opinion at that time that you had shot
5   Mr. Cotney?
6   A. No, sir, not until I found out that he had been injured.
7   Q. But at some point you -- combined with the fact that your
8   firearm had been taken and you finding out that Mr. Cotney had
9   been injured, basically your idea was that you had shot him?
10  A. Yes, sir.
11  Q. And is it correct that Investigator Stewart gave you another
12  service firearm for you to carry for the rest of the day?
13  A. Yes, sir.
14  Q. And that's standard policy for Alabama Bureau of
15  Investigation when you discharge your weapon like that?
16  A. Yes, sir, it is.
17          MR. BROWN: Thank you, Sergeant Parrish. I don't have
18  any more questions. The defense lawyer may have some questions
19  for you.
20          THE COURT: Mr. Dean, cross-examine?
21          MR. WALTON: Judge Albritton, Mr. Dean asked me to take
22  these questions. I'm Trip Walton. I'm assisting in the
23  defense.
24          THE COURT: All right. Mr. Walton.
25

107

1               CROSS-EXAMINATION
2   BY MR. WALTON:
3   Q. Good afternoon, Officer Parrish.
4   A. Good afternoon.
5   Q. When you-all were approaching the side of the lab, you and
6   Howard Carlton went around the right side of the home -- the
7   house; is that correct?
8   A. Yes, sir.
9   Q. And then you approached -- did you go across the pasture or
10  along the woodline?
11  A. It was about half and half. We stayed along the woodline
12  briefly and then went up toward the back of the cabin.
13  Q. You didn't walk out there waving your arms or anything. You
14  were sort of sneaking up on them, weren't you? Weren't you
15  trying not to be detected?
16  A. Yes, sir.
17  Q. And as you approached, I believe you said you eventually
18  turned your dog loose about 40 to 50 feet from the individuals
19  at the site, the lab; is that correct?
20  A. Once I had warned them, I was.
21  Q. Right. I jumped ahead a step. Let's back up. When you
22  first heard Tommy Sims yell what he yelled, was that a sign for
23  you to give your command to the individuals?
24  A. No, sir.
25  Q. What made you give your command when you gave your command?

108

1  A. When they started running.
2  Q. And could you identify those people at the site?
3  A. No, sir.
4  Q. When you later discovered that Mr. Cotney was one of the
5  individuals, did you see him run from the site?
6  A. Yes, sir.
7  Q. So you are aware he was at the site.
8  A. Yes, sir.
9  Q. And what was he wearing?  Do you recall?
10  A. Blue jeans and a gray T-shirt.
11  Q. And when they began to -- did they run immediately upon the
12  verbal commands going out to them?
13  A. Yes, sir.
14  Q. And then you started giving your commands at that point in
15  time?
16  A. Yes, sir.
17  Q. And how many times did you give a command?
18  A. Two, maybe three.
19  Q. And these people are getting it on back through the woods
20  while you're giving your commands, correct?
21  A. Yes, sir.
22  Q. And at that point in time, did you release Narco?
23  A. Yes, sir.
24  Q. And you were 40 to 50 yards from the site at that time?
25  A. No, sir.  I wasn't that far from the site.  I was that far

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

109

1  from them once I released him.
2  Q. When you released your dog, you were 40 to 50 yards from the
3  individual.
4  A. I had moved up into where the site was.
5  Q. So you were 40 to 50 yards from the individuals when you
6  released your dog.
7  A. Yes, sir.
8  Q. And the dog took off in the woods after them, correct?
9  A. Yes, sir.
10  Q. And you lost sight of your dog.
11  A. Yes, sir.
12  Q. Let me talk about your training a little bit.  You indicated
13  that you received a lot of training on direct examination,
14  correct?
15  A. Yes, sir.
16  Q. And in your training, did they ever instruct you to allow
17  your dog to run off in the woods unaccompanied by you?
18  A. Yes, sir.
19  Q. That is an appropriate action?
20  A. Yes, sir.
21  Q. Tell me about your training in that regard on apprehension.
22  A. The dog is trained to apprehend by sight or either odor.
23  And that's what he was doing.
24  Q. And are you not supposed to maintain control of your dog at
25  all times?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

110

1  A. I had control.
2  Q. All right.  You were 40 to 50 yards from the individuals
3  when you let him go.  We've established that, correct?
4  A. Yes, sir.
5  Q. And you testified in an earlier hearing that they were 50 to
6  60 yards from you in the woods when you finally got into the
7  woods where you saw David Cotney and the dog, correct?
8  A. I said he was 50 to 60 yards when I fired at him.  Yes, sir.
9  Q. And so you had to cover 40 to 50 yards to get to the woods,
10  and then how far did you go into the woods before you saw them?
11  A. That's not what I said, sir.
12  Q. Okay.  Then I misunderstand.  Tell me step by step.
13  A. I said once I released him, I had already moved up into the
14  woodline where the actual lab site was.
15  Q. Okay.
16  A. And then when I released him, he was 50 or 60 yards from me.
17  Q. And then you lost sight of them, correct?
18  A. Yes, sir.
19  Q. And how long did you lose sight of your animal?
20  A. Just a couple seconds.
21  Q. And then what did you see next?  Were you running?
22  A. Yes, sir.
23  Q. And it's my understanding from your earlier testimony that
24  you did not see Narco bite Mr. Cotney; is that correct?
25  A. That's correct.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

111

1  Q. And so you didn't see him shoot Narco either; is that
2  correct?
3  A. That's correct.
4  Q. And then you proceeded forward, checked your dog, decided
5  there was nothing you could do, and you continued on in the hunt
6  for Mr. Cotney, correct?
7  A. Correct.
8  Q. And when you got to Mr. Cotney, for some reason you thought
9  he had a gun.
10  A. That's correct.
11  Q. And why did you think he had a gun?
12  A. Because I had just seen him with one.
13  Q. And you didn't see the shotgun when you ran by him?
14  A. No.
15  Q. It's my understanding that he didn't point the shotgun at
16  you, correct?
17  A. No, sir.  I never gave him time.
18  Q. You saw him with a gun and began firing, correct?
19  A. No.  I saw him turning toward me with a gun, and I started
20  firing.
21  Q. Started firing.  He never aimed it at you?
22  A. No, sir.
23  Q. You never saw him pump the spent shell out of the chamber,
24  correct?
25  A. No, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon     October 15, 2003

112

1  Q. And when you ran by Narco, there's been some testimony that
2  the gun was within the vicinity of where your dog was laying.
3  And you didn't see the shotgun there on the ground?
4  A. No, sir.
5  Q. And you moved forward and Officer Sims had the client on the
6  ground. Did he have his gun pulled when you got there?
7  A. I don't think so.
8  Q. You don't think Officer Sims had his gun pulled on the
9  defendant when you arrived?
10 A. No, sir. I remember he had one of his hands. I don't think
11 he had his gun.
12 Q. And what was going on with them when you arrived? What did
13 you hear?
14 A. I was yelling at Investigator Sims that he had a gun. And
15 at that point, Investigator Sims started telling him to show him
16 his hands.
17 Q. And what did he do? Did he show him his hands?
18 A. Stayed still. Yes, sir.
19 Q. Did David Cotney show him his hands?
20 A. No, sir.
21 Q. Why not? Do you know?
22 A. I don't know.
23 Q. Was he on top of his hand?
24 A. Yes, sir.
25 Q. And were you then again on top of him, too, also?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon     October 15, 2003

113

1  A. Eventually.
2  Q. And I understand you put your knee in his back?
3  A. Yes, sir.
4  Q. And then you struck him in the head -- in back of the head
5  and the side of the face?
6  A. Yes, sir.
7  Q. And why did you do that?
8  A. Trying to get his attention to get his hands up.
9  Q. Is that standard procedure?
10 A. I don't know.
11 Q. Did you also kick him?
12 A. No, sir.
13 Q. Did you threaten him?
14 A. No, sir.
15 Q. Did you have your gun pulled at that time?
16 A. When I first went up there, yes, sir.
17 Q. And then did you holster your gun or did Officer Sims ask
18 you to put -- holster your gun?
19 A. No, sir. I holstered it before I even went down on one
20 knee.
21 Q. You mentioned that Narco was originally purchased, I
22 believe, from donations from our community, Chambers County,
23 correct?
24 A. Yes, sir.
25 Q. And when he was killed, was he also -- were there donations

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon     October 15, 2003

114

1  taken up for the new dog?
2  A. Yes, sir.
3  Q. And do you know what amount was collected from the community
4  for the new dog and your training?
5  A. In the area of 12, 13,000.
6  Q. So the request for restitution of 12,000 or so dollars from
7  Sheriff Lockhart would be for what? Do you know?
8  A. You need to ask him.
9  Q. Okay. But the point is they already raised the money to buy
10 Ace and to send you off to have new training, correct?
11 A. Yes, sir.
12 Q. So there's no money out on that particular event, correct?
13 A. Correct.
14 Q. And the funeral for Narco was donated by citizenry in
15 Chambers County, correct?
16 A. Correct.
17 Q. And the casket and the lot and everything, correct?
18 A. Correct.
19 Q. So there's no money owed on that type stuff, correct?
20 A. Correct.
21 Q. Back to your training -- I never got back to it -- how close
22 are you supposed to stay with your dog when they are
23 apprehending someone with a bite?
24 A. I don't think there is anything in writing. Depends on the
25 situation. The dog works off of verbal commands. So as long as

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon     October 15, 2003

115

1  he can still hear my voice, I have control over him.
2  Q. Can you give verbal commands at 50 to 60 yards in the woods?
3  A. Yes, sir.
4  Q. Could you actually see through those thick woods back there,
5  Officer Parrish? Could you actually see what was going on at 50
6  to 60 yards in the woods?
7  A. Not in the thick areas, no, sir.
8       MR. WALTON: I believe that's all I have, Your Honor.
9       THE COURT: All right. Mr. Brown, do you have any
10 redirect?
11      MR. BROWN: Just briefly, Your Honor.
12           REDIRECT EXAMINATION
13 BY MR. BROWN:
14 Q. Sergeant Parrish, what were you wearing that day?
15 A. My everyday uniform. It's a military-type uniform, brown
16 patches just like these. It says "sheriff," my name on one
17 side.
18 Q. And --
19 A. Badge.
20 Q. -- it is not a subdued badge, but a badge just like you have
21 on there?
22 A. Just like these (indicating).
23      MR. BROWN: Okay. No further questions, Your Honor.
24      THE COURT: All right. You can come down, Sergeant.
25      THE WITNESS: Thank you.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

116

1    THE COURT: All right. Mr. Brown?

2    MR. BROWN: No further witnesses, Your Honor.

3    THE COURT: All right. Mr. Dean, do you have any

4    witnesses you wish to call?

5    MR. DEAN: Your Honor, we do. We're going to call

6    David Cotney.

7    THE COURT: All right.

8    MR. LEWIS: Your Honor, may we approach?

9    THE COURT: All right.

10    MR. LEWIS: In an unrelated matter.

11    THE COURT: Not involving this case?

12    MR. LEWIS: No, sir.

13    THE COURT: Does it need to be on the record?

14    MR. LEWIS: No, sir.

15    (Bench conference held off the record)

16    MR. BROWN: Judge, can I have 30 seconds?

17    THE COURT: All right.

18    (Defendant Cotney is sworn)

19    (Brief pause)

20    MR. BROWN: Thank you, Your Honor.

21    THE COURT: All right. Mr. Dean?

22    DAVID FRANKLIN COTNEY, JR., the defendant, having been

23    duly sworn, testified, as follows:

24

25

118

1    A. Yes, sir. I had been shot at just a few days before.

2    Q. You had been shot at?

3    A. Yes, sir.

4    Q. Is that the reason you had a gun with you the day y'all were

5    at the scene of this meth lab?

6    A. Yes, sir. Because we did not know who the individual was

7    that shot at us.

8    Q. Did you recognize the individuals walking around your truck

9    as being police officers?

10    A. No, sir. The individual I saw standing by the truck had on

11    a striped shirt, like a light color with dark stripes on it.

12    Q. Okay. Did you even take time to get a good look at who it

13    was?

14    A. No, sir.

15    Q. You took off running immediately.

16    A. Very quick.

17    Q. The firearm -- the shotgun you had that day, other than your

18    fear of who had shot at you the day before over this ammonia

19    tank, did you have possession of that shotgun with any intention

20    of hurting anybody?

21    A. No, sir.

22    Q. Of hurting a dog?

23    A. No, sir.

24    Q. In fact, you didn't have it for any other reason other than

25    you were afraid the guy that shot at you might find you, hunting

117

1    DIRECT EXAMINATION

2    BY MR. DEAN:

3    Q. Would you state your name, please, sir?

4    A. David Franklin Cotney, Jr.

5    Q. How old are you, Mr. Cotney?

6    A. 30.

7    Q. When did you turn 30 years old?

8    A. March the 3rd.

9    Q. You've heard a lot of testimony here today about different

10    factual circumstances that have been entered into your

11    presentence report. I'm just going to ask you some questions

12    about that. And just respond to my questions, okay?

13    A. Yes, sir.

14    Q. When you were present at the lab on the day you were -- the

15    day you were arrested, did you notice somebody walking around

16    your truck?

17    A. After we had been there a while, I believe it was John

18    Weldon noticed someone walking by my truck and told me. And I

19    stood up. And at that time, I saw an individual standing on the

20    other side of my truck kind of facing -- he was facing like

21    sideways of me. He wasn't facing me. And he turned and looked

22    at us and hollered something like put your hands in the air.

23    And at that time, we all run.

24    Q. Mr. Cotney, prior to this day of your arrest, had you been

25    threatened over this ammonia tank that was in your possession?

119

1    down an ammonia tank?

2    A. Yes, sir. Just for protection.

3    Q. Mr. Cotney, as best you remember, did you hear -- as Officer

4    Parrish testified, did you hear him say he was going to release

5    his dog?

6    A. No, sir. I never heard Mr. Parrish say anything.

7    Q. Were you attempting to flee from the police?

8    A. No, sir. I was running from whoever was hollering at me

9    standing at my truck.

10    Q. As you were running away, Mr. Cotney, did something knock

11    you down?

12    A. Yes, sir.

13    Q. And when you looked back to see what it was, was it a dog?

14    A. Yes, sir. It was hooked on my leg.

15    Q. He had bit your -- bit you where on your leg?

16    A. On my calf, my left calf.

17    Q. Let me show you what I've marked as --

18    MR. DEAN: Is it on?

19    THE CLERK: I'm sorry. Yes.

20    Q. -- what's been marked as Defendant's Exhibit #9. David, is

21    this a picture of how your leg looked after they brought you out

22    of the woods on the day this happened?

23    A. Yes, sir. That's the one side where the canine teeth -- top

24    canine teeth was hooked on my leg. And then the other side, his

25    bottom teeth off his bottom jaw, tore a pretty good-sized place.

120

1   Q.  When you looked around and saw the dog, did you
2   instinctively just react and shoot it?
3   A.  Yes, sir.  It happened within a second.
4   Q.  Matter of a second?
5   A.  Just a second or two.  I turned over and there was a dog
6   hooked to my leg and I shot it.
7   Q.  Did you see any other officers around you or any other
8   people around you when you shot?
9   A.  No, sir.  After about a couple of seconds after I shot, I
10  started hearing two different individuals shooting, but I
11  couldn't see either one of them.  They were still a ways away
12  from me.
13  Q.  Did you leave the gun right where you shot the dog and take
14  off running?
15  A.  Instantly.
16  Q.  You never pumped the shotgun, did you?
17  A.  No, sir.
18  Q.  You had no intention of firing back at whoever was firing at
19  you, did you?
20  A.  No, sir.
21  Q.  You were just trying to get out of there.
22  A.  I was trying my best to, but I kept falling down.
23  Q.  The leg that was bitten, did it ultimately cause you not to
24  be able to run anymore?
25  A.  Yes, sir.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

121

1   Q.  Did it give you problems as you were being walked out of the
2   woods?
3   A.  Yes, sir.
4   Q.  You couldn't put any weight on it, as a matter of fact,
5   could you?
6   A.  No, sir.
7   Q.  David, you've heard and read a lot about your not accepting
8   responsibility for this.  You know you pled guilty to two counts
9   in this case.  Have you accepted responsibility for this crime?
10  A.  Yes, sir.
11  Q.  If you had it to do over again, what would you do different?
12  A.  I would never mess with methamphetamine again or associate
13  with the people that I knew did.
14  Q.  Were you using methamphetamine pretty regularly at the time?
15  A.  Every day.
16  Q.  You've seen in your presentence report some pretty
17  inflammatory statements supposedly made by your codefendants,
18  Mr. Weldon and Mr. Nelson.
19  A.  Yes, sir.
20  Q.  Now, I'm sure when you were arrested in Montgomery County
21  Jail -- I mean the Montgomery City Jail, the federal wing, you
22  were -- I'm sure you were angry and frustrated at the world in
23  general.  Would that be a fair statement?
24  A.  Yes, sir.
25  Q.  Is it possible that you made any statements like they said

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

122

1   you made?
2   A.  I might have made some statements; but some of that stuff, I
3   know I haven't said.
4   Q.  And as you look back on what you've done and what you've got
5   yourself into, can you honestly sit up in there and say that
6   you're remorseful for everything that's happened?
7   A.  Yes.
8        MR. DEAN:  That's all I have, Your Honor.
9        THE COURT:  All right.  Mr. Brown, cross-examine?
10       MR. DEAN:  Your Honor, I'd like to offer Defendant's
11  Exhibit #9.
12       THE COURT:  It's admitted.
13            CROSS-EXAMINATION
14  BY MR. BROWN:
15  Q.  Mr. Cotney, that's Defendant's Exhibit #9.  You're saying
16  that that's from a dog bite?
17  A.  Yes, sir.
18  Q.  Who took that picture?
19  A.  I'm not sure.  I was laying face down on the ground.
20  Q.  All right.  Who cut your jeans open so that they could take
21  the picture?
22  A.  I'm not sure.
23  Q.  Was it a paramedic or was it an officer or do you know?
24  A.  It was an officer.  There was about five or six officers
25  standing around me.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

123

1   Q.  And they just cut that open to see where you were bleeding
2   from?
3   A.  Yes, I believe so.
4   Q.  When is the first time that you knew that the people out
5   there were police?
6   A.  I guess when one of the officers hollered for me to get my
7   hands in the air after I had dove on the ground, after I had
8   heard -- I shot, and then they started shooting.  And then I
9   was trying to get a little bit where I could get undercover from
10  their fire, and I dove behind something.  And then I heard an
11  officer holler for me to get my hands in the air.  And I put my
12  hands up, and then that's the time I knew it was a police
13  officer.
14  Q.  Would that have been Investigator -- would that have been
15  Investigator Sims?
16  A.  I believe it was Investigator Clay Stewart, but they say
17  otherwise.  But I only saw him for a second, and I had -- had --
18  I was face down on the ground.  And then they handcuffed me.
19  Q.  And that was the first time that you knew that -- well, when
20  they said something was the first time that you knew that
21  anybody there was a police officer.
22  A.  Yes, sir.
23  Q.  All right.  The gun you had, you didn't have any intention
24  of hurting anyone with that gun.
25  A.  No, sir.  I only had it for self-protection because I had

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

124

1   been shot at a few nights before.

2   Q. How were you going to protect yourself with a gun if you

3   weren't going to discharge it?

4   A. I was not planning on shooting any police officers with my

5   gun. And I had it for protection if someone started shooting at

6   me.

7   Q. So you had it to shoot at somebody, just not at a police

8   officer.

9   A. I had it in case someone started shooting at me.

10  Q. And were you just going to point it at him or say, hey, I've

11  got a gun and hold it up; or what were you going to do with it?

12  A. Well, I didn't want to pull out my pocketknife on him.

13  Q. So you were going to shoot it if somebody were shooting at

14  you; is that right?

15  A. If I had to.

16  Q. All right. And apparently you had to.

17  A. Well, I ended up having to because a dog was biting me.

18  Q. So you shot -- you shot the gun. You don't deny you shot

19  the gun.

20  A. No, sir.

21  Q. And you shot the dog with the gun.

22  A. Yes, sir.

23  Q. And the reason you had the gun with you is because you had

24  it for protection in case somebody tried to take something from

25  you or shoot at you; is that right?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

126

1       MR. DEAN: No, Your Honor.

2       THE COURT: All right. You may come down.

3       Mr. Dean, any other witnesses?

4       MR. DEAN: No other witnesses, Your Honor.

5       THE COURT: All right. Mr. Brown, do you have any

6   rebuttal as to Defendant Cotney's testimony?

7       MR. BROWN: No, sir.

8       THE COURT: All right. Let's move to Defendant Nelson,

9   then. And are you going to have any witnesses you want to

10  present, Mr. Lewis?

11      MR. LEWIS: No, Your Honor. We would like to have the

12  opportunity to draw the Court's attention to some things, but

13  that's it.

14      THE COURT: Yes. I'll hear from you. Let me --

15  Mr. Nelson, let me ask you to stand. I didn't ask you this

16  earlier. But have you, and Mr. Lewis, have you, as defense

17  counsel, read the presentence report, including any revisions

18  that may have been made after the initial disclosure?

19      DEFENDANT NELSON: (Nods head)

20      THE COURT: You have? And you have. All right. You

21  can have a seat.

22      All right. Now, as to Defendant Weldon, Mr. Halstrom,

23  do you have any evidence you want to present?

24      MR. HALSTROM: No, Your Honor. We have no witnesses.

25      THE COURT: All right. Let me ask Mr. Halstrom -- I

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

125

1   A. That's correct.

2   Q. And you already knew of someone who was trying to get -- or

3   you had a -- some kind of altercation with about some ammonia;

4   is that right?

5   A. Yes, sir.

6   Q. And after you shot the dog, then you dropped the gun and ran

7   off?

8   A. Yes, sir.

9   Q. Weren't you still scared that somebody was coming after

10  you --

11  A. Yes, sir. I had --

12  Q. -- or did you just think the dog was out there?

13  A. I had no intention of shooting anyone. I was trying to get

14  away from the person with the gun.

15  Q. So you didn't care anymore about keeping that gun for your

16  protection.

17  A. I didn't plan on shooting anybody to begin with or I

18  wouldn't have run. I would have been shooting to begin with.

19  Q. But you did shoot to begin with.

20  A. No. I didn't shoot to begin with. I ran to begin with.

21  Q. Okay. But at the time you dropped the gun, you didn't know

22  that those were police officers.

23  A. No, sir.

24      MR. BROWN: No further questions, Your Honor.

25      THE COURT: All right. Any redirect, Mr. Dean?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

127

1   mean Mr. Weldon to stand. Mr. Weldon, have you, and

2   Mr. Halstrom, have you, as defense counsel, reviewed the

3   presentence report, including any revisions that may have been

4   made after the initial disclosures?

5       DEFENDANT WELDON: Yes, sir.

6       THE COURT: All right. Mr. Brown, you have nothing

7   further other than argument?

8       MR. BROWN: No, Your Honor.

9       THE COURT: I'll hear from you, then.

10      MR. BROWN: Your Honor, just in -- Your Honor, in

11  reference to Mr. Cotney, the government's position is that

12  Mr. Cotney, first of all, discharged this weapon in violation of

13  18 U.S.C. Section 924(c)(3) where the code calls for a ten-year

14  sentence -- a sentence of not less than ten years if a firearm

15  is discharged in connection with a drug trafficking crime -- in

16  this case, the conspiracy to manufacture methamphetamine --

17  which is a ten-year sentence in addition to whatever the

18  guidelines would call for.

19      In that vein, the defense has posed a theory of

20  self-defense that Mr. Cotney was merely protecting himself from

21  a police dog, that he was -- his civil rights were being

22  violated and that he was entitled to shoot that police dog. I

23  think that would be contrary to logic, and it would be contrary

24  to the facts of this case. The defendant was engaged in the

25  making of an illegal drug. He admits to using it to protect

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

128

1  himself. He had in fact already had an altercation with someone
2  over one of the precursors of making methamphetamine. And to
3  claim that when he got caught -- to shoot a narcotics-trained
4  dog flies in the face of logic. And the government feels that
5  that objection should be denied.
6      The probation officer's recommended and the defense has
7  objected in objections number two and three involving
8  obstruction of justice and acceptance of responsibility. I
9  think the testimony, the government feels, is clear that the law
10 enforcement officers did everything that they could to identify
11 themselves. And it would be difficult to imagine that these
12 individuals did not know -- and Mr. Cotney, specifically -- did
13 not know that these were law enforcement officers based on the
14 fact that they began running immediately after they were
15 identified as such. The probation officer -- office has also
16 recommended that acceptance of responsibility be denied on
17 those -- on that basis.
18     In terms of objection number four, the --
19         THE COURT: Well, let me ask you before you move away
20 from three --
21         MR. BROWN: Yes, sir.
22         THE COURT: -- there are two other things in here.
23 There's an objection to -- this is under objection number
24 three. The defendant denies that he intentionally broke a
25 sprinkler head in the cell and denies statements to

130

1  well.
2          MR. BROWN: No, sir. If I understand correctly,
3  objection number four relates to the hazardous materials. And
4  Agent DeJohn and Ms. Kelly gave testimony on that. I think
5  there was already testimony on objection number five, which
6  relates to the leader-organizer role. The objection number six
7  relates to the risk to others. I think we've already heard
8  that. And objection number seven relates to some material that
9  was not considered in calculating the guideline range. So I
10 don't -- I believe, if I've written those down correctly, then
11 we have heard testimony on all of the other --
12         THE COURT: Okay. You told me you don't have any more
13 evidence as to either of the other two also. So what I'm
14 telling you is I'm going to allow you to reopen one time and not
15 any more.
16         Mr. Dean, you were standing a minute ago. Do you have
17 an objection?
18         MR. DEAN: Your Honor, I was going to object to
19 reopening, for the record.
20         THE COURT: All right. Overruled.
21         MR. BROWN: Yes, sir. That would be the only other
22 witness.
23         THE COURT: All right. At this time I'll allow the
24 government to reopen to call the witnesses you referred to.
25         MR. BROWN: Probation Officer Joanne Sellers, Your

129

1  codefendants. I take it from what you just said that you're
2  relying, as to objection number three, strictly on the actions
3  taken there at the scene; is that right?
4          MR. BROWN: Yes, Your Honor. But I believe a lot of
5  that information was relayed to the probation officer and not to
6  law enforcement specifically.
7          THE COURT: I understand. But I haven't heard any
8  evidence on those two points.
9          MR. BROWN: Okay. Then --
10         THE COURT: Unless you want to point some out to me.
11         MR. BROWN: No. We may have to call the probation
12 officer, Your Honor, on those.
13         THE COURT: Well, are you asking to reopen?
14         MR. BROWN: Yes, sir, if the Court would accept that.
15         THE COURT: Well, I don't want to go at this piecemeal
16 as we go in. Is there anything else that you want to put on?
17         MR. BROWN: No, sir. I had written my notes down based
18 on the objections here. And I thought that I had covered that
19 piece of it. No, sir. I think that would be the only witness
20 that we would have to call as it relates to those statements,
21 because they were relayed to the probation officer in
22 preparation of this report.
23         THE COURT: Well, I'll let you reopen to put on this
24 evidence. But if you've got any others in connection with any
25 of these other objections, I want you to do that at this time as

131

1  Honor.
2          JOANNE SELLERS, the witness, having been duly sworn,
3  testified, as follows:
4                  DIRECT EXAMINATION
5  BY MR. BROWN:
6  Q.  Good afternoon.
7  A.  Hi.
8  Q.  Would you state your name for the record, please?
9  A.  Joanne Sellers.
10 Q.  How are you employed, Ms. Sellers?
11 A.  I'm a United States probation officer.
12 Q.  Were you -- in the course of your duties as a probation
13 officer for the United States, did you have the opportunity and
14 were you required to interview a Mr. David Franklin Cotney, Jr.,
15 in relation to a presentence report?
16 A.  Yes, I did.
17 Q.  In doing that, within that contact, did you have the
18 opportunity to speak with an individual by the name of Gary
19 Bowers?
20 A.  I did.
21 Q.  How is Mr. Bowers employed?
22 A.  He is the administrator of the Elmore County Jail in
23 Wetumpka.
24 Q.  What did Mr. Bowers relate to you regarding the
25 incarceration of Mr. Cotney?

132

1  A. He stated that on April the 18th of '03, while an inmate at
2  the Elmore County Jail, the defendant broke off the sprinkler
3  head in his cell and flooded the room. He stated there was
4  approximately $600 in damage to the property.
5  Q. Was this damage accidental?
6  A. He said it was definitely intentional.
7  Q. Did you also have the opportunity to speak with someone in
8  relation to the codefendants in this case?
9  A. I did.
10  Q. What information did you receive by looking into that
11  aspect?
12  A. I was told by Codefendant Nelson's probation officer that
13  Nelson had told him that David Cotney had made threats toward
14  Deputy Parrish after they had been arrested for the instant
15  offense. So I went over to the Montgomery City Jail and talked
16  with Mr. Nelson, asked him about the threats. He told me that
17  David Cotney had threatened to, after he was released from
18  prison, dig up Narco and throw him on Deputy Parrish's front
19  yard. He had threatened to shoot Deputy Parrish and to shoot
20  any other dog that Deputy Parrish might have. I then went and
21  talked with the other codefendant, Mr. Weldon, and he told me
22  that he had also heard David Cotney threaten to shoot Deputy
23  Parrish after they were arrested and were in the city jail.
24  Q. Did you speak with Mr. Cotney about these statements?
25  A. No. I have not.

134

1  Q. The incident in the Elmore County Jail, how did -- do you
2  know how Mr. Cotney came to be housed in the Elmore County Jail?
3  A. I understand that there was a threatened jailbreak at the
4  Montgomery City Jail. I don't believe they -- anyone actually
5  broke out, but they attempted to or had a plan to, and that the
6  marshals thought that he was in on this, so they moved him to
7  Elmore County Jail. And after they investigated, they found out
8  that he was not involved in this.
9  Q. Okay. But that's why he was in Elmore County to begin with.
10  A. That's my understanding.
11  Q. All right. Are there any other inconsistencies aside from
12  that, the identifying nature of the law enforcement officers,
13  the continuing threats, that would indicate that, in your
14  opinion, the defendant has not shown acceptance of
15  responsibility or has otherwise obstructed justice?
16  A. I think that pretty well covers it.
17       MR. BROWN: Thank you. No further questions.
18       THE COURT: All right. Mr. Dean, do you wish to
19  cross-examine?
20       MR. WALTON: Yes, sir.
21       THE COURT: All right.
22       MR. WALTON: Please the Court.
23            CROSS-EXAMINATION
24  BY MR. WALTON:
25  Q. Ms. Sellers, my name is Trip Walton, and I'll ask you a few

133

1  Q. Did you speak to him about the damage that was in the Elmore
2  County Jail?
3  A. Yes, I did. I found that out early in the investigation.
4  The part about the threats to Deputy Parrish I found out much
5  later in the investigation. Mr. David Cotney said that it was
6  strictly accidental. He did not mean to do it. He didn't
7  realize it was a sprinkler head, I believe is what he said.
8  Q. And correct me if I'm wrong, but your recommendation against
9  awarding acceptance of responsibility credit in this case stems
10  from the inconsistencies between what you've been told by the
11  codefendants and Mr. Bowers and what both Mr. Cotney told you in
12  the past and what he stated here under oath today?
13  A. You mean my enhancements and recommendations as to
14  acceptance of responsibility and obstruction of justice?
15  Q. Right.
16  A. That is part of it. Continuing threats is not acceptance of
17  responsibility, which he has made toward Deputy Parrish. Also,
18  the large part of it is I didn't feel he accepted responsibility
19  and obstructed justice because he told me he never saw officers,
20  never knew they were law enforcement officers, never saw their
21  identifying uniforms, never heard them identify themselves. It
22  was my opinion based on the proximity of where he was from the
23  officers that he had to have seen some of their identifying
24  uniforms and he had to have heard them continuously identify
25  themselves as law enforcement officers.

135

1  questions in follow-up, please. Did you hear the officers
2  testify -- one of them testify that they were trying to sneak up
3  on these gentlemen in the woods?
4  A. That they were trying to sneak up?
5  Q. So they wouldn't be seen, the officers? Isn't that logical
6  when you're going up on a crime site?
7  A. I didn't hear anyone testify to that.
8  Q. You didn't hear when I asked them if they were --
9  Mr. Parrish if they were trying to sneak along, they weren't
10  just waving at them coming across the field? You didn't hear
11  that?
12  A. No. I didn't hear that.
13  Q. Would you suppose that that's what law enforcement would
14  do? They would try to slip up on somebody before they were
15  seen? Doesn't that make logical sense in a field?
16  A. I don't think I could answer that, not being in that type
17  situation in law enforcement.
18  Q. Did you hear the officers testify -- particularly Officer
19  Clay Stewart testify that he was 25 to 35 feet and couldn't
20  identify the people, could not see what they were doing with
21  their hands? He remembers the color blue, he could see
22  movement, but that there were trees and there were bushes
23  between he and the individuals. Did you hear that testimony?
24  A. I did.
25  Q. And wouldn't it also be likely that those individuals

136

1  sitting over there in the woods who are not paying a bit of
2  attention to anybody coming at them -- they were doing whatever
3  illegal activity they were about doing, like busy bees -- that
4  all of the sudden they stop and look up and see something
5  themselves, and they -- the testimony was they immediately ran.
6  Now, wouldn't it be logical or would it be at least arguable or
7  reasonable that they ran before they did any ID check out there
8  on the scene?
9  A.  To me, the identifying uniforms that the officers had on
10  would be much more obvious than what someone would be doing with
11  their hands.  These are bold, primarily white, large letters
12  identifying them as police on a black background -- or a
13  sheriff, and then you've got the sheriff's uniform.  And also, I
14  didn't hear Officer Stewart say that he knew any of these
15  people, you know, to begin with.  He said he didn't identify
16  them to begin with.  I didn't hear him say that he knew them
17  before that.
18  Q.  I think you're correct.  What I was getting at was that he
19  couldn't -- he didn't go in there and identify clothing.  He
20  couldn't tell enough about them through the woods to get a -- if
21  they had gone and they hadn't caught them, I don't think Officer
22  Stewart could have sat there and drawn out a sketch of them,
23  because he just didn't have that much -- that great a
24  visibility.  And then it would be reasonable that those people
25  who took a -- now, let me back up a minute.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

137

1  The officers have been sneaking across there -- and I don't
2  mean that ugly.  That's what you do.  I've been there.  You
3  sneak across something; and when you get close, you're going to
4  have to identify yourself.  Well, those people that aren't
5  expecting it, they're not trained at visualization.  They're
6  doing whatever they're doing, and the officers are looking at
7  them.
8  THE COURT:  Mr. Walton, are you just talking or are you
9  going to ask a question?
10  MR. WALTON:  I guess I'm trying to argue, Judge.  I
11  don't mean to be arguing.  I'll move on.
12  THE COURT:  Ask a question.
13  Q.  Let's move on, if you will, with me to the Elmore County
14  Jail.  It's my understanding that my client was falsely accused
15  of participating in a jailbreak and was taken over to Elmore
16  County.  Is that your understanding?
17  A.  They thought he had been involved in it, and the
18  investigation showed that he was not involved.
19  Q.  All right.  So they were incorrect in thinking that he was
20  initially.
21  A.  From what I understand, yes.
22  Q.  And he got over there; and they claimed that he broke off a
23  sprinkler head, is that correct, and flooded the jail cell?
24  A.  Correct.
25  Q.  And did they discuss the rest of the incarceration and their

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

138

1  punishment of him with you about chaining him to the floor for
2  five days and that he got a staph infection?
3  A.  No.
4  Q.  I noticed that in your report, you didn't have that he had
5  staph, that he had to be hospitalized two or three times.
6  A.  No.
7  Q.  They didn't tell you that?
8  A.  No.
9  Q.  Did they mention to you that they kicked him and spit on
10  him?
11  A.  No.
12  Q.  Is the only testimony you have of alleged mouthing off or
13  threats of the two codefendants sitting here?
14  A.  Directly told to me -- I mean from them?
15  Q.  Yeah.  Yes, ma'am.
16  A.  To anyone else?  Other than that they told another probation
17  officer.
18  Q.  Right.  But there's no credible -- I mean they're both,
19  what, two -- one or two felonies apiece?  Been in crime most of
20  their lives?
21  A.  I don't know.  I didn't --
22  MR. HALSTROM:  Object, Your Honor.  The record doesn't
23  show that there are felony convictions.
24  MR. WALTON:  It does on -- one of them certainly has
25  two.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

139

1  Q.  But is there any other credible evidence that my client made
2  those statements?
3  A.  I've not talked with anyone other than the two codefendants
4  and the two other probation officers regarding the statements
5  that your client made.
6  Q.  And is there any reason why you didn't discuss that with
7  Mr. Cotney or ask him about it?
8  A.  No.  It was just later on in the investigation.
9  Q.  And when he sat up there today and he said I probably did
10  mouth off and say some things, but I didn't say everything they
11  said, and he apologized or basically said he was remorseful for
12  it, is that not of any significance?
13  A.  Saying -- continuously saying you're sorry is not
14  significant, as far as I'm concerned.  But I think that is very
15  important, that there are statements made by other people that
16  he did make these threats after the arrest.  I think these are
17  very serious threats --
18  Q.  Well --
19  A.  -- that you're going to shoot a law enforcement officer
20  after you're released.  I also think, like I said, that the fact
21  that he has denied continuously that he ever knew they were law
22  enforcement officers and continues to deny that, to me, there's
23  evidence that doesn't support his statements.
24  Q.  And that's what we went over with the first --
25  A.  Yes.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

140

1   Q.  -- questions.
2   A.  Yes.
3   Q.  And isn't it also a fact that by these gentlemen discussing
4   or giving up information on the codefendant, that they get
5   credit for that?  They get brownie points?
6   A.  Not with me.  As far as I know, not with the government.
7   That's something the government and I have never discussed.  I
8   wouldn't think that -- giving up this type information to me?
9   Q.  Any kind of information that's --
10  A.  I can't speak for --
11  Q.  -- part of a proffer or related to information they're
12  supposed to give.
13  A.  I can't speak as to any other information.  I would not
14  think that information, to me, would help them as far as any
15  sentence goes.  You'll have to ask the government.
16      MR. WALTON:  Okay.  Thank you, Your Honor.
17      THE COURT:  All right.  Mr. Brown?
18      MR. BROWN:  No, sir.
19      THE COURT:  Let me ask you this, Ms. Sellers.  When you
20  talked to the other two defendants about these statements and
21  you discussed it with them, as you were sitting there talking
22  with them, did they impress you as telling the truth?
23      THE WITNESS:  Yes, sir, they did.  As a matter of fact,
24  one of them in particular appeared to be afraid of David Cotney.
25      THE COURT:  Who?

142

1           RECROSS-EXAMINATION
2   BY MR. WALTON:
3   Q.  You were not initially informed until I took testimony and
4   furnished it from state court that my client had even been
5   attacked or bitten by the dog, were you?
6   A.  Oh, yes.
7   Q.  You were?
8   A.  Yes.  We discussed it the first time I interviewed him.
9   Q.  Okay.  I thought you --
10  A.  He showed me his leg.  He said -- you know, he said he was
11  bitten.  That's all I know.  He showed me the scar on his leg.
12      MR. WALTON:  Okay.  Thank you.
13      THE WITNESS:  You're welcome.
14      THE COURT:  Mr. Brown, do you have anything further?
15      MR. BROWN:  No, Your Honor.
16      THE COURT:  All right.  You can come down.
17      Mr. Dean, do you wish to present any testimony in
18  response to that testimony?
19      MR. DEAN:  No, Your Honor.
20      THE COURT:  All right.  Go ahead, Mr. Brown.
21      MR. BROWN:  I apologize for inadvertently overlooking
22  that portion, Your Honor.
23      THE COURT:  All right.
24      MR. BROWN:  And I'll just -- I believe it's at the
25  Court's discretion whether to draw those inconsistencies in the

141

1       THE WITNESS:  And he said, is he going to know I said
2   this?  And I said, well, I don't have to put it in the report;
3   but if I'm called to the stand, yes.  And I asked him -- I'm
4   sorry, Your Honor.  I'm talking.
5       THE COURT:  Go ahead.
6       THE WITNESS:  I asked him, I said, when he made these
7   statements, how did he make them?  Was he just running his
8   mouth?  Was he joking?  And he said -- I said, or was he
9   serious?  He said, oh, he was serious.
10      THE COURT:  Now, you've been -- you're the probation
11  officer that's been dealing with Mr. Cotney.  And has he
12  impressed you as actually having remorse over this incident
13  happening?
14      THE WITNESS:  None whatsoever.  I went back and
15  interviewed him two times to make sure that I was reading him
16  correctly.  I went back the second time to make sure I was
17  reading him correctly the first time and to give him an
18  opportunity to say, well, yeah, I did know they were law
19  enforcement or -- it's just like everything he told me was an
20  excuse for what he did.  He didn't know they were law
21  enforcement, so he ran.  He didn't know they were law
22  enforcement, so he shot the police dog.
23      THE COURT:  Mr. Walton, do you wish to ask any
24  questions after that?
25

143

1   information from the probation officer as it relates to both the
2   obstruction of justice and acceptance of responsibility.
3       Mr. Cotney's fourth objection relates to the hazardous
4   materials.  The government's position is the fact alone that a
5   team had to be called to clean up the area would show that there
6   were hazardous materials to the area.  But specifically, the
7   testimony of Agent DeJohn and Ms. Kelly with the Department of
8   Forensic Sciences who testified, Ms. Kelly specifically, about
9   the strong odor of ether in the area along with the ammonia,
10  which had been transferred at some point between those two tanks
11  and could potentially cause a leak based on the valve that was
12  on the second tank, in particular, would show that there were
13  hazards to the area.
14      Detective Stewart mentioned that there was a well right
15  there by the cabin, which would show that the potential for any
16  kind of alteration of the groundwater there -- there was a
17  potential for that.  And that, in fact, was something that could
18  not even -- if it had been noticed, would not have been able to
19  be cleaned up by the company that Agent DeJohn called to do the
20  other portions of the cleanup.
21      Mr. Cotney's fifth objection relates to
22  leader-organizer role.  And I think -- I believe it was
23  Mr. Stewart's testimony that based on the information provided
24  by Mr. Cotney himself, along with the other individuals,
25  indicated that Mr. Cotney was the leader of the individuals that

144

1  were there on that occasion, and that the substances that would
2  have been manufactured would have been sold by Mr. Cotney.
3        And finally -- and this sort of relates back a little
4  bit to the hazardous materials as well, but I prefer to address
5  it as -- in response to government -- or the defendant's sixth
6  objection as it relates to a risk posed by Mr. Cotney. It's
7  clear that there was a risk that was posed by him by the fact
8  that he was shooting. I know that Sergeant Parrish indicated
9  that when he swung -- when Mr. Cotney swung around in his
10  direction, he was -- clearly thought that there was a risk
11  involved, and that's why he returned fire. But in addition to
12  that, the -- both Agent DeJohn and Ms. Kelly indicated the
13  highly volatile nature of the ether that was in the area; and
14  had some sort of gunshot or spark resulting from that gunshot --
15  had that occurred, then there was -- there was the potential for
16  a disaster. I mean somebody -- more persons than the one police
17  K-9 could have been killed in that respect.
18        And then as I read the objection, the response to
19  number seven, that that is some factual information that was
20  included in the probation officer's report but which has no
21  impact on the guideline range. So I don't know -- I don't think
22  the Court requires the government's response to that particular
23  objection.
24        THE COURT: All right. Thank you.
25        All right. We're going to take a recess at this time.

146

1  responsibility -- the opinion of the probation officer that he
2  should have seen the officers, identified them as officers, and
3  not fled. My client consistently -- and although he has given a
4  proffer and he has opened up and told everything he knows about
5  the drug business, about what happened that day with him, about
6  his involvement with his codefendants -- even a motion for a
7  three-point downward departure was filed on behalf of the
8  government. I can't understand how he can do that and at the
9  same time not be given credit for acceptance of responsibility.
10        Not only has he accepted responsibility, he has
11  provided names. He has offered to testify, if need be. And not
12  only has he accepted responsibility, he has -- he's put his own
13  life in danger of what might happen to him down the road,
14  whether he's in the federal penitentiary or whether he gets out
15  one day. So it's hard for me to put those two together and give
16  him credit for substantial assistance and at the same time not
17  give him credit for acceptance of responsibility.
18        I'm not going to go back through my argument about my
19  objections regarding the environment and a substantial risk
20  thereto. I'll just remind the Court that that guideline and the
21  factors to consider, such as the remote area, the way the
22  chemicals were stored, the fact that it was in the initial
23  stages of production -- I would ask the Court to consider those
24  factors and determine whether or not -- not that it was a risk
25  to the environment, but whether it presented substantial risk

145

1  And then I'll hear from defense counsel for Defendant Cotney,
2  and then we'll take the other defendants. We'll be in recess
3  until 25 after three.
4        (Recess at 3:08 p.m. until 3:27 p.m.)
5        THE COURT: All right. Mr. Dean, I'll hear from you.
6        MR. DEAN: Your Honor, I have tried to focus my
7  questioning today towards the enhancements in the presentence
8  report. My objections were based on the enhancements and facts
9  that the probation officer had developed an opinion about and
10  facts that my client told me from day one were what he best
11  remembered.
12        As Your Honor knows, he pled guilty to the conspiracy
13  to manufacture charge, which the statutory mandatory minimum is
14  ten years. He's pled guilty to the firearm charge, which is
15  another statutory minimum mandatory. And then his recommended
16  sentence has been enhanced to take him to level 44 in the
17  federal sentencing guidelines, and they're -- and they stop at
18  43.
19        Your Honor, this has been a tough case, I think, for
20  everybody, because there's the death of a drug dog involved. I
21  think it's hard to, on one way -- one way or the other, not take
22  a personal approach to this case. It's very unique.
23        The enhancements for obstruction of justice as well as
24  some of the other ones that I've objected to deal mainly with my
25  client -- as well as they're not getting the acceptance of

147

1  under that Section 2 -- I don't remember the exact section, but
2  the section -- the enhancement for the substantial risk to the
3  environment.
4        I've dealt with David Cotney now one on one since his
5  initial appearance and detention hearing. I talked with him at
6  length in jail visits. And he's consistently told me that he
7  did not recognize them as officers. I've been to the scene.
8  I've seen the site of the lab. I've measured the distance from
9  where his truck was parked where officers said they first
10  noticed him, where they walked in, where they first saw him
11  run. And I think an equal reasonable argument can be made on
12  his behalf, just as Ms. Joanne Sellers argued that he should
13  have seen them.
14        I'd like Your Honor to be aware that Mr. Cotney has
15  been indicted in state court on two charges. One of them is for
16  killing the drug dog, under an Alabama statute. That is a
17  separate case from this federal drug charge. It will be dealt
18  with in state court. So I just ask Your Honor when deciding and
19  handing down a sentence to Mr. Cotney, just remember that the
20  dog incident is separate, as far as being charged in state
21  court, than it is from this conspiracy to manufacture
22  methamphetamine, which he's pled guilty.
23        The enhancement for substantial risk of serious bodily
24  harm that I objected to, I would point out to the Court once
25  again that while my client admits to shooting the dog, he shot

148

1  him when he was latched onto his leg at point-blank range. He
2  dropped the gun. He never ejected the shell. He never pumped
3  one back into the chamber. And it's been his position with me
4  that he never pointed the weapon at any of the other officers.
5      He testified as to being in jail, as to what his
6  codefendants said that he said about Deputy Parrish and what he
7  might do. And he has testified under oath that he probably did
8  say some things in the heat of anger, knowing that he had thrown
9  his life away. And he's had time to think about them, and he is
10  remorseful for them.
11      Your Honor, I just -- I just ask you to consider that
12  there are two sides to the material assertions in these
13  enhancements. Without the enhancements given, over 150 grams is
14  a base level 34, not to mention the statutory firearm charge
15  that he's pled guilty to. And I hate to see personal feelings
16  about the drug dog lead to an enhancement that takes him -- at
17  the age of 30 years old, with two misdemeanors on his record --
18  takes him to a range of 43, which is -- which is life,
19  notwithstanding the three-level downward departure filed through
20  motion by the government.
21      And Your Honor, in closing, I would just say to the
22  Court that I don't think anybody, including Mr. Cotney, doesn't
23  feel sorry and have remorse that a drug dog, who was -- you
24  know, he was an animal partner to these deputies, that he was
25  killed. But my client is a 30-year-old human being who, prior

150

1  looked at the -- with the assistance of the probation office, 18
2  U.S. Code 3664 where it discusses restitution. And in paragraph
3  (d)(5), it states that if the victim's losses are not
4  ascertainable by the date ten days prior to sentencing -- which,
5  of course, we thought they were ascertainable by that time, just
6  we didn't know about the recompensation -- that the Court can
7  set a date within 90 days to determine the actual figure. And I
8  would ask the Court for some period of time to get an accurate
9  figure of what the actual community recompensation was.
10      I don't -- I'm not quite prepared -- and I apologize
11  for that -- to take into account exactly what the money provided
12  by the community -- what impact it has on the restitution order
13  as well. I did look at paragraph (f)(1)(B), and there it states
14  that the fact that a victim has received or is entitled to
15  receive compensation with respect to a loss from insurance or
16  any other source be considered in determining the amount of
17  restitution, which would indicate that notwithstanding the
18  community's efforts, the restitution might still be proper. But
19  I would just ask the Court --
20      THE COURT: Well, I'll just tell you right now I would
21  not be inclined to do that.
22      MR. BROWN: Okay. And I understand that, Your Honor;
23  but we would ask for a period of a week, maybe, to come up with
24  the exact amount that the community raised to pay for a new dog
25  and the retraining and so forth.

149

1  to this incident -- 12 months ago had never got into
2  methamphetamine; but it's ruined his life. But it's still the
3  life of a human.
4      He has a mind. He was an excellent construction
5  worker. He owned his own business before he got involved with
6  this methamphetamine. He has a soul. And I would just ask Your
7  Honor to remember that when trying to decide which sentence to
8  impose. And we just -- we're asking the Court for mercy, Your
9  Honor. Thank you.
10      THE COURT: All right. Mr. Brown, before we move to
11  the next defendant, I meant to ask you about this when you were
12  up a while ago. But tell me as to this defendant what your
13  position -- the position of the government is on restitution in
14  light of the testimony that the dog was paid -- new dog was paid
15  for by contributions.
16      MR. BROWN: Your Honor, in the break, I spoke with the
17  probation office as well. It is my understanding that the
18  original restitution amount in this case included somewhere
19  close to $13,000 as it relates to the dog that was shot and
20  killed and to retraining and the purchasing of a new dog. And
21  then approximately $3,000 was -- relates to the cleanup portion
22  of what occurred.
23      I've spoke with the officers. They are unclear as to
24  the exact amount of contributions to the sheriff's department to
25  recompensate for the loss and retraining and so forth. I've

151

1      THE COURT: Well, the testimony was that it was 12,000
2  to $13,000.
3      MR. BROWN: Right. And I --
4      THE COURT: From the officer.
5      MR. BROWN: And I don't have any -- any way to dispute
6  that. But that was an estimate.
7      THE COURT: Well, I can understand why you were not
8  prepared on that, because there was no objection to that in the
9  presentence report. And I was not aware of any issue being
10  raised either before today. So I can understand why you would
11  want some time to respond to that.
12      All right. Now, let's move to the Defendant Nelson.
13  I'll hear from you on him. All right. Mr. Brown, I don't know
14  that I've heard -- I have not heard from you on him, so I'll
15  hear from you on Mr. Nelson.
16      MR. BROWN: Your Honor, I believe, if I have accurately
17  looked at the objections by Mr. Nelson, the first one is drug
18  quantity. Mr. -- I mean -- I'm sorry. Ms. Kelly testified that
19  based on her analysis, using a 75-percent yield, that
20  approximately 155 grams of methamphetamine could be produced by
21  the chemicals that were at the site of the offense. The
22  objections to that primarily state that the -- that a theory or
23  theoretical quantity would not be appropriate way of calculating
24  the drug quantity. And there are a couple of non-Eleventh
25  Circuit cases cited for that proposition.

152

1    The government's opinion would be that the case that
2    defendant also cites, which is United States versus Blaylock,
3    B-L-A-Y-L-O-C-K, at 249 F.3d 1298, which is a 2001 case out of
4    this circuit, does support that. That case has had a fairly
5    different history in the appellate courts, but the final opinion
6    issued there does state that actual methamphetamine yield based
7    on a hundred percent theoretical yield would be permissible
8    absent some evidence rebutting that. In this case, Ms. Kelly
9    used a 75-percent yield to -- rather than a hundred percent
10   yield. So the government's position would be that that would be
11   an accurate amount for which to sentence the defendant.
12       That is also an objection of Mr. Weldon, and the
13   government's position would be the same for Mr. Weldon.
14       THE COURT: Do you have any comment about the fact that
15   there is now a new table that applies to precursor drugs?
16       MR. BROWN: This case was a conspiracy to manufacture
17   methamphetamine. The defendants were intending to manufacture
18   an amount of methamphetamine. And the amount of methamphetamine
19   that they were intending to manufacture, the government's
20   position, is more appropriately determined by the end product,
21   because that was what they conspired to do. They didn't
22   conspire to manufacture 15-percent yield methamphetamine. I'm
23   sure they desired to produce a hundred percent yield
24   methamphetamine. I'm sure that was their goal. Yet 75 percent,
25   according to Department of Forensic Sciences, is an average

154

1    the arrest?
2        MR. BROWN: The day of the -- the day of the incident.
3        THE COURT: Because I don't recall that testimony,
4    but --
5        MR. BROWN: I think that was Mr. -- Investigator
6    Stewart's testimony.
7        THE COURT: Okay.
8        MR. BROWN: Mr. Nelson's -- Mr. Nelson's third
9    objection relates to the hazardous materials. And I think
10   that's been adequately covered by the government's argument as
11   it related to Mr. Cotney. And then unless there were some
12   supplemental objections, which those are the ones I had down,
13   that was all of Mr. Nelson's objections.
14       THE COURT: All right. And you were not going to cover
15   all of Mr. Weldon's at this time. That's fine. All right.
16       All right. Mr. Lewis?
17       MR. LEWIS: Thank you, Your Honor. Your Honor, we did
18   not actually -- I appreciate the probation officer noting that
19   we do not believe the defendant should receive the two-level gun
20   enhancement under 2D1.1(b)(1). We actually did not object to
21   that gun enhancement in our written objection that we filed. We
22   may have groused about it verbally a little bit, but I
23   appreciate their taking cognizance of that.
24       THE COURT: Do you want to withdraw that?
25       MR. LEWIS: No, sir. I'll leave it in. I think that's

153

1    which they use as a standard. And the government's position
2    would be that would be the more applicable guideline, 2D1.1,
3    versus the precursor chemical section.
4        THE COURT: All right.
5        MR. BROWN: Mr. Nelson's second objection relates to
6    the two-level gun enhancement under 2D1.1 as well. And the
7    testimony from both -- from Mr. -- from Mr. Nelson was that he
8    was aware that Mr. Cotney had the firearm the night before, and
9    on that date Mr. Weldon knew that the -- that Mr. Cotney had the
10   gun. He did not -- there is no testimony as to whether he had
11   it the day before. So the government's position with respect to
12   Mr. Nelson's second and Mr. Weldon's second objection as it
13   relates to the gun would be that -- would be consistent with the
14   probation officer's report.
15       THE COURT: Now, tell me as to Weldon what you say the
16   testimony was as to the gun.
17       MR. BROWN: That he was aware that Mr. Cotney had the
18   gun. But he was not, apparently, there the night before,
19   according to the information that Mr. -- that Investigator
20   Stewart said. He -- Mr. Weldon was not there before, the night
21   before, so he didn't know whether or not -- or would not have
22   known, if that were the case, whether Mr. Cotney had the gun the
23   night before.
24       THE COURT: Are you saying that you understand that
25   witness testified that he did know that he had it on the day of

155

1    good. As a matter of fact, one of the reasons that -- one of
2    the reasons that our client is considered to have knowledge of
3    the gun was because he told -- when he was talking to the
4    officers about Mr. Cotney, he said, Mr. Cotney had a gun; I knew
5    he had a gun. And if he knew he had a gun, he knew he had a
6    gun. And he knew he was conspiring to manufacture
7    methamphetamine.
8        I still don't like it. I think that Mr. Cotney ought
9    to be labeled with the gun and my client should not, so --
10   because my client didn't exercise any right of control over that
11   gun, didn't exercise any ownership right over the gun. In fact,
12   for all that appears in the record, he never touched that
13   weapon.
14       Let's go to what I consider to be the two important
15   areas, Your Honor. One is, we think the base level offense in
16   this case ought to be 26 and not -- we said not 32, and then we
17   were informed later, no, it's going up to 34 now, based on
18   quantity of drugs. Now, I've got to tell the Court that I'm the
19   person who called the government's attention to United States
20   versus Blaylock. I did that out of -- out of an abundance of
21   caution and mindful of my role as an officer of the Court, that
22   I have to call the Court's attention to any adverse law in
23   connection with any law that I'm citing. So I've done that.
24       But I don't consider Blaylock to be adverse. I think
25   Blaylock can be harmonized with my objection in this case.

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon          October 15, 2003

156

1  Blaylock says, it is thus the rule of this circuit that a
2  district court may base its estimate of actual methamphetamine
3  yield upon an expert's 100 percent calculation -- expert's
4  calculation of the 100 percent theoretical yield, at least where
5  there's no evidence presented by the defendants to rebut an
6  estimate.
7      Your Honor, you will recall my examination of the
8  witness in this case, and that was Ms. Melissa Kelly. She said
9  that she used a 75 percent yield because, and I quote, 75
10  percent is what we generally find. She said she also estimated
11  it at 100 percent, and she also estimated it at 50 percent
12  because both of those numbers are within the theoretical range
13  of possibility in this case.
14      She did not testify as to actual methamphetamine. The
15  Court will note that the DFS report itself, which is before the
16  Court, never talked about actual methamphetamine. The witness
17  would not use the word "actual methamphetamine." And I asked
18  her, is there a difference. Yeah, there's a difference. We
19  didn't have any actual methamphetamine. And that's what the
20  circuits around the country have been saying. And that is that
21  if you've got actual methamphetamine, that's what you ought to
22  be basing your estimate of purity on.
23      Let me call the Court's attention to United States
24  versus Houston. That is an Eighth Circuit case, 338 F.3d 876.
25  I'm going to read a paragraph at 878 through 79:

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon          October 15, 2003

158

1  methamphetamine. And yet the statute does and the sentencing
2  guidelines do.
3      We would simply suggest that there's been insufficient
4  evidence from any source that the defendant should be charged
5  with 155.6 grams of actual methamphetamine when in fact the
6  defendant should be charged with 155 grams of methamphetamine.
7  That takes it out of the thirties, Your Honor, and puts it down
8  to 26. And we would suggest, based on the testimony in this
9  case and the evidence before the Court, including the toxicology
10  report, that that's where this case needs to be.
11      THE COURT: Now, where -- point me to the table that
12  you're using where you say 26.
13      MR. HALSTROM: Paragraph seven.
14      MR. LEWIS: Yeah. Well, it's -- on the table, Your
15  Honor, in the sentencing report?
16      THE COURT: I want you to tell me -- you're saying a
17  level of 26. Tell me what that's based on.
18      MR. LEWIS: Yes, sir. That would be level 26 based on
19  50 to less than 200 grams of meth mix. And I'm sorry. I don't
20  have my drug table here.
21      MR. HALSTROM: That's 2D1.1(7).
22      PROBATION OFFICER: Page 120.
23      MR. LEWIS: Okay. 2D1.1(7).
24      THE COURT: 2D1.1(7), you say?
25      MR. LEWIS: That's what I'm told, Your Honor.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon          October 15, 2003

157

1      When use of the actual methamphetamine alternative
2  produces a greater sentence, the government must prove the
3  actual methamphetamine content of the substance or substances in
4  question. The government may prove the total quantity of actual
5  methamphetamine in a series of transactions by testing the
6  purity of the seized quantity and applying the percentage of
7  actual methamphetamine in the tested quantity to the unrecovered
8  quantities. When no quantity has been recovered, the government
9  may prove the purity of quantities attributed to the defendant
10  by circumstantial evidence -- for example, a conspirator's
11  reliable testimony that purchased amphetamine was undiluted,
12  unadulterated, not cut, pure -- or an expert's testimony as to
13  the normal purity of methamphetamine produced in a lab.
14      There is a difference, Your Honor, between normal
15  methamphetamine produced in a lab and methamphetamine produced
16  in a clandestine lab out in the -- in the woods of Chambers
17  County. And in fact, the expert said she could not relate their
18  experience in a lab to what would come out of a clandestine
19  lab. What she did say was that this was not actual
20  methamphetamine. The defendant pleaded guilty to conspiracy to
21  manufacture 50 grams or more of methamphetamine, not actual
22  methamphetamine. And Your Honor, if actual methamphetamine was
23  to be used in every case, even in the Eleventh Circuit, then the
24  statute itself would be redundant. The statute would have no
25  reason to differentiate between actual methamphetamine and

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

---

United States of America v. David Franklin Cotney, Allen Lee Nelson, Jonathan Boyd Weldon          October 15, 2003

159

1      THE COURT: All right. Go ahead.
2      MR. LEWIS: My other argument has to do with the harm
3  to the environment. Your Honor, the probation officer points
4  out correctly that pursuant to Sentencing Guideline
5  2D1.1(b)(5)(B), if the offense involves the manufacture of
6  methamphetamine and created a substantial risk of harm to human
7  life or the environment, increase by three levels.
8      Your Honor listened to the testimony just as I did.
9  Officer DeJohn, who is a renowned law enforcement officer in
10  these parts and who has busted no fewer than ten methamphetamine
11  labs, says he calls the haz mat team in every case and has
12  called the haz mat team in every case. And we asked him
13  further -- and I think Mr. Halstrom actually asked him this
14  also. Is every -- does every methamphetamine lab create a
15  substantial risk of harm to the environment? He says yes.
16  Well, Your Honor, if that were true, then we've got superfluity
17  in the law; because if that were true, there would be no reason
18  to say, and if it also created a substantial risk of harm to the
19  environment, increase by three levels.
20      If we're going to give effect to the sentencing
21  guidelines, Your Honor, we have to draw a distinction between
22  those cases in which there is a substantial risk of harm and a
23  case in which there is simply the inherent risk of harm that
24  comes from manufacturing methamphetamine. There's no method of
25  manufacturing methamphetamine -- and there are literally scores

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

160

1  of such methods -- that do not involve one or more hazardous
2  precursors that, if released into the environment, would create
3  some harm.
4      In this case, Your Honor, the methamphetamine
5  clandestine lab was outside. The risk of harm from ether comes
6  when it's confined in a small space. You don't have any risk
7  when it's outside in the open air, because you cannot create the
8  flash point because of volumetric concerns; and there was no
9  testimony that you could do so. Your Honor and I are old enough
10 to have experienced ether. You can breathe that stuff and
11 survive. Now they use all this Valium and stuff like that. But
12 the fact is that ether, pure ether, has medicinal purposes.
13 There is no evidence that this was released in a liquid form
14 into the ground in which it could have created a risk of harm.
15     There is no evidence whatsoever that any lithium was
16 ever allowed into the environment in any form. The batteries
17 were sealed. The batteries were in -- in commercial packaging
18 that was, in most cases, still sealed. The anhydrous ammonia
19 was in the container for which -- the container which was
20 designed to hold anhydrous ammonia. If it created a risk of
21 harm by being in that container, then anybody who sells
22 anhydrous ammonia is going to be creating that risk of harm.
23     The testimony originally on direct from Ms. Kelly was
24 that there was some anhydrous ammonia in the propane tank.
25 Well, on cross, it turns out that they were able to scrape some

162

1  my client, Mr. Nelson.
2      MR. BROWN: May I respond, Your Honor, to a couple
3  points?
4      THE COURT: All right.
5      MR. BROWN: First, I think it's totally appropriate if
6  the Court could recommend to the Bureau of Prisons that these
7  individuals be separated upon their incarceration. I think that
8  is an excellent idea, and we'll be forwarding that request to
9  the marshal's office as well.
10     In response to the drug quantity argument made by
11 Mr. Lewis, I looked at the precursor quantity, which, again,
12 I -- the government's position is that that quantity, that
13 guidelines quantity, would not be the more appropriate quantity
14 to use in this case. But just looking at the quantity,
15 according to Ms. Kelly's report, the actual grams of
16 pseudoephedrine in the three different containers added up --
17 and if I'm correct, it's 229.7 grams. If the Court were to use
18 the precursor chemical guideline, that would be a level 32 and
19 not a level 26.
20     And I'm not suggesting the Court use that. But what I
21 am suggesting is that, obviously, there is a -- more of a
22 correlation between the amount of pseudoephedrine that was in
23 this sample that was analyzed by Ms. Kelly towards the 150-gram
24 quantity, as she laid out, as opposed to some other quantity;
25 that those, while they don't both equal level 34s, it is this

161

1  residue off; but in fact, these defendants had not put any
2  anhydrous ammonia in there. They had the big tank there for
3  their cook. There's no evidence how long that tank had been
4  there or how long it had been since anybody had put anhydrous
5  ammonia into that tank. In any event, that wasn't happening at
6  that time. There was no testimony of corroded valves or
7  anything else that created the substantial risk of harm to the
8  environment.
9      And Your Honor, if we are to breathe life into these
10 sentencing guidelines, we must hold the government to its
11 proof. And that proof has got to include not only that there
12 was a conspiracy to manufacture methamphetamine, which we all
13 concede, but that, in addition to that, it created a risk of
14 harm to the environment that is not present in your ordinary
15 methamphetamine case. And that is the only way the Court can
16 view that. And we would ask that that enhancement, that
17 three-level enhancement, be removed from Mr. Nelson's
18 sentencing.
19     I have one other thing I would like to ask -- add, Your
20 Honor. And that is based on the testimony that I have heard
21 recently, I would move the Court at this point -- and will be
22 willing to file written motions to that effect if the Court
23 desires -- to have the defendants in this case, upon sentencing
24 and commitment to the Bureau of Prisons, housed in separate
25 institutions. And I also would urge the Court to have mercy on

163

1  level 32. It is fairly close. So the Guidelines Commission
2  obviously looked at that as being the more appropriate analysis,
3  if you will.
4      And I apologize to the Court. I've given up all of my
5  toxicology reports, but I think I have added that correctly.
6  Thank you.
7      THE COURT: All right. Mr. Lewis?
8      MR. LEWIS: Judge, may I say one thing? And I believe
9  if we're talking about the actual weight of the pseudoephedrine,
10 it was 155.61 grams, not two hundred and -- well --
11     MR. HALSTROM: He's right if --
12     MR. LEWIS: Oh, you're talking about the precursors.
13 I'll withdraw that because Mr. Brown's math is correct.
14     THE COURT: All right. Now, Mr. Brown, I want to hear
15 from you at this time on the other matters involving the
16 Defendant Weldon. I think there were some that you didn't
17 cover, if you want to be heard on them, role in the offense and
18 criminal history.
19     MR. BROWN: Right, Your Honor. I do think that I've
20 covered the first four objections but only -- or the first three
21 objections, leaving only the minimal participant role. I think
22 the only testimony that we heard was from Agent DeJohn and
23 Agent -- and Agent Stewart as part of information that was
24 obtained from proffer sessions to the government. I don't think
25 there's any doubt that Mr. Weldon is not at the level of

164

1  Mr. Cotney. But the government's position is -- agrees with the
2  recommendation of the probation office as well as the officers
3  in this case that Mr. Weldon and Mr. Nelson were equally
4  involved.
5       As it relates to the criminal history category, in this
6  case, an uncounseled misdemeanor conviction was used to enhance
7  or to increase the level of criminal history category. In that
8  particular case, although it was an uncounseled misdemeanor, it
9  is my understanding that there was no suspended --
10      MR. HALSTROM: Your Honor, if I may.
11      MR. BROWN: There was a suspended sentence.
12      MR. HALSTROM: We withdraw the uncounseled objection.
13 I think the one the Court's interested in is the youthful
14 offender count, for which there was one point added. And it
15 was -- we contend it was eight years subsequent --
16      MR. BROWN: And that was in your motion today?
17      Quite frankly, Your Honor, being involved in this
18 sentencing all day today, I have not had the opportunity to look
19 at that one particular thing. And regardless, the government
20 would defer to the probation officer on that as well.
21      THE COURT: All right. Mr. Halstrom?
22      MR. HALSTROM: May it please the Court. We would,
23 first of all, adopt the arguments that were offered on behalf of
24 Mr. Nelson and won't go through the rhetoric and the eloquence
25 with which Mr. Lewis expounded upon those.

166

1  involved in this, Mr. Brown indicated that this would be a level
2  32. If we use 229.7 grams, which is the weight of the
3  pseudoephedrine involved, that would put it at a level 28 rather
4  than a level 32, which is at least --
5       THE COURT: Wait a minute.
6       MR. HALSTROM:  -- at least 200 grams but less than 350
7  grams of methamphetamine.
8       THE COURT: Where are you looking now on level 28?
9       MR. HALSTROM: I think that's page 120 of the
10 guidelines. About the fifth dot down, it talks about 200 grams
11 but less than 350 grams of methamphetamine or at least 20 grams
12 but less than 35 grams of methamphetamine actual.
13      THE COURT: You're referring to the methamphetamine
14 table and not precursor table. The precursor table is on page
15 144.
16      MR. HALSTROM: That may be correct. Yeah. I'm not
17 going on the same pages because I'm a year behind on this, Your
18 Honor. But the facts of these cases, I think, are correct. At
19 any rate, we contend and we agree with the comments of Mr. Lewis
20 that this should be a base level 26 offense to start with.
21      Then we argue, regarding the substantial risk aspect to
22 the environment, we feel that there are constitutional issues
23 involved here. We don't feel -- we feel that the language there
24 of substantial harm or substantial risk to the environment does
25 not meet the sufficient definite -- requirement, and it

165

1       We would point to some direct evidence, however, in
2  support of our argument that this should be a level 26
3  application, a base level 26. The first one is the indictment
4  itself. And the Defendant Weldon was indicted to manufacture 50
5  grams or more of methamphetamine. That is what he was put on
6  notice to defend.
7       The second aspect was raised by Mr. Lewis as well --
8  and I believe it's in Government's Exhibit #1 -- which is the
9  toxicology report or the forensic report from Ms. Kelly, where
10 she mentions or testifies that the substance produced would
11 equate to 155.61 grams of methamphetamine. And she does not,
12 even though questioned about the difference -- does not go to
13 the point that that's actual. And we contend that it ought to
14 be level 26. In addition to that, the preguidelines estimates
15 that were established long ago initially set this at a level
16 28. I'm not sure how that level was produced, but that's what
17 the -- Mr. Weldon was put on notice that he was facing.
18      Furthermore, in a conversation that I had with
19 Mr. Brown on the 19th of May of this year, just prior to my
20 going to talk to Mr. Weldon about entering a plea, I wanted to
21 be sure what it was that we were dealing with. And Mr. Brown at
22 that point concurred that we were dealing with a level 26,
23 between 50 grams and less than 20 (sic) grams of
24 methamphetamine, and actual was not an issue in this particular
25 case. If you establish or go to the precursor chemicals

167

1  encourages an arbitrary and discriminatory enforcement of that
2  particular enhancement.
3       Now, I'm speaking from language that comes from the
4  statutes and not from language that comes from the guidelines,
5  so I admit that initially. I haven't been able to find a case
6  where this particular enhancement has been brought up before the
7  appellate courts. But nonetheless, I would feel that in view of
8  the testimony that's been provided, especially from Agent
9  DeJohn, who testified that all meth labs posed a substantial
10 risk to persons or the environment, that not only do you have a
11 language issue of vagueness in the statute, but you have a real
12 potential for a double jeopardy argument in that there's an
13 inherent substantial risk to the environment for which the
14 methamphetamine conspiracy case already applies a punishment.
15 And now we're enhancing it for something that is inherent in the
16 production of a meth lab.
17      Our -- we contend that as far as the minimal
18 participant argument, that Agent DeJohn was clear in
19 establishing a hierarchy of participation in this particular
20 case; that he testified that Mr. Cotney was the organizer, the
21 leader of the affair; that Mr. Nelson was the cook; and he
22 wasn't sure exactly what Mr. Weldon's role is, but he was a
23 participant in it. We pled guilty to the conspiracy. We agree
24 that we're part of the conspiracy. But we contend that we are,
25 at most, a minor participant and, at best, a minimal

168

1  participant. And he's entitled to a four-level reduction if
2  he's a minimal participant; and if the Court determines he's a
3  minor participant, then he's entitled to a two-level reduction.
4          I think everything -- the testimony was that this was
5  an ongoing -- a several-day process. The night before,
6  Mr. Weldon is not available, or he's not in the lab area. He's
7  not participating in it. The evidence was that he didn't
8  purchase anything. He didn't supply anything. He moved some
9  things around. I think that his participation is obviously
10 different from the other two that are before the Court this
11 morning.
12         The dangerous weapon aspect, the only -- again, there
13 was evidence that Mr. Weldon had informed the agents that he was
14 aware that the weapon that they showed him was that -- did
15 belong to Mr. Cotney. There was no evidence that he was aware
16 that this weapon -- or it was reasonably foreseeable that this
17 weapon would be used by Mr. Cotney in the criminal endeavor.
18 None. There was no evidence that he was aware that it was there
19 on the scene when he was there. No one has testified to that.
20 And we don't think that Mr. Weldon should be responsible for a
21 two-level enhancement based on the firearm.
22         The youthful offender aspect -- and let me correct the
23 Court -- not the Court, but Mr. Brown and the probation office.
24 That youthful offender objection was submitted in my initial
25 objections to presentence investigation report. The only change

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

170

1  a criminal offense in the first place. Alabama law states that
2  the effect of the determination -- that in such determinations,
3  juvenile offenses shall not be deemed a conviction of a crime.
4  And so that's another grounds for which we think that this
5  particular offense should not receive a one-point addition in
6  his criminal history.
7          THE COURT: Okay.
8          MR. HALSTROM: And those are our objections, Your
9  Honor.
10         MR. LEWIS: Your Honor, to the extent applicable, I'd
11 like to adopt Mr. Halstrom's arguments as to those issues
12 applicable to my client, particularly the potential problem with
13 constitutionality of the enhancement.
14         THE COURT: Of the enhancement based on the
15 environmental and human hazard?
16         MR. LEWIS: Yes, sir.
17         THE COURT: All right.
18         MR. DEAN: Your Honor, likewise, we would like to
19 adopt.
20         THE COURT: All right. Mr. Brown, any response to
21 the government?
22         MR. BROWN: No, sir, I don't believe so.
23         THE COURT: All right. I'm going to take just a few
24 minutes to pull some of this together and review my notes.
25 We'll just recess in place, and I'll be back in just a few

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

169

1  I made in the subsequent one is that I did not address the
2  firearm issue. And I don't know -- I think that was just a
3  plain oversight that that was not placed in the final report of
4  the probation office. But it's not brand new. The fact of the
5  matter is that the offense clearly was committed eight years
6  prior to the commencement of the instant offense. I believe
7  it's Section 4A1.2(d)(2) --
8          THE COURT: Wait a minute.
9          MR. HALSTROM: -- capital (B).
10         THE COURT: Let me catch up with you. 4A1. --
11         MR. HALSTROM: We'll go to 4A1.2(d)(2)(B). And you're
12 to add one point --
13         THE COURT: All right. Now, wait. Let me interrupt
14 you just a minute. I understand you put this in your objection,
15 but it was not in what I was looking at, so it's new to me. And
16 I think it's an oversight by probation. But we're talking about
17 paragraph 30 in the presentence report, aren't we?
18         MR. HALSTROM: That's correct. In the current
19 presentence report.
20         THE COURT: Okay. Now, you've pointed me to 4A1.2(d),
21 which says offenses committed prior to age 18. Paragraph 30
22 says that he was 18. Do you still contend that applies?
23         MR. HALSTROM: Well, I suspect I can't argue that it
24 was prior to 18 if he was 18 at the time. But I do also contend
25 that it should not apply because under Alabama law, this is not

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

171

1  minutes.
2          (Recess at 4:20 p.m. until 4:31 p.m.)
3          THE COURT: Mr. Brown, I neglected to ask you one thing
4  that I meant to, and that was to have your response to the
5  argument of Mr. Halstrom that he was told a lower amount by you
6  in negotiating a plea.
7          MR. HALSTROM: Your Honor, let me correct the Court's
8  thinking. It was not necessarily in the actual negotiation of a
9  plea. What I was really talking to Mr. Brown -- I don't want
10 the Court to misinterpret this. I was talking to Mr. Brown to
11 establish the level that we were talking about in getting my
12 client -- in talking to my client about a plea. So I can't
13 represent to the Court that this was a plea negotiation that he
14 would say it was 26 -- level 26.
15         MR. BROWN: And that level, Your Honor, came from the
16 preliminary guidelines estimate that was provided by probation.
17 And at the time, that's what we thought it would be. And it
18 turned out that it was not that.
19         THE COURT: That was -- and I understand from you it
20 was just a discussion as to what, preliminarily, you thought it
21 would be. And it turned out in the negotiation -- or in the
22 final analysis that it was something different. Is that --
23         MR. BROWN: Yes, sir.
24         THE COURT: According to the probation office.
25         MR. BROWN: Yes, Your Honor.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

172

1    THE COURT: All right. I'm first going to rule on the
2  drug quantity amount. There are specific objections from
3  Defendants Nelson and Weldon for the same rule to apply in the
4  Cotney case in determining what the offense level -- the
5  appropriate offense level is. First, as to the argument made by
6  two of the defendants that they pleaded guilty to 50 grams of
7  methamphetamine and in fact that there's a distinction between
8  methamphetamine and methamphetamine actual, that distinction is
9  made in the guidelines at certain places. But as far as the
10  statute is concerned that the defendants pleaded guilty to, the
11  statute speaks merely in terms of either methamphetamine or
12  methamphetamine mixture.
13    This is not a case of methamphetamine mixture.
14  Methamphetamine mixture is when manufactured methamphetamine is
15  taken and mixed with something else. The indictment charged the
16  defendants with an offense of methamphetamine, which, in effect,
17  would be the same thing under the statute as actual
18  methamphetamine.
19    So on the objection that the defendants pleaded guilty
20  to something that is not being -- that they're not being
21  sentenced for at this time, I overrule that objection. They
22  pleaded guilty to 50 grams of methamphetamine; and under the
23  statute, that's actual methamphetamine. We'll look at that,
24  then, as to where the tables go.
25    Now, the government would have me sentence under the

174

1  testimony of Ms. Kelly, the total amount of pseudoephedrine
2  falls within that range and, therefore, I find as a fact that
3  that's the amount of pseudoephedrine, the 129.7, I think, was
4  the final amount -- that that was the amount of
5  pseudoephedrine. And under the guidelines table that I just
6  referred to, the amount will be stated at level 32 rather than a
7  level 34.
8    Now, as to the enhancement for hazardous or toxic
9  substances under Section 2D1.15(b), which is a three-level
10  enhancement under that section on the theory that the offense --
11  that provides that if the offense involved the manufacture of
12  methamphetamine or -- of amphetamine or methamphetamine -- it
13  did here -- and second, created a substantial risk of harm to
14  one human life other than a life described in subsection C or,
15  two, the environment, increase by three levels. It doesn't say
16  if the manufacture of the -- if the offense involved in this
17  case created the potential for substantial risk of harm to human
18  life or the environment. It says created a substantial risk of
19  harm. So I take that to mean that at the time of the raid and
20  the pickup, that at that time, a substantial risk of harm to
21  human life or the environment had been created at that time.
22    Under the testimony that I've heard, it appears to me
23  that the only difference between this offense and practically
24  all offenses is the -- of creation of methamphetamine is the
25  size of it. There are some ways that, despite the size, it

173

1  testimony of the chemist as to the projection of what the
2  possible yield of these precursor chemicals would be, Melissa
3  Kelly. I'm concerned about what that would be because of the
4  testimony that it was computed on 50 percent, 75 percent, 100
5  percent, that it could have a range of 30 percent to 90
6  percent. Frankly, I'm just simply not comfortable with dealing
7  with a projection as to what it could possibly be. And I've
8  studied the Blaylock case, and I think that's what we're dealing
9  with.
10    Now, I guess the bottom line on this is I'm going to
11  agree with what was pointed out by the -- in the concurrence and
12  the final opinion in Blaylock, which reinstated the original
13  opinion and vacated the order granting en banc hearing in the
14  case. And that final opinion is at 275 F.3d 1030. I'm going to
15  agree with the concurrence in saying that since the guidelines
16  have now been amended so that they provide a more simple basis
17  for figuring this when the chemicals have not actually been
18  turned into methamphetamine, and that is to use the tables on
19  precursor chemicals. I'm going to do that. And I'm going to
20  use the table at 2D1.11, again, on page 144 of the guidelines
21  manual.
22    And in using the precursor chemicals and accepting the
23  testimony of the witness Kelly, Section 2D1.11(4) would require
24  that at least 100 grams -- at least 100 grams but less than 300
25  grams of pseudoephedrine would be a level 32. Accepting the

175

1  appears to me, that this could be less of a substantial risk
2  than others -- a smaller amount in an apartment complex, a
3  smaller amount in a housing development.
4    In this case, the manufacture was carried on outside.
5  Taking into consideration all the facts and the testimony
6  presented -- the location of it; the fact that it was in the
7  early to -- early stages to a little way into it; the fact that
8  the only odor that has been referred to is the odor of ether;
9  the fact that in all of the cleanups, these -- this cleanup crew
10  is brought in -- that makes this no different from all of the
11  cases. And I think it's a strong argument that's made by the
12  defendants in that fact this could be applied to all
13  methamphetamine cases and simply increases the -- would increase
14  in all cases the offense level that the Sentencing Commission
15  has determined to be applicable in the first place.
16    So I think that this enhancement means something
17  different, something more. And I am not persuaded by a
18  preponderance of the evidence that in this case at the time of
19  the raid that the offense had created a substantial risk of harm
20  to human life or to the environment. So I sustain the
21  objections based on that and will disallow the enhancement of
22  three levels based on that provision of the guidelines.
23    Now let me go to the Defendant Cotney's other
24  objections. First, as to objection number one, I view this as
25  simply tied in with the victim impact provision in objection

176

1  six, and I'm going to deal with those together. To the extent
2  that objection number one may inject something different and say
3  that there's some basis for not including this as a part of the
4  victim impact statement simply because the defendant is charged
5  in another -- in a state indictment with this and to the extent
6  that he says he may have a defense or says he does have a
7  defense to that, I overrule that basis for it. But I'm going
8  to -- because that's -- if the State wants to charge him with
9  something and he wants to bring up his plea of guilty in this
10 case as a defense there to double jeopardy, he's free to do so.
11 But I'm dealing right now with whether this victim impact
12 enhancement is appropriate. And I'll deal with the whole thing
13 there when I get over to number six.
14        Objection number two objects to the two-point
15 enhancement for obstruction of justice. That two-point
16 enhancement for obstruction of justice is based on giving false
17 information to the probation officers and law enforcement
18 concerning the facts that happened when the raid took place,
19 that being that the defendant told them and testified today that
20 he did not know that these were police officers or sheriff's
21 deputies, law enforcement officers, that he did not know that he
22 had been told that a police dog was going to be turned loose and
23 did not try to escape and avoid arrest. I do not accept the
24 testimony of the Defendant Cotney in that regard.
25        It's my finding that the government has sustained its

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

178

1  government has moved the Court to grant a downward departure for
2  substantial assistance. That has to do with assisting the
3  government with something that will help them with convictions
4  of other law violators.
5        Acceptance of responsibility and credit for that
6  envisions a person being actually remorseful, not just saying
7  I'm sorry or saying I'm sorry I got caught and here I am, I
8  plead guilty. It's a bonus given to somebody who pleads guilty
9  when they actually are remorseful not for getting caught, but
10 for what they did, that they want to do something different and
11 that they to try to straighten their lives out. And that's why
12 the guidelines gives people credit for that.
13        In this case, I'm satisfied both from the testimony of
14 the probation officer, from the testimony of others, and from
15 the testimony of the defendant himself that he has not
16 confronted what he did in this case in a remorseful way, that he
17 is very sorry that he got caught and that it happened, but that
18 he has not indicated remorse for having done it in the first
19 place and accepted the responsibility for it. I find also that
20 this is made greater by the fact that he tore up a sprinkler
21 head while he was in his cell and that he made statements
22 threatening police officers in several ways, all of which is not
23 a separate charge of threats or destruction of property but is
24 evidence that the defendant did not have the remorse for
25 committing the acts that would be appropriate for giving him the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

177

1  burden of proof by a preponderance of the evidence that the
2  police officers -- the sheriff's deputies, rather, and the drug
3  task force officers identified themselves. I find as a fact
4  that they did identify themselves; that at the time they did,
5  that they were in close enough proximity for the defendant to
6  hear their identification of them; that they were wearing
7  clearly identifiable clothes that showed them to be law
8  enforcement officers; that the K-9 officer warned the defendant
9  that he was going to turn the dog loose if the defendant didn't
10 stop; and that by a preponderance of the evidence I find that
11 this was known by the defendant; that he attempted to escape;
12 that he shot the dog in an effort to escape; and that he
13 provided false information to law enforcement and to the
14 probation officers in this regard. And I overrule objection
15 number two and will continue with the two-point enhancement for
16 obstruction of justice.
17        Objection number three has to do with not being given
18 three points for acceptance of responsibility. Acceptance of
19 responsibility is much more than simply pleading guilty.
20 Pleading guilty without actually accepting responsibility for
21 what a person did does not entitle them to acceptance of
22 responsibility credit. Credit for acceptance of responsibility
23 is a different thing from being given a departure downward for
24 assistance. Those are two entirely different things.
25        We'll get to the assistance in a little bit. The

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

179

1  benefit of a three-level or even a two-level downward
2  departure. So I agree with the probation officer's findings on
3  that, and I deny -- overrule objection number three.
4        Objection number four, I've ruled on. That was the
5  substantial risk to harm of human life or the environment. I've
6  sustained that.
7        Number five, the defendant objects to being given an
8  enhancement for being an organizer or leader in this criminal
9  activity. The evidence is clear to me from the testimony of
10 other witnesses and not rebutted by the defendant that he's the
11 one that put this together, he organized it, he got the others
12 involved in it, and that he should be given an enhancement for
13 that purpose. His role in this conspiracy was that he was the
14 organizer and leader of it. I overrule objection number five.
15        Objection number six objects to the victim-related
16 adjustment based on the creation of substantial risk of serious
17 bodily injury. I find from the facts that in this case the
18 defendant did take actions that could have resulted in serious
19 bodily injury in connection with this offense; that he
20 discharged a shotgun in the vicinity of another person in
21 killing the dog; that there could have been other people close
22 by; that -- I find as a fact and accept the testimony of the
23 officer that this defendant, while he didn't point the gun
24 directly at the officer, that was only because the officer beat
25 him to it and started shooting when he turned toward him with

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

180

1  the gun; and that at the time the officer began shooting, he
2  then fell on the ground and things went from there; but that he
3  did create the substantial risk of serious bodily harm as a part
4  of the offense for which he -- to which he pleaded guilty, and
5  that the enhancement is appropriate.  I overrule objection
6  number six.
7       Objection number seven is simply an objection to the
8  inclusion of uncharged criminal conduct.  It was appropriate for
9  the probation officer to include that, along with anything else
10  that she knew about the defendant.  I will not consider any of
11  that in setting the sentence.  So I overrule objection number
12  seven.
13       All right.  Now I'm going to the objections of the
14  Defendant Nelson.  Objection number one having to do with
15  calculation of the drug amount I sustain only to the extent that
16  I will calculate it by the table I referred to earlier and will
17  set the offense level at 32.  I find that the defendant's
18  contention that it should be 26 would not be appropriate in this
19  case and not fit the facts or the method -- proper method of
20  computation.  And for the reasons I've stated earlier, I'll
21  sustain that objection to that extent and I overrule that
22  objection to the extent that it should be any less than 32.
23       As to the enhancement for the gun enhancement, the
24  enhancement based on the weapon being in the possession of the
25  other defendant, the coconspirator, I overrule that objection

181

1  under the U.S. versus Otero case and the Gallo case.  This is --
2  the evidence is sufficient to hold this defendant responsible
3  because it was foreseeable, based on his knowledge, that the
4  Defendant Cotney had this weapon in his possession the night
5  before, also had this possession -- this weapon in his
6  possession at the time of this offense.  It was foreseeable that
7  he may have used this weapon in protecting the drug operation
8  and as a part of the offense.  So the elements of those two
9  cases are met in this case, and I overrule the objection.
10       I've ruled on the harm to the individuals and
11  environment, objection number three.  I sustained that objection
12  and will not give those three enhancements.
13       All right.  As to the Defendant Weldon, objection
14  number one, again, has to do with the offense level.  Based on
15  the calculation of the amount for the reasons that I gave
16  earlier, I overrule or sustain the objection as appropriate to
17  the point that the offense level will be set at 32.
18       Objection number two has to do with the two-level
19  enhancement as to the possession by the Codefendant Cotney of
20  the firearm.  The court reporter gave me the question and answer
21  that was what I -- and it was as I remembered it, in the
22  testimony of Officer Stewart.  The question was:  What did
23  Mr. Weldon say as it relates to that gun?  And the answer was:
24  That the 12-gauge shotgun belonged to David Cotney that was at
25  the lab site.

182

1       Now, that's all the evidence that I heard regarding
2  this witness -- or rather, this Defendant Weldon's knowledge of
3  the firearm.  There was no testimony that he knew it was there
4  on that morning, no testimony that he knew it was there that
5  night, only the testimony that he knew that that gun belonged to
6  Mr. Cotney.  It takes more than that under the Otero case for it
7  to be foreseeable.  I find that the government has not met its
8  burden of proving that it was foreseeable to Defendant Weldon
9  that this firearm would be used in connection with the drug
10  conspiracy that morning, so I sustain objection number two.
11       Objection number three, the substantial risk of harm,
12  I've ruled on that, and I sustain that.
13       The role in the offense, the defendant had asked for an
14  adjustment for a minimal role in the offense.  I don't find that
15  to be appropriate because he had knowledge of the extent of the
16  conspiracy, of what was involved, full knowledge of what they
17  were doing out there.  However, I do find that a two-level
18  departure downward for a minor participant would be appropriate
19  under all the facts and circumstances of the case; that he, in
20  this case, was performing what I would consider simply the role
21  of a gofer, somebody who was asked to come and do odds and ends
22  that the others could have done just as easily and got -- he was
23  gotten involved in this.  He was not the cook.  He was not
24  performing services that came to the level of either of the
25  other two.  And under the particular facts of this case as

183

1  presented to me by the evidence, I find him to be a minor
2  participant and entitled to be treated as such.  So to that
3  extent, I sustain objection number four.
4       Objection number five, well, that's the calculation
5  again.  So same ruling on that.
6       Objection number six as to the criminal history point,
7  I overrule that objection.  The defendant concedes the age to be
8  18, so the paragraph referred to of 4A1.2(d) doesn't apply
9  because he was 18.  The mere fact of what state law may have to
10  do with it being an offense or whatever, the guidelines in this
11  case are what applies.  And under the federal sentencing
12  guidelines, this offense would require the calculation to be one
13  point, as done by the probation office.
14       All right.  Now, it appears to me that I have ruled on
15  all the objections that are before me, but I have not done the
16  calculations of where that takes us.  I want to hear first from
17  anybody who thinks there's still an outstanding objection that I
18  have not ruled on.
19       Mr. Brown, is there anything you're aware of that has
20  not been ruled on?
21       MR. BROWN:  No, Your Honor.
22       THE COURT:  All right.  Mr. Dean, are you aware of any
23  objections of your client that I've not ruled on?
24       MR. DEAN:  No, Your Honor.
25       THE COURT:  Mr. Lewis?

184

1     MR. LEWIS: No, Your Honor.
2     THE COURT: Mr. Halstrom?
3     MR. HALSTROM: No, Your Honor.
4     THE COURT: All right. I want to take -- let's take a
5     ten-minute recess and let me talk to probation about where these
6     rulings take us on the figures. And then we'll come back in and
7     I'll hear from -- I'll entertain the government's motions for
8     departures, and I'll hear from all parties regarding
9     sentencing. We'll be in recess for ten minutes.
10     (Recess at 5:00 p.m. until 5:26 p.m.)
11     THE COURT: All right. First, as to the Defendant
12     David Franklin Cotney, Jr., having made findings as to the
13     objections to the presentence report, the Court finds that the
14     offense level as to count one is 39, the criminal history
15     category is II, the guideline range before any reduction for
16     substantial assistance is 292 to 365 months, the supervised
17     release period is not less than five years in count one and not
18     less than three years in count two, the fine range is from
19     $25,000 to $4 million. Count two provides a sentence of not
20     less than ten years consecutive to count one.
21     The United States has filed a motion for reduction of
22     sentence based on substantial assistance pursuant to Section
23     5K1.1 of the guidelines and has requested a departure downward
24     of three levels. Is that correct, Mr. Brown?
25     MR. BROWN: It is, Your Honor.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

185

1     THE COURT: And you -- tell me about that briefly.
2     MR. BROWN: Yes, Your Honor. All of these
3     defendants -- in an effort to save a little time, all of these
4     defendants have come in and cooperated with law enforcement
5     officers in terms of providing information as it relates to
6     their case and their -- and information as it relates to their
7     codefendants. The Court may or may not be aware. There is a
8     fourth codefendant in this case who was hospitalized for a
9     period of time. And his case was continued --
10     THE COURT: Yes. I have his sentencing set for a
11     couple weeks, I think.
12     MR. BROWN: I believe it's next Tuesday -- or next
13     Wednesday, if I'm not mistaken, the 22nd. He -- because he was
14     in a hospital and not available to plead guilty at the time, it
15     was anticipated that he might go to trial. And all three of
16     these defendants agreed to testify against the remaining
17     codefendant, should that be necessary. And based on the
18     information that was provided and the willingness to testify
19     against their codefendants, the government is satisfied that it
20     meets the requirements for substantial assistance and asks for
21     three levels in this case.
22     THE COURT: All right. I grant the motion based on
23     defendants' substantial assistance. The Court finds that the
24     guideline range after that reduction should be 36, which, when
25     combined with the criminal history category, creates a guideline

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

186

1     range of 210 months to 262 months -- that's on count one -- and
2     a fine range from $20,000 to $4 million. Of course, count two
3     provides for not less than ten years consecutive to what's
4     ordered in count one.
5     All right. I'll ask the Defendant Cotney and counsel
6     to stand. Mr. Dean, is there anything you'd like to say on
7     behalf of your client before I pronounce sentence?
8     MR. DEAN: Your Honor, I would just ask the Court to
9     have mercy on my client. And we would ask that as to count one
10     we get the lower end of the range, Your Honor.
11     THE COURT: All right. Mr. Cotney, is there anything
12     you'd like to say?
13     DEFENDANT COTNEY: No, sir.
14     THE COURT: Mr. Brown?
15     MR. BROWN: No, sir.
16     THE COURT: The sentence will now be stated. You will
17     have a final chance to make legal objections before the sentence
18     is imposed.
19     I will say that I am going to set the level in count
20     one at 222 months based on the fact that the criminal history
21     category is I -- the criminal history category is II, rather.
22     If the criminal history category had been I, it would have been
23     lower. But taking into consideration the facts of the case and
24     the criminal history category, that's where I'll set it. And
25     combined with ten years consecutive as to count one, pursuant to

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

187

1     the Sentencing Reform Act of 1984, it is the judgment of the
2     Court that you are hereby committed to the custody of the
3     Federal Bureau of Prisons to be imprisoned for a total term of
4     342 months. This term consists of 222 months on count one and
5     120 months on count two to be served consecutively to the term
6     on count one.
7     The Court recommends that you be designated to a
8     facility where intensive residential substance abuse treatment
9     is available. The Court further recommends that you be housed
10     at an institution separate from the codefendants in this case.
11     You are remanded to the custody of the United States Marshal.
12     You shall pay to the U.S. District Court Clerk a
13     special assessment fee of $200, which is due immediately. Based
14     on your inability to pay, the Court waives the imposition of a
15     fine.
16     It is further ordered that you make restitution to the
17     Drug Enforcement Administration, 2350 Fairlane Drive, Suite 200,
18     Montgomery, Alabama, 36166, in the amount of $3,054, which is
19     due immediately. This is based on cleanup of the site pursuant
20     to Title 21, United States Code, Section 853(q). Any balance
21     remaining at the start of supervision shall be paid at a rate of
22     $350 per month. This restitution shall be paid by all
23     codefendants, who are held accountable for restitution jointly
24     and severally until paid in full.
25     Now, as to the costs related to the new dog, because

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

188

1  that cannot be accurately computed today as a result of the
2  information that came out for the first time today concerning
3  the possibility that there is no loss to the Chambers County
4  Sheriff's Department, I'm going to give the government one week
5  from today to file either a statement conceding that this
6  restitution is not proper and that there should be no
7  restitution based on the dog or a request for the hearing to
8  present evidence on that issue. One week from today. The Court
9  waives all interest.
10      Upon release from imprisonment, you shall be placed on
11  supervised release for a term of five years. This term consists
12  of five years on counts one and two, all such terms to run
13  concurrently. Within 72 hours of release from custody, you
14  shall report to the probation office in the district to which
15  you are released. While on supervised release, you shall comply
16  with the mandatory and standard conditions of supervised release
17  on file with this Court.
18      The Court also orders the following special
19  conditions. You shall participate in drug testing and/or
20  treatment if directed by the probation officer. You shall
21  contribute to the cost of any treatment based on ability to pay
22  and availability of third-party payments. You shall provide the
23  probation officer any requested financial information. You
24  shall not obtain new credit without approval of the probation
25  officer unless in compliance with the payment schedule. You

189

1  shall submit to a search of your person, residence, office, or
2  vehicle pursuant to the search policy of this Court. The
3  sentence is imposed at 342 months because of the defendant's
4  serious conduct and because of the defendant's criminal history.
5      Now, are there any objections to the sentence or to the
6  manner in which the Court pronounced it? For example, do you
7  have any objections to the Court's ultimate finding of fact or
8  conclusions of law? If you fail to state such fully articulated
9  objections at this point, you run the risk of being unable to
10  raise such objections on appeal. Mr. Dean?
11      MR. DEAN: Your Honor, I would just -- as far as the
12  enhancements that we argued earlier regarding his acceptance of
13  responsibility and his -- the factual assertions about him
14  knowing whether or not they were police officers, which led to
15  the enhancement, I would just reiterate them at this time.
16      THE COURT: All right. Same ruling.
17      Mr. Brown?
18      MR. BROWN: Yes, Your Honor. Included in the
19  indictment is a forfeiture allegation relating to a -- the
20  firearm that was used in this case. The State of Alabama has a
21  pending case in which that particular firearm is a piece of
22  evidence. And the State of Alabama is going to handle any
23  forfeiture of that item after that administratively. So based
24  on that, the United States moves to strike the forfeiture
25  allegation as it is currently in the federal indictment.

190

1      THE COURT: All right. The motion is granted, and
2  that's stricken. Any objections to the sentence?
3      MR. BROWN: No, Your Honor.
4      THE COURT: All right. The sentence is ordered imposed
5  as stated.
6      Mr. Cotney, I advise you that you have the right to
7  appeal. Any appeal must be taken within ten days from today.
8  If you cannot afford a lawyer or the cost of an appeal, you may
9  apply for in forma pauperis treatment. If you're available -- I
10  mean if you're eligible for that, you will be furnished with a
11  lawyer and a transcript. You are committed to the custody of
12  the United States Marshal.
13      (Defendant Cotney not present)
14      THE COURT: All right. As to the Defendant Allen Lee
15  Nelson, having made findings as to the objections to the
16  presentence report, the Court finds the offense level is 31, the
17  criminal history category is V, the guideline range is from 168
18  months to 210 months; however, the statutory minimum is 240.
19  Therefore, the guideline sentence before any reduction on motion
20  of the government is 240 months. The supervised release period
21  is ten years, and the fine range is from $15,000 to $8 million.
22      Based on the representations made by Mr. Brown, I find
23  it appropriate to grant the downward departure based on
24  substantial assistance. In this case, the request is for a
25  downward departure of four months. Therefore, the Court -- and

191

1  I grant that motion, and the Court finds that the guideline
2  level is 21 -- is 27, which, when combined with the criminal
3  history category, creates a guideline range of 120 months to 150
4  months and a fine range of $12,500 to $8,000.
5      PROBATION OFFICER: Judge.
6      THE COURT: In the computation of the range here, I
7  took into account the government's motion for an additional
8  one-level downward departure for acceptance of responsibility.
9  That motion that's been filed in writing would make it three
10  levels instead of two. And I grant that motion to give an
11  additional level down for acceptance of responsibility. That
12  was taken into consideration.
13      PROBATION OFFICER: Judge Albritton.
14      THE COURT: Yes.
15      PROBATION OFFICER: The Court mentioned that the
16  guideline -- the fine range was 8,000. 12,500 to 8 million.
17      THE COURT: Oh, I'm sorry. The guideline range --
18  rather, the fine range is $12,500 to $8 million.
19      All right. I'll ask the defendant and defense counsel
20  to stand, please.
21      Mr. Lewis, do you have anything you'd like to say on
22  behalf of your client before I pronounce sentence?
23      MR. LEWIS: Just a couple things, Your Honor. First of
24  all, the Court, I believe, inadvertently said it granted the
25  government's motion for downward departure to the extent of four

192

1  months. I'm sure the Court meant four levels.

2           THE COURT: You're correct. Four levels. Thank you.

3           MR. LEWIS: Thank you, Your Honor.

4           THE COURT: Thank you for correcting that.

5           MR. LEWIS: That having been said, I'd like to note for

6  the Court the testimony that came out today that Mr. Nelson has

7  been more than cooperative with law enforcement officials. I've

8  sat in proffer meetings with him. He has done his dead-level

9  best to not only acknowledge his own bad behavior, but to also

10 assist law enforcement agents in any question they had for him

11 about anybody and any event.

12          He's already going to be in, primarily because of the

13 criminal history category, for a minimum of ten years in this

14 case. He's a 35-year-old person. He's going to be 45 years old

15 by the time he sees the first light of day. We would ask the

16 Court to take into consideration the fact that at that time, he

17 is still going to be young enough to create a new life if he

18 will. He will be inside the prison. He will be away from the

19 opportunity to engage in the risky behavior in which he's been

20 engaging. And at age 45, he will be eligible to begin a new

21 life.

22          And we would ask the Court to give him that opportunity

23 and sentence him to the bottom of the guideline range, to

24 sentence him to be incarcerated in a place at which he can get

25 maximum, intensive drug treatment. I don't know if the Court

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

193

1  has studied the issue; but from what I've read about

2  methamphetamine addiction, it is hell on earth. And not many

3  people come back from that. I think he needs the maximum

4  opportunity possible that the Bureau of Prisons can give him.

5  But that being done, I would ask the Court to sentence him at

6  the bottom of the guideline range to give him a chance to create

7  a life that he does not have now.

8           THE COURT: All right. Mr. Nelson, is there anything

9  you'd like to say?

10          DEFENDANT NELSON: No, sir. I just want to apologize

11 to all the family and the Court and Deputy Mike Parrish.

12          THE COURT: All right. Mr. Brown?

13          MR. BROWN: No objections, Your Honor.

14          THE COURT: I'm going to grant your request to

15 recommend a facility where intensive residential substance abuse

16 treatment is available. I will tell you, Mr. Nelson, a lot of

17 that depends on whether you want to make that work. You'll be

18 fortunate in that the federal prison system has available a

19 program that has been quite successful with a lot of people, but

20 it won't work unless you want to make it work. If you want to

21 make it work and turn your life around, you'll have the

22 opportunity to do that.

23          I'm not going to sentence the defendant at the bottom

24 of the guidelines. With a criminal history category of V, I'm

25 simply not going to do that. But I'll sentence within the

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

194

1  range, and I'm going to set his sentence at 135 months.

2           All right. The sentence will now be stated, but you'll

3  have a final chance to make legal objections before the sentence

4  is imposed.

5           Pursuant to the Sentencing Reform Act of 1984, it is

6  the judgment of the Court that you are hereby committed to the

7  custody of the Federal Bureau of Prisons to be imprisoned for a

8  total term of 135 months. The Court recommends that you be

9  designated to a facility where intensive residential substance

10 abuse treatment is available. The Court further recommends that

11 you be imprisoned at an institution separate from the

12 codefendants in this case. You are remanded to the custody of

13 the United States Marshal.

14          You shall pay to the U.S. District Court Clerk a

15 special assessment fee of $100, which is due immediately. Based

16 on your inability to pay, the Court waives the imposition of a

17 fine.

18          It is further ordered that you make restitution to the

19 Drug Enforcement Administration, 2350 Fairlane Drive, Suite 200,

20 Montgomery, Alabama, 36116, in the amount of $3,054, which is

21 due immediately. Any balance remaining at the start of

22 supervision shall be paid at the rate of not less than $50 per

23 month. The restitution shall be paid by all codefendants, who

24 are held accountable for restitution jointly and severally until

25 paid in full. This restitution is ordered pursuant to Title 21,

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

195

1  Section 853(q), United States Code. The Court waives interest.

2           Upon release from imprisonment, you shall be placed on

3  supervised release for a term of ten years. Within 72 hours of

4  release from custody, you shall report to the probation office

5  in the district to which you are released. While on supervised

6  release, you shall comply with the mandatory and standard

7  conditions of supervised release on file with this Court.

8           The Court also orders the following special

9  conditions. You shall participate in drug testing and/or

10 treatment if directed by the probation officer. You shall

11 contribute to the cost of any treatment based on ability to pay

12 and availability of third-party payments. You shall provide the

13 probation officer any requested financial information. You

14 shall not obtain new credit without approval of the probation

15 officer unless in compliance with the payment schedule. You

16 shall submit to a search of your person, residence, office, or

17 vehicle pursuant to the search policy of this Court. The

18 sentence is imposed at 135 months because of the defendant's

19 serious conduct and the criminal history.

20          Now, are there any objections to the sentence or to the

21 manner in which the Court pronounced it? For example, do you

22 have any objections to the Court's ultimate finding of fact or

23 conclusions of law? If you fail to state such fully articulated

24 objections at the point, you run the risk of being unable to

25 raise such objections on appeal. Mr. Lewis?

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

196

1   MR. LEWIS: No objections, Your Honor.

2   THE COURT: Mr. Brown?

3   MR. BROWN: No objections, Your Honor.

4   THE COURT: The sentence is ordered imposed as stated.

5   Mr. Lewis, I advise you that you have the right to

6   appeal. Any appeal must be taken within ten days from today.

7   If you cannot afford the cost of an appeal, you have the right

8   to apply for leave to appeal in forma pauperis. And if you are

9   eligible, you will be furnished with a free lawyer and a free

10   transcript. You are committed to the custody of the United

11   States Marshal. Good luck to you.

12   (Defendant Nelson not present)

13   THE COURT: Now as to the Defendant Jonathan Boyd

14   Weldon, having made findings as to the objections to the

15   presentence report, the Court finds that the offense level is

16   27, the criminal history category is III, the guideline range

17   before any reduction for substantial assistance is from 87

18   months to 108 months; however, the statutory minimum is 120

19   months. The supervised release period is five years, and the

20   fine range is from $12,500 to $4 million.

21   The government has moved for a downward departure of

22   three levels, and you are also -- in this case and in the Nelson

23   case -- well, in all three cases, you are moving for reduction

24   below the mandatory minimum, I understand.

25   MR. BROWN: Yes, Your Honor. Pursuant to 18 U.S.C.

197

1   3553.

2   THE COURT: Yes. I grant the motion for the reasons

3   given by Mr. Brown earlier. I find that a departure downward of

4   three levels is appropriate, and it's granted.

5   The Court finds that the guideline level should be 24,

6   which, when combined with the criminal history category, creates

7   a guideline range of 63 months to 78 months and a fine range

8   from $10,000 to $4 million.

9   The defendant will please stand.

10   Mr. Halstrom, do you have anything that you'd like to

11   say on behalf of your client before I pronounce sentence?

12   MR. HALSTROM: Yes, Your Honor. I think it's obvious

13   from the evidence in this case that Mr. Weldon does have a drug

14   problem. And we, too, would ask the Court to order intensive

15   residential substance abuse treatment at any facility to which

16   he might be incarcerated.

17   We also argued about the age at which he was convicted

18   of a crime. He thought that ought to be a juvenile offense;

19   however, the guidelines and the rules of this court, federal

20   guidelines, he was 18. But for four months, this would have

21   been removed from his record and he would have been a criminal

22   history category II.

23   None of the offenses for which Mr. Weldon has been

24   convicted involve violent crime. The one for which he was --

25   received the most points for was he was on probation for a

198

1   drug-related offense. We would also ask the Court if it would

2   consider the lower end of the guidelines in this particular

3   case.

4   We also point out that Mr. Weldon has got a ninth grade

5   education. He repeated the fifth and sixth grades. Mr. Weldon

6   doesn't have a lot of the same natural advantages that many of

7   us in this court do. His life is going to be greatly enhanced,

8   in my opinion, for his spending four or five years in prison

9   where he'll be able to take advantage of many of the

10   opportunities to enhance his life. We've talked about that, and

11   he fully agrees with that, that his life is all available to him

12   at this point and this could save the rest of his life if he

13   looks at it that way. That's all I have, Your Honor.

14   THE COURT: Mr. Weldon, is there anything you'd like to

15   say?

16   DEFENDANT WELDON: No.

17   THE COURT: Mr. Brown?

18   MR. BROWN: Nothing further, Your Honor.

19   THE COURT: The sentence will now be stated, but you'll

20   have a final chance to make legal objections before the sentence

21   is imposed.

22   Pursuant to the Sentencing Reform Act 1984, it is the

23   judgment of the Court that you are hereby committed to the

24   custody of the Federal Bureau of Prisons to be imprisoned for a

25   total term of 70 months. The Court recommends that you be

199

1   designated to a facility where intensive residential substance

2   abuse treatment is available. The Court further recommends that

3   you be placed in an institution separate from the codefendants

4   in this case. You are remanded to the custody of the United

5   States Marshal.

6   You shall pay to the U.S. District Court Clerk a

7   special assessment fee of $100, which is due immediately. Based

8   on your inability to pay, the Court waives the imposition of a

9   fine. It is ordered that you make restitution to the Drug

10   Enforcement Administration, 2350 Fairlane Drive, Suite 200,

11   Montgomery, Alabama, 36116, in the amount of $3,054, which is

12   due immediately. Any balance remaining at the start of

13   supervision shall be paid at the rate of $50 per month. The

14   restitution shall be paid jointly and severally with all

15   codefendants until paid. This restitution is ordered pursuant

16   to Title 21, United States Code, Section 853(q). The Court

17   waives interest.

18   Upon release from imprisonment, you shall be placed on

19   supervised release for a term of five years. Within 72 hours of

20   release from custody, you shall report to the probation office

21   in the district to which you are released. While on supervised

22   release, you shall comply with the mandatory and standard

23   conditions of supervised release on file with this Court.

24   The Court also orders the following special

25   conditions. You shall participate in drug testing and/or

200

1    treatment if directed by the probation officer.  You shall
2    contribute to the cost of any treatment based on ability to pay
3    and availability of third-party payments.  You shall provide the
4    probation officer any requested financial information.  You
5    shall not obtain new credit without approval of the probation
6    officer unless in compliance with the payment schedule.  You
7    shall submit to a search of your person, residence, office, or
8    vehicle pursuant to the search policy of this Court.  The
9    sentence is imposed at 70 months because of the defendant's
10   serious conduct and criminal history.
11          Now, are there any objections to the sentence or to the
12   manner in which the Court pronounced it?  For example, do you
13   have any objections to the Court's ultimate finding of fact or
14   conclusions of law?  If you fail to state such fully articulated
15   objections at this point, you run the risk of being unable to
16   raise such objections on appeal.  Mr. Halstrom?
17          MR. HALSTROM:  No, Your Honor.
18          THE COURT:  Mr. Brown?
19          MR. BROWN:  No, Your Honor.
20          THE COURT:  The sentence is ordered imposed as stated.
21          Mr. Weldon, I advise you that you have the right to
22   appeal.  Any appeal must be taken within ten days from today.
23   If you cannot afford the cost of an appeal, you have the right
24   to apply for leave to appeal in forma pauperis.  If you are
25   eligible for that, you will be furnished with a free lawyer and

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

201

1    a free transcript.  You are committed to the custody of the
2    United States Marshal.
3          Court is adjourned.
4          (Proceedings concluded at 5:53 p.m.)
5                * * * * * * * * * * *
6                COURT REPORTER'S CERTIFICATE
7          I certify that the foregoing is a correct transcript
8    from the record of proceedings in the above-entitled matter.
9          This 6th day of February, 2004.
10
11
                RISA L. ENTREKIN, RDR, CRR
12                   Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104  334-240-2405

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

SEP 15 2004

THOMAS K. KAHN
CLERK
```

---

No. 03-15473
Non-Argument Calendar

---

D. C. Docket No. 03-00078-CR-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID FRANKLIN COTNEY, JR.,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Middle District of Alabama

---

(SEPTEMBER 15, 2004)

Before BLACK, CARNES and PRYOR, Circuit Judges.

PER CURIAM:



GOVERNMENT
EXHIBIT
6

David Franklin Cotney, Jr. appeals his sentence imposed after pleading guilty to conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. § 846 (Count 1), and use and possession of a firearm in relation to the commission of Count 1, in violation of 18 U.S.C. § 924(c)(1) (Count 2). Cotney claims the district court clearly erred by (1) applying an obstruction-of-justice enhancement, (2) denying him a reduction for acceptance of responsibility, (3) applying an aggravating-role enhancement, and (4) applying an enhancement for creating a substantial risk of serious bodily injury. Cotney also claims the district court impermissibly double counted his use of a firearm. The district court did not err. We affirm.

## I. OBSTRUCTION OF JUSTICE

Cotney first argues the district court erred by applying the obstruction-of-justice enhancement because no evidence established he looked at the officers before he fled or heard the officers identify themselves. Cotney stresses both Deputy Mike Parrish and Investigator Clay Stewart were far away from him when they identified themselves. Stressing he admitted his guilt, Cotney argues there is no evidence showing he lied when he denied seeing the officers or hearing them identify themselves. Citing *United States v. Howard*, 923 F.2d 1500 (11th Cir. 1991), Cotney states his allegedly inconsistent statement was not material, in light

2

of his otherwise complete cooperation. Cotney also avows the probation officer's
assertion Cotney could have heard the officers was merely a conclusory statement
not supported by the evidence.

Clear error review is appropriate where "the district court must make a
particularized assessment of the credibility or demeanor of the defendant, such as
when applying the obstruction of justice enhancement for perjury." *United States
v. Banks*, 347 F.3d 1266, 1269 (11th Cir. 2003). The government must establish,
by a preponderance of the evidence, that an enhancement is applicable. *United
States v. Cataldo*, 171 F.3d 1316, 1321 (11th Cir.1999). The government must
show this through "reliable and specific evidence." *Id.* (internal quotations and
citation omitted). "We accord great deference to the district court's credibility
determinations." *United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999).
We have also acknowledged "[t]he district court is uniquely suited to make such a
determination because it heard all the evidence and was able to observe a particular
witness' demeanor and behavior on the witness stand." *United States v. Hasner*,
340 F.3d 1261, 1277 (11th Cir. 2003) (internal quotations and citation omitted),
*petition for cert. filed*, (U.S. Apr. 26, 2004) (No. 03-1487).

A two-level, obstruction-of-justice enhancement is appropriate if: (1) a
defendant willfully obstructed or impeded "the course of the investigation,

3

prosecution, or sentencing of the instant offense of conviction," and (2) the

obstructive conduct related to either the offense of conviction or any relevant

conduct. U.S.S.G. § 3C1.1. Such an enhancement is appropriate if the defendant

gave "materially false information to a probation officer in respect to a presentence

or other investigation for the court." U.S.S.G. § 3C1.1, comment (n.4(h)).

"'Material' evidence, fact, statement, or information, as used in this section, means

evidence, fact, statement, or information that, if believed, would tend to influence

or affect the issue under determination." U.S.S.G. § 3C1.1, comment (n.6).

The district court did not clearly err by finding Cotney obstructed justice.

During his presentence interview, Cotney denied knowing the individuals raiding

his methamphetamine laboratory were police officers, and claimed at least one

arresting officer was not wearing a police uniform. The evidence, however,

established the officers' attire clearly indicated they were police. More

importantly, Detective Sims testified he had identified himself multiple times as a

police officer from a mere 40 feet away, and Deputy Parrish testified he had also

identified himself as an police officer. Based on these facts, the probation officer

maintained Cotney should have also heard Investigator Stewart identify himself.

Although Cotney contends no direct evidence established he heard Investigator

Stewart identify himself, Cotney admitted to hearing someone instruct him to put

his hands up in the air. As a result, Cotney was within earshot of the officers, indicating he had heard the officers identify themselves.

Additionally, Cotney's misstatement was material, as his knowledge of whether police were raiding the methamphetamine laboratory was relevant in regard to an enhancement under § 3A1.2(b)(1), which concerned whether he had reasonable cause to know Deputy Parrish was a police officer when he pointed his shotgun at Deputy Parrish. *See* U.S.S.G. § 3A1.2(b)(1). Citing *Howard*, Cotney claims his substantial assistance established he would not obstruct justice. That case, however, is inapplicable because it stated an obstruction-of-justice enhancement is inappropriate where the defendant merely omitted some information in his presentence interview, which he had already told the arresting authorities. *See Howard*, 923 F.2d at 1504-05. Cotney's situation is distinguishable because he did not omit any information, but rather, made deliberate misrepresentations to the probation officer. Accordingly, the district court did not clearly err by applying an obstruction-of-justice enhancement.

## II. ACCEPTANCE OF RESPONSIBILITY

Cotney next argues the district court erred by denying him a reduction for acceptance of responsibility. He claims he did not know the individuals raiding the methamphetamine laboratory were actually officers. Again citing *Howard* for

5

authority, Cotney states the fact he provided substantial assistance indicated he had accepted responsibility for his actions. Cotney also states the Government actually sought an acceptance-of-responsibility reduction for him. Finally, Cotney claims the probation officer's hearsay testimony concerning alleged threats made by him lacked the reliability necessary to support the enhancement.

"The district court's determination of whether a defendant is entitled to a reduction for acceptance of responsibility is a finding of fact which is entitled to great deference on appeal and will be affirmed unless clearly erroneous." *United States v. Rodriguez*, 959 F.2d 193, 195 (11th Cir.1992). We, however, review "the district court's application of the sentencing guidelines *de novo*." *Id.* The defendant bears the burden of showing he is entitled to a reduction. *Howard*, 923 F.2d at 1505.

The Guidelines provide for a two-level reduction if the defendant demonstrates an acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(a). Evidence indicating acceptance of responsibility, such as a guilty plea and admission of the conduct of the offense may be outweighed by conduct indicating a defendant is not entitled to a reduction. U.S.S.G. § 3E1.1, comment (n.3). A defendant who receives an obstruction-of-justice enhancement under § 3C1.1, absent extraordinary circumstance, is not entitled to a reduction for acceptance of

6

responsibility. U.S.S.G. § 3E1.1, comment (n.4).

As an initial matter, the Government only agreed Cotney was entitled to an acceptance-of-responsibility reduction "so long as [Cotney] [did] not obstruct justice or otherwise fail to accept responsibility for the offense conduct." Therefore, the plea agreement did not bar the Government from opposing Cotney's request for an acceptance-of-responsibility reduction.

Moreover, the district court did not clearly err by denying an acceptance-of-responsibility reduction. Cotney obstructed justice, and a reduction for acceptance of responsibility was normally inappropriate. *See* U.S.S.G. § 3E1.1, comment (n.4). Once again citing *Howard*, however, Cotney claims his substantial assistance qualified him for an acceptance-of-responsibility reduction. While this Court, in *Howard*, found the district court erred by not granting an acceptance-of-responsibility reduction in light of the defendant's substantial assistance, that defendant had not obstructed justice. *See Howard*, 923 F.3d at 1504-06. While substantial assistance does indicate an acceptance of responsibility, Cotney committed other acts, which further indicated such a reduction was inappropriate, namely, damaging a sprinkler in prison and making threats directed at Deputy Parrish. The district court ultimately determined Cotney only regretted getting caught. The district court did not clearly err by finding Cotney had not accepted

7

responsibility for his actions.

### III. AGGRAVATING ROLE

Next, Cotney claims there was insufficient evidence to support the aggravating-role enhancement because the district court improperly relied upon a hearsay statement by one of Cotney's codefendants, Allen Lee Nelson, indicating Cotney was the coordinator of the scheme and sold most of the methamphetamine. Cotney maintains Nelson's statement was self-serving because, if not for this statement, Nelson, who was the principal manufacturer of the methamphetamine, would have received an aggravating-role enhancement. Cotney also argues no evidence distinguishes his role in the offense from the roles of the other participants. As a result, Cotney maintains, the evidence only indicated all defendants participated equally in the offense.

The district court's determination of a defendant's role in the offense is a finding of fact reviewed for clear error. *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993). The guidelines provide if the defendant was an organizer or leader of an activity that involved fewer than five participants, his offense level should be increased by two levels. U.S.S.G. § 3B1.1(c). Factors the court should consider in distinguishing a leadership/organizer role from a manager/supervisory role include:

8

> the exercise of decision making authority, the nature of participation in
> the commission of the offense, the recruitment of accomplices, the
> claimed right to a larger share of the fruits of the crime, the degree of
> participation in planning or organizing the offense, the nature and
> scope of the illegal activity, and the degree of control and authority
> exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4).  More than one person may qualify as a leader or

organizer of a conspiracy.  *Id.*  The government must prove the existence of an

aggravating role by a preponderance of the evidence.  *Yates*, 990 F.2d at 1182.

Hearsay testimony may be relied upon at sentencing if (1) the evidence has a

sufficient indicia of reliability, (2) the court makes specific credibility findings, and

(3) the defendant has an opportunity to rebut the testimony.  *United States v.

Anderton*, 136 F.3d 747, 751 (11th Cir. 1998).  We have found hearsay testimony

possesses a sufficient indicia of reliability if the statements of multiple individuals

are consistent.  *United States v. Gordon*, 231 F.3d 750, 760 (11th Cir. 2000).

These is sufficient evidence to support the aggravating role enhancement.

According to Agent DeJohn, Nelson avowed Cotney organized the laboratory and

was to receive a majority of the methamphetamine to sell.  Investigator Stewart

stated that, based on Cotney's proffer, he believed Cotney had organized the

operation and acquired the necessary supplies.  Although Nelson's statements

constituted hearsay, such statements were admissible at sentencing.  *See Anderton*,

136 F.3d at 751.  Nelson's statements were reliable because they were also

9

supported by Investigator Stewart's testimony. *See Gordon*, 231 F.3d at 760.
Moreover, the court found the uncontested statements credible. Finally, Cotney
could have called Nelson to rebut the testimony. As a result, Nelson's hearsay
testimony was admissible.

Contrary to Cotney's arguments he played a similar to the other conspirators,
the record established Cotney's role as an organizer of the lab was more substantial
than the roles of Nelson and Cotney, who merely cooked the methamphetamine in
Cotney's lab. Accordingly, the district court did not clearly err by applying an
aggravating-role enhancement.

## IV. SUBSTANTIAL RISK OF BODILY INJURY

Cotney further argues the district court erred by enhancing his offense level
by three levels, based upon a finding he created a substantial risk of bodily injury
during his flight. Cotney first states there was no evidence showing he knew he
was fleeing police. Cotney states that, after he shot Narco, a police canine, although
he attempted to raise the gun, he ultimately dropped the weapon without
chambering another shell or firing the gun again. Accordingly, Cotney states, he
did not create a risk of serious bodily harm.

The guidelines provide for a three-level enhancement if a defendant, having a
reasonable cause to believe an individual is a law enforcement officer, assaults such

10

an officer during the immediate flight from an offense. U.S.S.G., § 3A1.2(b)(1).

The assault must have been in a manner that created "a substantial risk of serious

bodily injury." *Id.*

The district court did not clearly err by applying the § 3A1.2(b) enhancement

to Cotney. As stated above, Cotney knew police officers were raiding his

methamphetamine laboratory, based on Investigator Stewart's identification of

himself as a police officer while 40 feet away from Cotney. Moreover, Cotney

clearly created a substantial risk of bodily harm while assaulting an officer.

Cotney's shooting of Narco was probably insufficient to support the enhancement,

as Deputy Parrish was not next to Narco when Cotney discharged his firearm.

Cotney's turning his gun towards Deputy Parrish, however, was sufficient to justify

the enhancement. Although Cotney was stopped from actually pointing his weapon

at Deputy Parrish or chambering a fresh shell, Deputy Parrish, fearing for his safety,

fired upon Cotney to halt his movement with the shotgun. The district court did not

clearly err in applying this enhancement.

## V. IMPERMISSIBLE DOUBLE COUNTING

Finally, Cotney claims the district court engaged in impermissible double

counting by enhancing his offense level for the creation of a serious risk of bodily

harm. He states the actions justifying this enhancement were already taken into

account by his conviction under § 924(c). In support, he notes a defendant with a § 924 conviction cannot also receive an enhancement for the possession or use of a firearm.

We review a claim of double counting *de novo*. *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1310 (11th Cir. 1999). "'Double counting during sentencing is permissible if the Sentencing Commission intended the result, and if the result is permissible because each section concerns conceptually separate notions related to sentencing.'" *Id.* (quoting *United States v. Adeleke*, 968 F.2d 1159, 1161 (11th Cir.1992)). "Further, this court presumes the Sentencing Commission intended to apply separate guideline sections cumulatively, *unless* specifically directed otherwise." *Matos-Rodriguez*, 188 F.3d at 1310 (emphasis in original).

When a defendant is sentenced for a violation of § 924(c), the guidelines bar the application of an enhancement for weapons possession. U.S.S.G. § 2K2.4 (b), comment. (n.4). The guidelines require the district court to apply Chapter 3A, victim-related enhancements, after determining the offense guideline under Chapter 2. *United States v. Jackson*, 276 F.3d 1231, 1236 (11th Cir. 2001). In *Jackson*, we found impermissible double counting did not occur when a defendant received an enhancement under both § 2K2.1(b)(5) (possession or use of a firearm in relation to

12

a felony offense) and § 3A1.2(b). *Id.* at 1235-36. In finding no double counting occurred, we noted: (1) the guidelines do not prohibit enhancements under both § 2K2.1(b)(5) and § 3A1.2(b), and (2) Chapter 2 addresses the specific conduct of offenses, while Chapter 3A deals with the victim. *Id.* at 1236.

The district court did not impermissibly double count Cotney's possession of a firearm. Double counting is permissible if the two guideline sections involve separate sentencing concepts. *See Jackson*, 276 F.3d at 1236. The punishment for violation of § 924(c) is for the use or possession of a firearm during the commission of a crime. Section 3A1.2, on the other hand, bars the creation of a substantial risk of harm involving a police officer. *See* U.S.S.G. § 3A1.2. As the guidelines do not bar the application of § 3A1.2 together with § 2K2.4, we presume the two sections may be applied together. *See Matos-Rodriguez*, 188 F.3d at 1310. Our decision in *Jackson* is controlling. Although the opinion involves a Chapter 2 enhancement for possession of a firearm, we ruled an enhancement pursuant to § 3A1.2 did not implicate double counting because it addresses victim harm. *See Jackson*, 276 F.3d at 1236. The same reasoning applies here. Accordingly, we affirm Cotney's sentence.

AFFIRMED.

13

**RECEIVED**                                    [DO NOT PUBLISH]

2005 OCT 12  P 12: 47
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

No. 03-15473
Non-Argument Calendar

---

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 12, 2005
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-00078-CR-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID FRANKLIN COTNEY, JR.

Defendant-Appellant.

---

Appeal from the United States District Court for the
Middle District of Alabama

---

(September 12, 2005)

## ON REMAND FROM THE
## SUPREME COURT OF THE UNITED STATES

Before BLACK, CARNES and PRYOR, Circuit Judges.

PER CURIAM:

GOVERNMENT
EXHIBIT
7

This case is before the Court for consideration in light of *United States v. Booker*, 125 S. Ct. 738 (2005). We previously affirmed Cotney's sentence. *See United States v. Cotney*, Case No. 03-15473 (11th Cir. Sept. 15, 2004) (unpublished). The Supreme Court vacated our prior decision and remanded the case to us for further consideration in light of *Booker*.

In his initial brief on direct appeal, Cotney did not assert error based on *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000), or any other case extending or applying the *Apprendi* principle. However, Cotney sought permission to file a supplemental brief to present additional arguments concerning *Blakely v. Washington*, 124 S. Ct. 2531 (2004). We denied Cotney's motion.

In *United States v. Dockery*, 401 F.3d 1261, 1262–63 (11th Cir. 2005), after the Supreme Court's remand with instructions to reconsider our opinion in light of *Booker*, we relied on our earlier case of *United States v. Ardley*, 242 F.3d 989 (11th Cir.), *cert. denied*, 121 S. Ct. 2621 (2001), which observed:

> Nothing in the *Apprendi* opinion requires or suggests that we are obligated to consider an issue not raised in any of the briefs that appellant has filed with us. Nor is there anything in the Supreme Court's remand order, which is cast in the usual language, requiring that we treat the case as though the *Apprendi* issue had been timely raised in this Court. In the absence of any requirement to the contrary in either *Apprendi* or in the order remanding this case to us, we apply our well-established rule that issues and contentions not timely raised in the briefs are deemed abandoned.

2

*Ardley*, 242 F.3d at 990 (citations omitted). Thus, because Dockery had not asserted an *Apprendi* (or its progeny) challenge to his sentence, we reinstated our previous opinion. *Dockery*, 401 F.3d at 1263.

In *United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000), we denied Nealy's attempt to raise an *Apprendi*-based argument for the first time by filing a supplemental brief. We noted that "[p]arties must submit all issues on appeal in their initial briefs." *Nealy* held supplemental briefs will be authorized only when intervening decisions or new developments arise after the moving party's brief has been filed, and only when that new authority relates to an issue already properly raised in the party's initial brief. *Nealy* further held "parties cannot properly raise new issues at supplemental briefing, even if the [new] issues arise based on the intervening decisions or new developments cited in the supplemental authority." *Id.*

Because Cotney did not assert error based on *Apprendi* (or its progeny) in his initial brief on appeal, we reinstate our previous opinion in this case and affirm Cotney's sentence after our reconsideration in light of *Booker*, pursuant to the Supreme Court's mandate.

OPINION REINSTATED IN PART; AFFIRMED IN PART.

True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:_____
Deputy Clerk
Atlanta, Georgia

# United States Court of Appeals
## RECEIVED For the Eleventh Circuit

2005 OCT 12 ₽ 12: 47

DEBRA P. HACKETT,
U.S. DISTRICT COURT,
MIDDLE DISTRICT ALA

No. 03-15473

District Court Docket No.
03-00078-CR-E



FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Sep 12, 2005

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

versus

DAVID FRANKLIN COTNEY, JR.,

        Defendant-Appellant.

-------------------------------------------------

Appeal from the United States District Court
for the Middle District of Alabama

-------------------------------------------------

A True Copy - Attested
Clerk U.S. Court of Appeals
Eleventh Circuit

By:
Deputy Clerk
Atlanta, Georgia

## JUDGMENT

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

        Entered:    September 12, 2005
For the Court:    Thomas K. Kahn, Clerk
        By:    Harper, Toni



ISSUED AS MANDATE

OCT 1 1 2005

U.S. COURT OF APPEALS
ATLANTA, GA.

GOVERNMENT
EXHIBIT
8

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **DAVID FRANKLIN COTNEY, JR.,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **VS.** | ) **CASE NO. 3:07cv46-WHA-CSC** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

### AFFIDAVIT OF BRENTON LAWRENCE DEAN

STATE OF ALABAMA

LEE COUNTY

Before me, the undersigned authority, personally appeared Brenton Lawrence

Dean, who, first being duly sworn by me, deposes and states as follows:

My name is Brenton Lawrence Dean, and I have been a licensed attorney at law in

the State of Alabama since September 1998, and I am admitted to practice before the

United States District Court for the Middle District of Alabama.

I was retained defense counsel along with Will O. (Trip) Walton, III, for David

Franklin Cotney, Jr., in the case of United States of America v. David Franklin Cotney,

Jr., Case No. 3:03-CR-0078-A, which resulted in a guilty plea on the 28th day of May,

2003, and a sentencing hearing on the 15th day of October, 2003. I make this Affidavit

in compliance with the Court's Order of January 17, 2007, to address claims of

ineffective assistance of counsel presented by Mr. Cotney in his §2255 Motion. It has

now been more than three (3) years since the guilty plea and subsequent sentencing.

Since I was not appellate counsel for Mr. Cotney, I have not had the benefit of having a



GOVERNMENT
EXHIBIT
9

transcript of the guilty plea or sentencing hearing. Therefore, the following responses to

Mr. Cotney's allegations are based principally upon my recollection of the things that

occurred up to and during the guilty plea and subsequent sentencing. In some instances, I

have been able to refresh my recollection from notes, memoranda, correspondence,

pleadings and other documents and tangible items. My specific responses to Mr.

Cotney's allegations are as follows:

## ISSUE ONE

Counsel for the defendant met with both the AUSA assigned to the case and the

probation officer in an effort to get a downward departure for substantial assistance.

Counsel for the defendant further met with law enforcement agents assigned to the case

and Mr. Cotney for approximately five (5) hours while Mr. Cotney was questioned by

said law enforcement officials concerning assistance. Based upon said assistance, Cotney

was granted a three level reduction for substantial assistance. Counsel for defendant is

unaware of the custom referred to by Cotney concerning the BOP and a 25% to 50%

downward departure.

## ISSUE TWO

If the undersigned counsel understands Issue Two, it appears that Cotney would

have had his attorneys repeat the same questions as asked by Nelson's attorney during

cross examination of Ms. Kelly. Because the defendant's sentencing hearing was held at

the same time on the same offenses, the defense attorneys took turns questioning

witnesses for the government. Surely Mr. Cotney does not contend that his attorneys

should have asked Ms. Kelly the exact same questions as asked by the co-defendants'

attorneys. At any rate, it is clear that Attorney Lewis, as counsel for co-defendant

Nelson, asked the appropriate questions of Ms. Kelly during the sentencing hearing which was considered by the trial judge handling the sentencing of all defendants.

## ISSUE THREE

If the undersigned counsel understands Cotney's third issue, it appears that he is complaining that the sentencing Judge violated guidelines in his Sentencing Order which should have been addressed on appeal to the Eleventh Circuit. Because the case was appealed and due to the fact that the undersigned counsel took no part in the appeal, said counsel simply cannot address this issue other than to say that he recalls no surprise announcement by the trial court regarding punishing Cotney for pseudoephedrine rather than methamphetamine. Furthermore, at no time did Cotney advise the undersigned counsel that he wished to have a jury trial nor would undersigned counsel have recommended that Cotney undergo a jury trial based on the facts and circumstances as relayed by Mr. Cotney.

## ISSUE FOUR

Although there are several issues set forth in Issue Four, it would appear that the undersigned counsel has been accused of failing to introduce photographs in his possession to prove that the officers were lying regarding whether or not they were in uniform or plain clothes at the time Cotney was arrested. If memory serves counsel, one or more of the arresting officers were questioned regarding whether or not they were wearing a uniform or plain clothes at the time of their encounter with Cotney. Upon further examination, one or more of the officers testified that the photographs taken at the scene depicting them in plain clothes were taken the following day during their follow up investigation and cleanup of the scene. Of course, counsel would defer to the sentencing

hearing transcript regarding exactly what was asked and said. Furthermore, counsel for Cotney made an issue regarding whether or not law enforcement properly identified themselves as "law enforcement" as they approached and/or chased Cotney.

## ISSUE FIVE

The undersigned counsel does not recall Agent DeJohn's specific testimony regarding Cotney being the ring leader in financing the meth lab, but does recall being told by the investigating probation officer (Jo Ann Sellers) that co-defendants Nelson and Weldon informed her during her interview that Cotney was the ring leader who financed and supervised everything. If memory serves counsel, Sellers testified to said statements at the sentencing hearing but counsel would defer to said transcript of the hearing. At any rate, the undersigned counsel has no specific recollection of Agent DeJohn's specific testimony as stated by Cotney.

## ISSUE SIX

Counsel for the defendant has no independent recollection of negotiations of the plea bargain, but according to his file, it appears that Cotney refused to plea with the ten (10) year minimum mandatory language contained in the plea agreement regarding the discharging of a weapon. Based upon his refusal, the AUSA agreed to remove the "discharge" language from the plea regarding the discharge of the weapon by Cotney. However, counsel for the defendant explained to Cotney that he would be looking at a ten (10) year minimum mandatory at sentencing although we had arguments to the contrary. Obviously, arguments in that regard were not well taken by the Trial Court.

On May 27, 2003, the entire plea agreement was read to the defendant, paragraph by paragraph, while his father listened on the phone. Based upon the facts and

circumstances surrounding the case and the discharging of the shotgun by Cotney,

counsel does not understand why Cotney believes the AUSA should not have been

allowed to argue discharge as a basis for enhancement at the sentencing hearing.

Furthermore, there was no agreement between the Government and defense counsel that

the AUSA could not argue for an enhancement due to Cotney's discharging of his

firearm.

Respectfully submitted this the 27 day of __January__, 2007.

BRENTON LAWRENCE DEAN (DEA025)

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 29TH DAY OF
__January__, 2007.

NOTARY PUBLIC

OF COUNSEL:

BRENT L. DEAN, LLC
THE LAW CENTER
9 LaFAYETTE STREET NORTH
LaFAYETTE, ALABAMA 36863
Telephone: 334-864-5293
Facsimile: 334-864-5300

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following by
depositing the same, postage prepaid, United States Mail, at their proper mailing
addresses:

Hon. Todd Brown
Assistant United States Attorney
Court Square, Suite 201
Montgomery, Alabama 36104

Mr. David Franklin Cotney, Jr.
11196-002
U. S. Penitentiary - Big Sandy
P. O. Box 2068
Inez, KY 41224

This the 29 day of January , 2007.

BRENTON LAWRENCE DEAN

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| DAVID FRANKLIN COTNEY, JR., | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
| VS. | ) CASE NO. 3:07cv46-WHA-CSC |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Respondent. | ) |

### <u>AFFIDAVIT OF WILL O. WALTON, III</u>

STATE OF ALABAMA

LEE COUNTY

Before me, the undersigned authority, personally appeared WILL O. WALTON,

III, who, first being duly sworn by me, deposes and states as follows:

My name is Will O. Walton, III, and I have been a licensed attorney at law in the

State of Alabama since 1984. I am admitted to practice before the United States District

Court for the Middle District of Alabama, the Eleventh Circuit Court of Appeals for the

United States, and the United States Supreme Court.

I was retained defense counsel along with Brenton L. Dean for David Franklin

Cotney, Jr., in the case of United States of America v. David Franklin Cotney, Jr., Case

No. 3:03-CR-0078-A, which resulted in a guilty plea on the 28th day of May, 2003, and a

sentencing hearing on the 15th day of October, 2003. I make this Affidavit in

compliance with the Court's Order of January 17, 2007, to address claims of ineffective

assistance of counsel presented by Mr. Cotney in his §2255 Motion. It has now been

more than three (3) years since the guilty plea and subsequent sentencing. Since I was

**GOVERNMENT
EXHIBIT**
10

not appellate counsel for Mr. Cotney, I have not had the benefit of having a transcript of the guilty plea or sentencing hearing. Therefore, the following responses to Mr. Cotney's allegations are based principally upon my recollection of the things that occurred up to and during the guilty plea and subsequent sentencing. In some instances, I have been able to refresh my recollection from notes, memoranda, correspondence, pleadings and other documents and tangible items. My specific responses to Mr. Cotney's allegations are as follows:

### ISSUE ONE

Counsel for the defendant met with both the AUSA assigned to the case and the probation officer in an effort to get a downward departure for substantial assistance. Attorney Dean further met with law enforcement agents assigned to the case and Mr. Cotney for approximately five (5) hours while Mr. Cotney was questioned by said law enforcement officials concerning assistance. Based upon said assistance, Cotney was granted a three level reduction for substantial assistance. Counsel for defendant is unaware of the custom referred to by Cotney concerning the BOP and a 25% to 50% downward departure.

### ISSUE TWO

If the undersigned counsel understands Issue Two, it appears that Cotney would have had his attorneys repeat the same questions as asked by Nelson's attorney during cross examination of Ms. Kelly. Because the defendant's sentencing hearing was held at the same time on the same offenses, the defense attorneys took turns questioning witnesses for the government. Surely Mr. Cotney does not contend that his attorneys should have asked Ms. Kelly the exact same questions as asked by the co-defendants'

attorneys. At any rate, it is clear that Attorney Lewis, as counsel for co-defendant Nelson, asked the appropriate questions of Ms. Kelly during the sentencing hearing which was considered by the trial judge handling the sentencing of all defendants.

## ISSUE THREE

If the undersigned counsel understands Cotney's third issue, it appears that he is complaining that the sentencing Judge violated guidelines in his Sentencing Order which should have been addressed on appeal to the Eleventh Circuit. Because the case was appealed and due to the fact that the undersigned counsel took no part in the appeal, said counsel simply cannot address this issue other than to say that he recalls no surprise announcement by the trial court regarding punishing Cotney for pseudoephedrine rather than methamphetamine. Furthermore, at no time did Cotney advise the undersigned counsel that he wished to have a jury trial nor would undersigned counsel have recommended that Cotney undergo a jury trial based on the facts and circumstances as relayed by Mr. Cotney.

## ISSUE FOUR

Although there are several issues set forth in Issue Four, it would appear that the undersigned counsel has been accused of failing to introduce photographs in his possession to prove that the officers were lying regarding whether or not they were in uniform or plain clothes at the time Cotney was arrested. If memory serves counsel, one or more of the arresting officers were questioned regarding whether or not they were wearing a uniform or plain clothes at the time of their encounter with Cotney. Upon further examination, one or more of the officers testified that the photographs taken at the scene depicting them in plain clothes were taken the following day during their follow up

investigation and cleanup of the scene. Of course, counsel would defer to the sentencing

hearing transcript regarding exactly what was asked and said. Furthermore, counsel for

Cotney made an issue regarding whether or not law enforcement properly identified

themselves as "law enforcement" as they approached and/or chased Cotney.

## ISSUE FIVE

The undersigned counsel does not recall Agent DeJohn's specific testimony

regarding Cotney being the ring leader in financing the meth lab, but does recall being

told by the investigating probation officer (Jo Ann Sellers) that co-defendants Nelson and

Weldon informed her during her interview that Cotney was the ring leader who financed

and supervised everything. If memory serves counsel, Sellers testified to said statements

at the sentencing hearing but counsel would defer to said transcript of the hearing. At

any rate, the undersigned counsel has no specific recollection of Agent DeJohn's specific

testimony as stated by Cotney.

## ISSUE SIX

Counsel for the defendant has no independent recollection of negotiations of the

plea bargain, but according to his file, it appears that Cotney refused to plea with the ten

(10) year minimum mandatory language contained in the plea agreement regarding the

discharging of a weapon. Based upon his refusal, the AUSA agreed to remove the

"discharge" language from the plea regarding the discharge of the weapon by Cotney.

However, counsel for the defendant explained to Cotney that he would be looking at a ten

(10) year minimum mandatory at sentencing although we had arguments to the contrary.

Obviously, arguments in that regard were not well taken by the Trial Court.

On May 27, 2003, the entire plea agreement was read to the defendant, paragraph by paragraph, while his father listened on the phone. Based upon the facts and circumstances surrounding the case and the discharging of the shotgun by Cotney, counsel does not understand why Cotney believes the AUSA should not have been allowed to argue discharge as a basis for enhancement at the sentencing hearing. Furthermore, there was no agreement between the Government and defense counsel that the AUSA could not argue for an enhancement due to Cotney's discharging of his firearm.

Respectfully submitted this the _29th_ day of _January_, 2007.

WILL O. WALTON, III (WAL046)

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _29th_ DAY OF
_January_, 2007.

NOTARY PUBLIC

OF COUNSEL:

WALTON LAW FIRM, P.C.
2515 EAST GLENN AVENUE
SUITE 304
AUBURN, AL 36830
Telephone: 334-321-3000
Facsimile: 334-321-3007

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following by depositing the same, postage prepaid, United States Mail, at their proper mailing addresses:

Hon. Todd Brown
Assistant United States Attorney
Court Square, Suite 201
Montgomery, Alabama 36104

Mr. David Franklin Cotney, Jr.
11196-002
U. S. Penitentiary - Big Sandy
P. O. Box 2068
Inez, KY 41224

This the 29ᵗʰ day of  January  , 2007

WILL O. WALTON, III