IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID FRANKLIN COTNEY, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No.3:07cv46-WHA |
| | ) | (WO) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

David Franklin Cotney, Jr. ("Cotney") asks the court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  After due consideration of Cotney's § 2255 motion, the supporting and opposing submissions, and the record in this case, the court concludes that an evidentiary hearing is not required and that, pursuant to Rule 8(a), *Rules Governing Section 2255 Proceedings in the United States District Courts*, the motion should be denied.

**I.   PROCEDURAL HISTORY**

In this court on May 28, 2003, pursuant to a plea agreement, Cotney pled guilty to conspiracy to manufacture 50 grams or more of methamphetamine, in violation of 18 U.S.C. §§ 841(a)(1) and 846, and the use and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).  On October 15, 2003, the court sentenced Cotney to a total of 342 months' imprisonment, comprising a term of 222 months on the conspiracy count and a consecutive term of 120 months for the gun count.  Cotney

appealed to the Eleventh Circuit Court of Appeals, and on September 15, 2004, that court affirmed his convictions and sentence.  *See United States v. Cotney*, 120 Fed.Appx. 785 (11th Cir. 2004) (unpublished).  The Supreme Court subsequently remanded the case to the court of appeals for further consideration of Cotney's sentence in light of *United States v. Booker*, 543 U.S. 220 (2005).  *Cotney v. United States*, 544 U.S. 1013 (2005).  On September 12, 2005, the Eleventh Circuit reaffirmed Cotney's sentence.  *United States v. Cotney*, 143 Fed.Appx. 290 (11th Cir. 2005) (unpublished).   On January 9, 2006, the Supreme Court denied Cotney's petition for writ of certiorari.  *Cotney v. United States*, 546 U.S. 1130 (2006).

On January 9, 2007,[1] Cotney filed this § 2255 motion, in which he asserts that his counsel was ineffective for the following reasons:

1.      Counsel allowed the prosecutor and court to depart downwardly only three levels for his substantial assistance to the government, when federal courts customarily grant downward departures of from 25-50 percent of the entire sentence.

2.      Counsel failed to object to the amount of methamphetamine attributed to him, resulting in imposition of a sentence higher than what was justified by the evidence.

3.      Counsel failed to object to the district court's calculation of his base offense level under the Sentencing Guidelines.

4.      Counsel failed to introduce exculpatory photographic evidence at sentencing that would have obviated application of an

---

[1]*See* Doc. No. 1.  Although Cotneys's § 2255 motion was date-stamped "received" in this court on January 16, 2007, under the "mailbox rule," the court deems it filed on the date Cotney delivered it to prison authorities for mailing, October 12, 2006.  *See Houston v. Lack*, 487 U.S. 266, 271-72 (1988); *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001).

enhancement for obstruction of justice.

5.      Counsel failed to effectively challenge hearsay statements adduced at sentencing and forming the basis of an aggravating-role enhancement.

6.      Counsel failed to object to the government's breach of the terms of the plea agreement.

The government answers that Cotney's claims are meritless and therefore afford him no basis for relief. (Doc. No. 6.) Cotney was allowed an opportunity to respond to the government's answer and has done so. (Doc. No. 8.) The court will address the issues.

## II.  DISCUSSION

### A.   *Ineffective Assistance of Counsel*

A claim of ineffective assistance of counsel is governed by the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). *Grossman v. McDonough*, 466 F.3d 1325, 1344 (11th Cir. 2006). Under *Strickland*'s two-part test, a petitioner must demonstrate (1) that "counsel's representation fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (internal quotation marks omitted); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). A "reasonable probability is one "sufficient to undermine confidence in the outcome." *Strickland*., 466 U.S. at 694.

Scrutiny of counsel's performance is "highly deferential," and the court indulges a "strong presumption" that counsel's performance was reasonable. *Chandler*, 218 F.3d at

1314 (internal quotation marks omitted).  The court will "avoid second-guessing counsel's performance:  It does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance."  *Id.* (internal quotation marks and brackets omitted).  Thus, "[g]iven the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one."  *Id.*

Unless a petitioner satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied.  *Strickland*, 466 U.S. at 687.  Accordingly, once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been.  *Id.* at 697; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998) ("if a defendant cannot satisfy the prejudice prong, the court need not address the performance prong").

**B.      *The Ineffective Assistance Claims***

     **1.      Failure to Argue for "Customary" Downward Departure**

Cotney maintains that his counsel was ineffective for failing to argue at sentencing that it is customary for federal courts to award defendants reductions of from 25-50 percent in their sentences when granting motions for downward departure based on substantial assistance under U.S.S.G. § 5K1.1.  *See § 2255 Motion* (Doc. No. 1) at 5-5a.  According to Cotney, his counsel's failure to present this argument to the court resulted in his receiving only a three-level downward departure for assisting the government.  *Id.*

Cotney's claim in this regard is completely unsupported. Not only does he fail to present any evidence that courts customarily award sentence reductions of 25-50 percent when granting downward departures under U.S.S.G. § 5K1.1, but he fails also to point to any facts indicating that he was entitled to a downward departure greater than the three-level reduction recommended by the prosecution and granted by the court in his case. In an apparent effort to suggest he did not receive the reduction to which he was entitled, Cotney asserts that "[t]he court awarded Cotney's co-defendants a very substantial reduction in sentence for the same cooperation and participation." *See § 2255 Motion* (Doc. No. 1) at 5a. While Cotney presents no facts in support of this claim, a review of the transcript of the October 15, 2003, hearing at which Cotney and two of his codefendants were sentenced reveals that those two codefendants – Allen Lee Nelson and Jonathan Boyd Weldon – were awarded the same three-level reduction for substantial assistance under U.S.S.G. § 5K1.1 that the court awarded Cotney. *See Sentence Hearing* at 190-92 & 196-97. Cotney's claim is baseless.

Because Cotney fails to show that his counsel's performance in this regard was deficient and that such performance prejudiced his case, *see Strickland*, 466 U.S. at 687-89, he is not entitled to any relief based on this claim of ineffective assistance of counsel.

### 2.    Failure to Object to Attributed Drug Amount

Cotney contends that his counsel rendered ineffective assistance by failing to object to the amount of methamphetamine attributed to him, resulting, he says, in the district court's

imposition of a sentence significantly higher than what was justified by the evidence. *See § 2255 Motion* (Doc. No. 1) at 5b-5d.

At the sentence hearing, the government presented evidence that laboratory analysis of substances seized from a meth lab operated by Cotney revealed that these substances contained a total of 229.70 grams of pseudoephedrine hydrochloride, a precursor chemical used in the manufacture of methamphetamine. *See Sentence Hearing* at 44-49. Melissa Marie Kelly, a chemist for the Alabama Department of Forensic Sciences, testified that based on an estimated yield of between 50% to 75%, which she said was the typical yield of methamphetamine from pseudoephedrine hydrochloride, the pseudoephedrine hydrochloride seized from Cotney's lab would be expected to produce approximately 155.61 grams of methamphetamine. *Sentence Hearing* at 50-55.

The Eleventh Circuit has held that the district court may calculate potential methamphetamine yield based upon seized precursor chemicals. *United States v. Carroll*, 6 F.3d 735, 742-43 (11th Cir. 1993); *see also United States v. Smith*, 240 F.3d 927, 930-31 (11th Cir. 2001) (courts may estimate quantity of methamphetamine based on quantity of precursors). In the instant case, the theoretical yield of 155.61 grams of methamphetamine easily met the threshold amount of 50 grams or more of methamphetamine set forth at 21 U.S.C. § 841(b)(1)(A)(viii), the statute that determined the sentencing range for Cotney's drug conviction.[2]

_____

[2]If "50 grams or more of methamphetamine ... or 500 grams or more of a mixture or substance
(continued...)

Cotney maintains that his counsel was ineffective for failing to argue that he should instead have been sentenced under § 841(b)(1)(B)(viii), which provides for a sentence of from 5 to 40 years where "5 grams or more of methamphetamine ... or 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine" is involved. *See* 21 U.S.C. § 841(b)(1)(B)(viii). Cotney's argument in this regard is apparently based on his erroneous assumption that because the pseudoephedrine hydrochloride was part of a *mixture* when it was seized, the threshold amount for sentencing him under § 841(b)(1)(A)(viii) was 500 grams or more of methamphetamine mixture. *See* 21 U.S.C. 841(b)(1)(A)(viii). However, the theoretical-yield analysis allows the court to "separate" a precursor chemical from any mixture in which it may be found and to then calculate the potential yield of methamphetamine itself, again separated from any mixture in which it could theoretically be found. *See Smith*, 240 F.3d at 930-31; *Carroll*, 6 F.3d at 742-43. In this case, the theoretical yield – approximately 155.61 grams – represented a quantity of methamphetamine itself, and did *not* represent "a mixture or substance containing a detectable amount of methamphetamine." This amount met the threshold amount set forth in § 841(b)(1)(A)(viii). Furthermore, and perhaps more importantly for resolution of this issue, when pleading guilty, Cotney expressly admitted that it was his intent to manufacture the threshold amount of at least 50 grams of methamphetamine. *See Change of Plea Hearing*

---

[2](...continued)

containing a detectable amount of methamphetamine" is involved, § 841(b)(1)(A)(viii) provides for a sentence of from 10 years to life. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

at 11.  In any event, the sentence actually imposed by the court under § 841(b)(1)(A)(viii)
was within the statutory range in which Cotney maintains he was entitled to be sentenced
under § 841(b)(1)(B)(viii).

For these reasons, there would have been no merit to any objection by counsel that
Cotney's sentence should have been determined pursuant to § 841(b)(1)(B)(viii) based on
50 grams or more of a mixture or substance containing methamphetamine.  Accordingly,
Cotney fails to demonstrate deficient performance in this regard by counsel or any resulting
prejudice.  *See Strickland*, 466 U.S. at 687-89.  This allegation of ineffective assistance of
counsel lacks merit.

### 3.    Failure to Object to Calculation of Base Offense Level

In a claim related to his previous claim, Cotney argues that his counsel was ineffective
for failing to join with counsel for his codefendants in objecting to the district court's
calculation of his base offense level under the Sentencing Guidelines.  *See § 2255 Motion*
(Doc. No. 1) at 5e; *see also* 5b-5c.

At sentencing, the government argued that the base offense level for Cotney and his
codefendants for their manufacture of methamphetamine should be set at 34 pursuant to
U.S.S.G. § 2D1.1,[3] based on the evidence indicating that, under a theoretical-yield analysis,
the seized pseudoephedrine hydrochloride would be expected to produce approximately

---

[3]Section 2D1.1 of the Sentencing Guidelines addresses the "Unlawful Manufacturing, Importing,
Exporting, Trafficking, or Possession; Continuing Criminal Enterprise" by assigning a base offense level
through the application of predetermined ranges to drug weights.  At the time of Cotney's sentencing, the
Sentencing Guidelines were mandatory.

155.61 grams of methamphetamine. *See* Drug Quantity Table, U.S.S.G. § 2D1.1(c)(3) (providing for a base offense level of 34 for an offense involving "at least 150 G but less than 500 G of Methamphetamine (actual)"). Counsel for codefendants Nelson and Weldon objected to the government's position, arguing that since the methamphetamine that could be derived from the precursor chemicals was theoretical and had not actually been produced, the 155.61 grams of methamphetamine was not "actual" methamphetamine for purposes of the Guidelines and so the base offense level for the methamphetamine at issue should be controlled by § 2D1.1(c)(7) of the Drug Quantity Table, which sets forth a base offense level of 26 for an offense involving "[a]t least 50 G but less than 200 G of Methamphetamine." *See Sentence Hearing* at 155-66. The district court overruled the objections by counsel for Nelson and Weldon and declined to use 26 as the base offense level for any of the defendants, including Cotney. *Id*. at 172-74 & 180. However, the court also declined to accept the government's recommendation that the base offense level for Cotney and his codefendants be set at 34 as provided by U.S.S.G. § 2D1.1(c)(3). Instead, the court found that, under the facts of the case, the most simple and direct method of calculating the base offense level for the methamphetamine offense was to use the Drug Quantity Table for precursor chemicals set forth at U.S.S.G. § 2D1.11.[4] *See Sentence Hearing* at 173-74. Thus,

---

[4]The district court found authority for this method of calculating the base offense level in Judge Carnes's concurring opinion in *United States v. Blaylock*, 275 F.3d 1030 (11th Cir. 2001). Under the Sentencing Guidelines, where "there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, comment. (n.12). In resolving sentencing factors, the court may consider any information with sufficient indicia of reliability to support its probable accuracy. *See* U.S.S.G. § 6A1.3(a).

based on the evidence of 229.70 grams of seized pseudoephedrine hydrochloride, the district court set the base offense level for Cotney and each of his codefendants at 32.  *See Sentence Hearing* at 173-74; *see also* Drug Quantity Table, U.S.S.G. § 2D1.11(d)(4) (providing for a base offense level of 32 for an offense involving "[a]t least 100 G but less than 300 G of Pseudoephedrine").

It is clear from this record that, had Cotney's counsel joined with the counsel for his codefendants in objecting to the district court's calculation of the base offense level for the methamphetamine offense, Cotney's counsel would have been similarly unsuccessful.  First, the district court specifically rejected the argument that the base offense level should be controlled by U.S.S.G. § 2D1.1(c)(7), which would have provided for a base offense level of 26.  Any such argument by Cotney's counsel would likewise have been rejected by the court.  Next, had the district court elected to determine the base offense level under U.S.S.G. § 2D1.1 using the theoretical-yield method, as was urged by the government, it could properly have done so using U.S.S.G. § 2D1.1(c)(3) ("at least 150 G but less than 500 G of Methamphetamine (actual)"), which would have put Cotney's base offense level at 34.  In the Sentencing Guidelines, the term "methamphetamine (actual)" refers to the weight of the controlled substance, methamphetamine, itself.  *See* U.S.S.G. § 2D1.1 (n. B).  The term methamphetamine with no qualifier refers to a mixture of methamphetamine and other substances.  *See* U.S.S.G. § 2D1.1 (n. A).  These definitions were overlooked by counsel for Nelson and Weldon in their arguments at sentencing, and are overlooked by Cotney in his

instant argument.  Although the expected yield of methamphetamine from the precursor chemicals was indeed "theoretical" and the methamphetamine did not in fact exist, the approximation of 155.61 grams of methamphetamine was not of a mixture or substance containing methamphetamine, but rather of methamphetamine itself.  That is, when the chemist, Kelly, testified regarding the theoretical yield from the pseudoephedrine hydrochloride, she was not hypothesizing a quantity of a mixture or substance containing methamphetamine, but rather a quantity of actual methamphetamine itself.[5]

---

[5]Although in response to questioning by counsel for one of Cotney's codefendants, Kelly stated that the expected methamphetamine yield was not actual methamphetamine, it is clear from the context of the questions and answers that Kelly's statements in this regard refer to the question of whether the methamphetamine itself in fact existed and not to the question of whether the methamphetamine was contained within a mixture or other substance:

Q:  You write in your report that this would have theoretically yielded 77.95, 35.65, and 42.01 grams of methamphetamine, correct?

A:  Correct.

Q:  You did not use the phrase "actual methamphetamine."

A:  Correct.

Q:  Okay.  Is there a difference from methamphetamine and actual methamphetamine in the world of DFS [Department of Forensic Sciences]?

A:  Actual methamphetamine would be if we had a sample of methamphetamine that we had to quantitate.  Theoretically, we had no methamphetamine, so we're working with the starting material.

Q:  Okay.  So basically, this was potential methamphetamine.

A:  Yes, sir.

Q:   All right.   We might call it executory methamphetamine, a platonic, ideal methamphetamine.  It was not actual meth.

(continued...)

11

From all the above, three things are apparent: (1) Cotney's counsel would not have prevailed if he had raised the argument propounded by counsel for his codefendants and rejected by the district court; (2) if the district court had chosen to sentence Cotney under the provisions of U.S.S.G. § 2D1.1 instead of U.S.S.G. § 2D1.11, the resulting base offense level would have been 34, as set forth in § 2D1.1(c)(3), and not 26, as provided in § 2D1.1(c)(7); and (3) the district court's decision to calculate Cotney's sentence using the precursor chemical table in § 2D1.11 resulted in a lower base offense level, 32, than Cotney otherwise would have received had his base offense level been determined by reference to U.S.S.G. § 2D1.1.  Consequently, this court concludes that Cotney has failed to demonstrate deficient performance by counsel or any resulting prejudice.  *See Strickland*, 466 U.S. at 687-89. Therefore, he is not entitled to any relief based on this claim of ineffective assistance of counsel.

### 4.   Failure to Introduce Exculpatory Evidence Regarding Alleged Obstruction of Justice

Cotney argues that his counsel rendered ineffective assistance by failing to introduce

---

[5](...continued)
A:  No.  It was not actual meth.

*Sentence Hearing* at 51-52.

The meaning of "actual methamphetamine" discussed in the above-quoted exchange is clearly not the meaning assigned to "actual methamphetamine" as it is used in the Sentencing Guidelines, where actual methamphetamine refers to the amount of methamphetamine itself, as distinguished from a mixture of methamphetamine and other substances.  *See* U.S.S.G. § 2D1.1 (n. A & n. B).  Indeed, it would seem to defy common sense that Kelly, when using the theoretical-yield method to calculate the expected yield from the precursor chemicals, would posit quantities of methamphetamine within a theoretical mixture instead of simply calculating the amount of methamphetamine itself that could be produced.

exculpatory photographs at his sentence hearing.  *See § 2255 Motion* (Doc. No. 1) at 6a-6b.

When police officers raided Cotney's meth lab, Cotney ran into the woods surrounding the lab.  The officers followed, and one of the officers released his canine partner to assist in the pursuit.  Cotney shot and killed the police dog.  Cotney then pointed his weapon – a sawed-off shotgun – in the direction of one of the officers before other officers were able to apprehend him.

During his presentence interview with the probation officer with respect to preparation of the presentence investigation report ("PSI"), Cotney denied knowing that the individuals who raided his meth lab and pursued him into the woods were police officers, and he claimed that at least one arresting officer was not wearing a uniform.  Cotney testified at the sentence hearing, where he continued to insist that he had not known these individuals were police officers.  The government presented testimony from several of the officers, who maintained that their attire had clearly indicated they were police and that they had also verbally identified themselves to Cotney as police multiple times before he fled.  The district court credited the officers' version of events and accepted the PSI's recommendation that a two-level enhancement for obstruction of justice be applied to Cotney pursuant to U.S.S.G. § 3C1.1, comment. (n. 4(h)), because he had provided materially false information to the probation officer.[6]  *See PSI* at 9 ¶ 32; *Sentence Hearing* at 176-77.

---

[6]Cotney's misstatements to the probation officer were material, because his knowledge of whether it was police who were raiding the meth lab was relevant with regard to an enhancement under U.S.S.G. § 3A1.2(b)(1), which concerned whether he had reasonable cause to know that the individual at whom he
(continued...)

Cotney contends that, at the time of the sentence hearing, his counsel had possession of photographs showing the officers at the arrest scene dressed in civilian clothes. According to Cotney, his counsel should have offered these photographs into evidence at sentencing in order to demonstrate that the officers committed perjury by testifying that they were wearing attire identifying them as police when they raided the meth lab. Cotney maintains that had these photographs been introduced by counsel, they would have demonstrated the truth of his version of events, and the district court would not have imposed the obstruction-of-justice enhancement for providing false information to the probation officer.

With his § 2255 motion, Cotney submitted four photographs purportedly depicting three of the police officers who raided the meth lab wearing civilian clothes at the arrest scene. Assuming, without knowing, that these photographs indeed depict three of the participating police officers at the arrest scene, the photographs prove very little. At the sentence hearing, several of the officers who participated in the raid testified that they were wearing tactical police vests with the word "Police" in large letters on the front and back *over* their civilian clothing at the time of the raid.[7] The photographs now presented by Cotney, of officers near the arrest scene at some undetermined time after the raid and after Cotney's arrest, no longer wearing the tactical police vests, do not demonstrate that the vests were not

---

(...continued)
pointed his gun was a police officer.

[7]At the sentence hearing, one of the officers identified Government Exhibit # 5 as the tactical vest he wore during the raid. *Sentence Hearing* at 66-67.

worn by the officers at the time of the raid and wholly fail to prove that the officers committed perjury when testifying that their attire had indicated they were police and that they had verbally identified themselves to Cotney as police multiple times. Consequently, this court concludes that Cotney has failed to demonstrate deficient performance by counsel in this regard or any resulting prejudice. *See Strickland*, 466 U.S. at 687-89. He is not entitled to any relief based on this claim of ineffective assistance of counsel.

### 5. Failure to Challenge Hearsay Statements Supporting Aggravating-role Enhancement

Cotney contends that his counsel was ineffective for failing to challenge hearsay statements adduced at sentencing and forming the basis of an aggravating-role enhancement imposed by the district court. *See § 2255 Motion* (Doc. No. 1) at 6c.

At the sentence hearing, Drug Enforcement Agent Raymond DeJohn testified that one of Cotney's codefendants, Allen Lee Nelson, had avowed that Cotney organized the meth lab and was to receive the majority of the methamphetamine to sell. *Sentence Hearing* at 20-21. Also testifying on this point was Clay Stewart, an investigator with the Chambers County Sheriff's Department. Stewart testified that, based on Cotney's own proffer, he believed Cotney had organized the operation and acquired the necessary supplies. *Id*. at 82-87. The district court found Nelson's statements to be credible and, over an objection by Cotney's counsel, imposed a two-level role enhancement against Cotney under U.S.S.G. § 3B1.1(c). *See Sentence Hearing* at 179.

Cotney challenged this enhancement on appeal, arguing that there was insufficient

15

evidence to support the enhancement because the district court improperly relied on Nelson's hearsay statements. After noting that hearsay is generally admissible at sentencing, provided that such statements have sufficient indicia of reliability, the Eleventh Circuit found that Nelson's hearsay statements were properly admitted because (1) Investigator Stewart's testimony supported the reliability of Nelson's statements, (2) the court found the statements credible, and (3) the defense had an opportunity to rebut the testimony.[8] *See United States v. Cotney*, 120 Fed.Appx. 785 at *9-10 (11th Cir. 2004) (unpublished) (citing *United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998). Accordingly, the court held there was sufficient evidence to support the aggravating-role enhancement. *Id.*

Cotney does not suggest how his counsel could have prevented the hearsay statements from being introduced and used against him at sentencing. Nor has he proffered any evidence that could have been introduced to successfully rebut the hearsay testimony. Under the circumstances, this court concludes that Cotney has failed to demonstrate that his counsel rendered ineffective assistance. Therefore, is not entitled to § 2255 relief based on this claim.

### 6.    Failure to Object to Breach of Plea Agreement

Cotney contends that his counsel rendered ineffective assistance by failing to object to the government's breach of the terms of the plea agreement. *See § 2255 Motion* (Doc. No. 1) at 6c-6d. According to Cotney, the government agreed not to argue that Cotney's

---

[8]U.S.S.G. § 6A1.3 provides that the sentencing court may rely on "relevant hearsay without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."

16

discharge of the firearm he possessed warranted a 10-year sentence pursuant to 18 U.S.C. § 924(c)(1)(A)(iii).[9]  *Id.*  He maintains that the government reneged on this term of the agreement at sentencing and that his counsel's failure to object to the government's alleged breach resulted in his receiving a sentence five years in excess of what was agreed upon.  *Id.*

For purposes of § 924(c)(1)(A)(iii), whether a defendant discharged a firearm is a sentencing factor, not requiring proof at trial or that it be set forth in the indictment.  *See Harris v. United States*, 536 U.S. 545, 556 (2002); *United States v. Dean*, 517 F.3d 1224, 1229-30 (11th Cir. 2008).  Notwithstanding Cotney's claim, the plea agreement did not contain any provision in which the government agreed not to argue that Cotney's discharge of the firearm warranted a 10-year sentence under § 924(c)(1)(A)(iii).  *See Plea Agreement* at 3.  Nor did the plea agreement contain a provision whereby the government agreed to make any specific sentencing recommendation.[10]  *Id.*  During the guilty plea colloquy in this case, Cotney expressly affirmed to the magistrate judge that he had read the plea agreement, reviewed it with his counsel before signing it, and understood its terms.  *See Change of Plea Hearing* at 4-5.  Cotney also affirmed to the court that, other than the plea agreement, no one had made any promises to him to get him to plead guilty.  *Id.* at 5.  In addition, Cotney stated

---

[9]Generally, a violation of 18 U.S.C. § 924(c)(1)(A) carries a mandatory minimum sentence of 5 years. However, § 924(c)(1)(A)(iii)  provides, in pertinent part, that a person who, in relation to a drug trafficking crime uses or carries a firearm "shall, in addition to the punishment for such crime ... if the firearm is discharged, be sentenced to not less than 10 years."

[10]The plea agreement contained a provision whereby the government reserved the right to inform the court and the probation office of "all facts pertinent to the sentencing process, including all relevant information concerning the offenses and the defendant's background."  *Plea Agreement* at 3.

that he understood that until the probation office completed a presentence report, his exact sentence could not be determined and that any sentence that might be imposed could be different from any estimate his counsel had given him.  *Id.* at 7.

There is no support in the record for Cotney's assertion that the government breached the plea agreement in his case.  Consequently, Cotney has failed to show that his counsel's performance in this regard was deficient and that such performance prejudiced his case.  As such, he is not entitled to any relief based on this claim of ineffective assistance of counsel.

## III.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the 28 U.S.C. § 2255 motion filed by Cotney be denied, as the claims therein entitle him to no relief.

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before **December 4, 2008.**   A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of*

*Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done this 21st day of November, 2008.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

19